**Nos. 14-55120, 14-55121, 14-55122, 14-55125, 14-55128, & 14-55140**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND,
*Plaintiff-Appellee*,

and

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC.; CWALT, INC., a Delaware corporation; CWMBS, INC., a Delaware corporation; CWABS, INC., a Delaware corporation; CWHEQ, INC., a Delaware corporation; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; BANK OF AMERICA CORPORATION; NB HOLDINGS CORPORATION; J.P. MORGAN SECURITIES INC.; DEUTSCHE BANK SECURITIES INC.; BEAR STEARNS & CO., LP; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN SACHS & CO.; CREDIT SUISSE SECURITIES (USA), LLC; GREENWICH CAPITAL MARKETS, INC., AKA RBS GREENWICH CAPITAL; BARCLAYS CAPITAL INC.; HSBC SECURITIES (USA); BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH PIERCE FENNER & SMITH INCORPORATED; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR,
*Defendants-Appellees*,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First Pacific Bank of California, as Receiver for Affinity Bank, as Receiver for CF Bancorp, as Receiver for Citizens National Bank, as Receiver for Eurobank, as Receiver for First Banking Center, as Receiver for First Dupage Bank, as Receiver for Horizon Bank, as Receiver for Imperial Capital Bank, as Receiver for Independent Bankers Bank, as Receiver for Los Padres Bank, as Receiver for Palos Bank & Trust Co., as Receiver for Prosperan Bank, as Receiver for SCB Bank, as Receiver for ShoreBank, as Receiver for Statewide Bank, as Receiver for USA Bank, as Receiver for Venture Bank, and as Receiver for Warren Bank,
*Objector-Appellant*.

————————

On Appeal from the United States District Court for the Central District of California
The Honorable Mariana R. Pfaelzer, Nos. 10-302, 12-5122, 12-5125

————————

**BRIEF FOR OBJECTORS-APPELLANTS BRODERICK CDO 2 LTD., CIMARRON CDO, LTD., CRYSTAL COVE CDO, LTD., DUKE FUNDING IX, LTD., G SQUARE FINANCE 2006-1 LTD., HOUT BAY 2006-1 LTD., KLEROS PREFERRED FUNDING, LTD., MILLSTONE II CDO LTD., MILLSTONE III CDO, LTD., AND MILLSTONE IV CDO, LTD.**

————————

Counsel Listed on Inside Cover

DAVID J. GRAIS
MARK B. HOLTON
OWEN L. CYRULNIK
KATHRYN E. MATTHEWS
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, NY 10036

PAUL D. CLEMENT
 *Counsel of Record*
JEFFREY M. HARRIS
CANDICE CHIU
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Broderick CDO 2 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Cimarron CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Crystal Cove CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Duke Funding IX, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

G Square Finance 2006-1 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Hout Bay 2006-1 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Kleros Preferred Funding, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone II CDO Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone III CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone IV CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................... 4

STATEMENT OF THE ISSUES .............................................................. 5

STATEMENT OF THE FACTS AND STATEMENT OF THE CASE ................... 5

    A.    Countrywide's MBS Assembly Line ................................................... 5

    B.    The *Luther*, *Western Conference*, and *Maine State* Complaints .......................................................................................... 9

    C.    The District Court's Standing and Tolling Rulings Dramatically Narrow the Actions ............................................................................11

    D.    The Push To Settlement .................................................................. 14

SUMMARY OF ARGUMENT ................................................................. 18

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT ...................................................................................... 22

I.    The District Court Created Intractable Conflicts Of Interest Between Named Plaintiffs And The Vast Majority Of The Class That Should Have Precluded Certification Of The Settlement Class .............................. 22

    A.    The District Court's Standing and Tolling Rulings Created Sharp Conflicts of Interest Within the Class ...................................... 24

    B.    If the District Court's Standing and Tolling Rulings Were Correct, Named Plaintiffs Were Neither "Adequate" Nor "Typical" Class Representatives ......................................................... 29

II.    The Settlement Negotiated By Named Plaintiffs Was Not Even Close To "Fair, Reasonable, and Adequate." ................................................ 35

III.   The District Court's Underlying Standing And Tolling Rulings Were
       Fundamentally Flawed. ................................................................. 43

       A.   The Standing Rulings Contravene Well-Settled Principles ............... 43

       B.   The Tolling Rulings Contravene Well-Settled Principles ................. 51

CONCLUSION ..................................................................................... 58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ......................... 12, 51, 53, 55

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................... *passim*

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008)....................................................47

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) ............................47

*Casey v. Lewis*, 4 F.3d 1516 (9th Cir. 1993) ............................................................47

*Catholic Social Servs. v. INS*, 232 F.3d 1139 (9th Cir. 2000)............................ 12, 53

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007)..........................................47

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).................. 17, 35

*City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 2012 WL 426267 (D.N.J. Feb. 7, 2012) ............................................................56

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983).......................... 53, 55, 56

*Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987).................................................56

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395 (1977) ......................29

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ..............................48

*Eubank v. Pella Corp.*, 2014 WL 2444388 (7th Cir. 2014) ....................................38

*Evans v. Jeff D.*, 475 U.S. 717 (1986)....................................................................26

*Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) ....................48

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)........................................... 14, 45

*Fleming v. Pickard*, 581 F.3d 922 (9th Cir. 2009) ..................................................47

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................. 30, 31, 34

*Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortgage Sec. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011) ....................................51

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012)....................47

*Griffin v. Singletary*, 17 F.3d 356 (11th Cir. 1994) ...................................................52

*Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083 (3d Cir. 1975).................................53

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................ 35, 36

*Harmsen v. Smith*, 693 F.2d 932 (9th Cir. 1982).......................................................47

*Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009) ..........................................53

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012) .....................................................50

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ...... 22, 36

*In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010) .................51

*In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006)....................................57

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).................................................................42

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995).......................................................... 32, 36

*In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584 (N.D. Cal. 2009).............51

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) .......................................................... 28, 33

*In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998)...........................51

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998).................................................................47

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...............................................47

*Machesney v. Ramsgate Ins., Inc.*, 2014 WL 2605479 (E.D. Mich. June 10, 2014) ................................................56

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*,
834 F.2d 677 (7th Cir. 1987) ............................................................... 36

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
272 F.R.D. 160 (S.D.N.Y. 2011) ......................................................... 45

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*,
709 F.3d 109 (2d Cir. 2013) ................................................................ 50

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) .................................................... 44, 45, 50

*Officers for Justice v. Civil Serv. Comm'n of the City & Cnty. of San
Francisco*, 688 F.2d 615 (9th Cir. 1982) ............................................ 35

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................... 33

*Plumbers' Local Union No. 12 Pension Fund v. Nomura Asset
Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) ................................ 50

*Putnam Bank v. Countrywide Fin. Corp.*,
860 F. Supp. 2d 1062 (C.D. Cal. 2012) ............................................... 54

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*,
642 F.3d 560 (7th Cir. 2011) ........................................................ 56, 57

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ................ 29

*Sobel v. Hertz Corp.*, 2011 WL 2559565 (D. Nev. June 27, 2011) ......................... 36

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ................................ 47

*Tosti v. City of Los Angeles*, 754 F.2d 1485 (9th Cir. 1985) .................................... 55

*Valenzuela v. Kraft, Inc.*, 801 F.2d 1170 (9th Cir. 1986) ......................................... 53

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ................................... 30, 34

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ............................................... 36

**Statute & Rules**

15 U.S.C. § 77m ............................................................................... 13

Fed. R. Civ. P. 23(a) ....................................................................... 22, 30

Fed. R. Civ. P. 23(e) .......................................................................... 35

**Other Authorities**

Manual for Complex Litigation (3d. ed. 1995) .................................... 36

Newberg on Class Actions (5th ed. 2014) ........................................... 48

Wright & Miller, *Federal Practice and Procedure* (3d. ed.) ................... 48

## INTRODUCTION

These consolidated appeals arise out of the billions of dollars in losses that investors suffered when Countrywide Financial Corporation and its affiliates mass-produced and sold purportedly "investment-grade" securities backed by improperly underwritten Countrywide mortgages. The named plaintiffs in these actions claimed that offering documents for all of the 429 offerings in which class members purchased or acquired the mortgage-backed securities ("MBS") contained uniformly false and misleading statements and omissions regarding Countrywide's loan-origination practices.

The district court held, however, that plaintiffs had "Article III standing" to represent only those investors that purchased certificates in the *same offerings* as plaintiffs—then narrowed that still further to those that purchased the *same "tranches,"* or types of certificates, within each offering as plaintiffs. The district court also held that an earlier putative state-court class action raising essentially identical claims tolled the statute of limitations only for those investors that had bought certificates in the same tranches as the named plaintiffs there. The net result of those rulings was that named plaintiffs here were able to advance their claims with respect to fewer than 2% of the 9,383 certificates encompassed by the 429 offerings, and there was a massive conflict of interest between named plaintiffs and the vast majority of the class they purported to represent.

The district court's standing and tolling rulings effectively orphaned the vast majority of investors in Countrywide MBS, leaving them without a named plaintiff with standing in the district court's eyes or (because of the district court's tolling ruling) a viable choice to opt out. The best recourse for those orphaned class members was clearly to appeal the district court's dubious standing and tolling rulings. But named plaintiffs never appealed the rulings that devastated the claims of the vast majority of investors they purported to represent. Instead, named plaintiffs entered into a settlement in which they (and other investors they had standing to represent) did dramatically better than the vast majority of the class whose claims were sacrificed for a pittance as a bargaining chip. Remarkably, the same district court that found that named plaintiffs lacked standing to represent investors in other tranches turned around and concluded that they had just enough standing to compromise those investors' claims for a vanishing fraction of what those they had standing to represent would receive.

Those decisions cannot be reconciled or sustained on appeal. Once the district court concluded that named plaintiffs lacked standing to represent the vast majority of the class, named plaintiffs could no longer adequately represent that majority, nor were named plaintiffs' claims typical of that majority.

Indeed, the district court was bound to reject any settlement that purported to release the claims of the orphaned class members that, in its view, were not even

properly part of the actions. And even if the court considered the possibility that its standing and tolling rulings could be overturned on appeal, it is inconceivable that the settlement terms could be considered fair and reasonable with respect to the orphaned class members; their paltry recovery was dwarfed by the recoveries of the investors that named plaintiffs had standing to represent. Rather than recognize this as clear evidence of a conflict, the district court pointed to the very rulings that created the chasm among differently-situated class members as a justification. In fact, those rulings rendered named plaintiffs inadequate and atypical representatives and foreclosed approval of the settlement.

The unfairness of the settlement is only underscored by the profoundly erroneous nature of the district court's rulings. The appellate rights that class counsel sacrificed on behalf of the orphaned class members were substantial. The district court's focus on "Article III standing" was misguided. Named plaintiffs clearly had standing to bring their own claims, and their ability to represent investors in other tranches is a question of adequacy and typicality under Rule 23, not a question of constitutional standing. And if the district court had viewed that question under Rule 23, it could not have reached the bizarre conclusion that named plaintiffs were adequate and typical representatives only for purposes of throwing the vast majority of class members under the proverbial bus in a wholly lopsided settlement. The tolling ruling was equally flawed, as the availability of tolling does not depend

on standing, much less a later court's assessment of standing. But without the standing and tolling rulings, there is no semblance of a justification for the lopsided settlement approved by the district court. Neither that settlement nor the flawed rulings that underlie it should be allowed to stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over *Luther v. Countrywide Financial Corp.*, No. 2:12-cv-5125 ("*Luther*"), *Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corp.*, No. 2:12-cv-5122 ("*Western Conference*"), and *Maine State Retirement System v. Countrywide Financial Corp.*, No. 2:10-cv-00302 ("*Maine State*") under 15 U.S.C. § 77v and 28 U.S.C. § 1331. The district court additionally had jurisdiction over *Luther* and *Western Conference* under 28 U.S.C. § 1334(b).

This Court has jurisdiction under 28 U.S.C. § 1291. The district court approved a proposed settlement of all three class actions on December 5, 2013, and entered final judgment on December 17, 2013. Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd. ("Objectors-Appellants") filed timely notices of appeal for each action on January

4

15, 2014 (as did the FDIC in its capacity as receiver for 19 failed banks). This Court consolidated the six appeals on June 12, 2014.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in certifying this settlement class and ruling that named plaintiffs were adequate and typical class representatives under Rule 23(a), even though it had ruled that named plaintiffs lacked standing to represent the vast majority of the class and that still other class members' claims were barred on tolling grounds.

2. Whether the district court erred in finding that the settlement was "fair, reasonable, and adequate" under Rule 23(e)(2) when it was negotiated by, and disproportionately benefitted, named plaintiffs that it had ruled lacked standing to represent the vast majority of the class and when still other class members' claims were barred on tolling grounds, especially in light of the erroneous nature of the standing and tolling rulings.

Pursuant to Circuit Rule 28-2.7, pertinent statutes and rules are set forth in an addendum to this brief.

## STATEMENT OF THE FACTS AND STATEMENT OF THE CASE

### A. Countrywide's MBS Assembly Line

This case concerns the mass production and sale by Countrywide and its affiliates ("Countrywide") of purportedly investment-grade MBS that collapsed in

value. Countrywide was able to sell investors hundreds of billions of dollars in certificates by exploiting its unique ability to rapidly "securitize" mortgage loans.

"Securitization"—the process of converting mortgage loans into certificates for sale to investors—begins with loan *originators*, who make loans to homeowners. The originators' task is to collect information about a potential borrower's creditworthiness (income, assets, employment status, and so forth) and the property's value to ensure that they are making a good loan. To that end, originators have loan-origination guidelines that set forth criteria for qualifying borrowers and loan products.

Next, *securities issuers*—depositors and trusts—enter the picture. The depositor buys mortgage loans from an originator and sells them to a trust. Because the trust now owns the loans, it receives all the homeowners' payments of principal and interest. The trust, meanwhile, finances its purchase of the loans by selling certificates to investors.

The *securities underwriters* are the go-between for the trusts and investors. The underwriters buy certificates from the trust and sell them to investors through offerings. The investors thus become certificate-holders—receiving a share of proceeds when homeowners make their mortgage payments, and assuming a share of losses when homeowners default. In return, the investors' money flows back to the originators, ultimately funding further loan origination.

Certificates are designed to cater to different types of investors, and thus have different payment priorities, interest rates, and risk profiles. A bundle of certificates constitutes a *tranche*; the tranche determines the certificates' seniority in the capital structure. For example, the "senior tranche" of certificates refers to those certificates with highest priority to payment proceeds, while a "lower tranche" refers to those with lower priority that would be hit first in the event of a homeowner payment default but yield a higher interest rate. Each offering contains different tranches of certificates, and each incoming mortgage payment is divvied up amongst those different tranches. In many instances, however, all tranches in the offering rely on payments from the same pool of mortgages. All tranches in the offering, moreover, are sold to investors pursuant to the same offering documents.[1]

Here, Countrywide had a "securitization" process that functioned as an assembly line. Countrywide was a major residential mortgage lender—indeed, the nation's largest residential mortgage lender from 2005-2007. Countrywide set up its own special-purpose entities as depositors to which it could transfer its loans. And

---

[1] The district court conflated "tranche" with "certificate," "us[ing] the terms … somewhat interchangeably." ER81 n.1. In fact, one tranche corresponds with numerous certificates; there were 9,383 *certificates*, not tranches, in the settlement class. Moreover, the varying payment seniorities associated with different tranches are inapplicable to different certificates within a tranche. Nonetheless, because the district court equated the two throughout the litigation—including in its discussion of the settlement's allocation among 9,383 "tranches"—this brief utilizes the court's terminology.

Countrywide used both unaffiliated securities underwriters (*e.g.*, Bear Stearns, Morgan Stanley, etc.) and its own in-house securities underwriter to sell its MBS. No. 10-302 D.E. 281 ¶ 86 (Third Am. Compl.); No. 12-5125 D.E. 1-2 ¶ 80 (Consol. Compl.); No. 12-5122 D.E. 1-1 ¶ 74 (Compl.). Because it believed it could shift the risks of borrower default almost immediately to investors, Countrywide was able to sell loans on a massive scale—and at substantial profit—without regard to the quality of underlying loans. No. 10-302 D.E. 281 ¶ 81; No. 12-5125 D.E. 1-2 ¶ 103; No. 12-5122 D.E. 1-1 ¶ 97. Countrywide systematically disregarded its loan-origination guidelines by making loans to unqualified borrowers, artificially increasing property appraisal values, and including inaccurate borrower information in loan documents. No. 10-302 D.E. 281 ¶¶ 81, 97-101; No. 12-5125 D.E. 1-2 ¶¶ 103-106, 142; No. 12-5122 D.E. 1-1 ¶¶ 97-100, 134. Meanwhile, Countrywide's securities underwriters, including its in-house underwriter, curtailed their due diligence. They enlisted outside contractors to perform perfunctory reviews of mere fractions of the loans and, when alerted to problems, failed to resolve or even disclose them. No. 10-302 D.E. 281 ¶¶ 149-152; No. 12-5125 D.E. 1-2 ¶¶ 169-174; No. 12-5122 D.E. 1-1 ¶¶ 161-167. The underwriters also negotiated with ratings agencies, before hiring them, to obtain investment-grade credit ratings for certificates and maximize the price at which they could be sold. No. 10-302 D.E. 281 ¶¶ 94, 161-163.

The offering documents pursuant to which Countrywide and its securities underwriters sold certificates were false and misleading. Each depositor filed registration statements with the SEC. Each registration statement contained a core prospectus describing, among other things, the types of securities to be offered and their risk factors. The registration statements also "incorporated" all later-issued "prospectus supplements," which ostensibly contained transaction-specific details and representations about specific mortgage loans collateralizing each offering. Importantly, in part because the ratings agencies required Countrywide to make consistent representations about the underlying assets, all the registration statements and prospectus supplements included nearly identical misrepresentations concerning Countrywide's loan-origination guidelines and its purported compliance with those guidelines. They also uniformly omitted crucial information about the real credit quality of the loans Countrywide was securitizing. No. 10-302 D.E. 281 ¶¶ 87-88, 111, 165-189; No. 12-5125 D.E. 1-2 ¶¶ 152-168; No. 12-5122 D.E. 1-1 ¶¶ 144-160.

## B. The *Luther*, *Western Conference*, and *Maine State* Complaints

This appeal implicates three class actions filed on behalf of investors in $450 billion of certificates in 429 Countrywide MBS offerings who incurred massive losses after their purportedly investment-grade securities collapsed in value. Raising claims under Sections 11, 12(a)(2), and 15 of the Securities Act, the allegations

concern Countrywide's material misrepresentations and omissions in all the offering documents.

The first action—*Luther*—began in November 2007 as a state-court suit brought on behalf of a putative class of all persons and entities who purchased or acquired MBS issued by Countrywide affiliates in hundreds of offerings between 2004 and 2007. The case, later consolidated with a virtually identical putative class action, alleged near-identical misrepresentations and omissions in offering documents across 429 offerings. ER19.

In the process of consolidation, the question arose whether the *Luther* claims were subject to exclusive federal jurisdiction under the Securities Litigation Uniform Standards Act of 1998. In January 2010, the California Superior Court said yes and dismissed the suit as jurisdictionally barred. In May 2010, however, the California Court of Appeal disagreed and reinstated the case. ER20-21.

But *Luther* was to wind up in federal court after all. In June 2012, after two loan originators connected to the relevant MBS initiated bankruptcy, Countrywide successfully removed to federal court on grounds that the case was "related to" federal bankruptcy proceedings. The district court, however, deferred any ruling on a motion to dismiss in light of settlement negotiations. ER21.

Meanwhile, the second action—*Western Conference*—likewise began in state court. Filed in November 2010, the complaint advanced essentially identical claims

10

to *Luther* in connection with 428 MBS offerings. In June 2012, like *Luther*, the case was successfully removed to federal court based on the same "related to" bankruptcy jurisdiction grounds. As in *Luther*, the court below deferred any ruling on a motion to dismiss in light of settlement negotiations. ER22.

The third action—*Maine State*—was filed in January 2010 to preserve class interests in the event that *Luther*'s (ultimately short-lived) dismissal by the California Superior Court was affirmed. The action was filed in federal court, but again advanced claims regarding 428 offerings nearly identical to those in *Luther* and *Western Conference*. In a series of rulings on motions to dismiss, the district court dramatically changed the course of litigation not only in *Maine State*, but in *Luther* and *Western Conference* as well. ER22.

## C. The District Court's Standing and Tolling Rulings Dramatically Narrow the Actions

The district court appointed Iowa Public Employees' Retirement System (IPERS) as lead plaintiff in *Maine State*, and its counsel as lead counsel, on grounds that IPERS had "the greatest financial interest" based on the face amount of securities it had purchased. ER23. In assessing the sufficiency of an amended complaint filed by IPERS and three other named plaintiffs, the district court issued a series of rulings that gutted the action and left a mere fraction of the claims in the case.

The district court unveiled the sweeping breadth of its rulings in stages. In November 2010, the district court held that "a plaintiff lacks standing under both Article III of the U.S. Constitution and under … the 1933 [Securities] Act to represent the interests of investors in MBS offerings in which the plaintiffs did not themselves buy." ER123. Under that conception of *offering-based* "standing," the court reasoned that named plaintiffs "have no personal stake in the outcome and have suffered no injury from offerings which they did not purchase." ER123-24. Thus, the "power of the court to entertain the suit" extended only to the 81 offerings in which named plaintiffs had purchased certificates, not to the over 400 offerings allegedly infected by false or misleading offering documents. ER123. All claims relating to certificates from different offerings, the court explained, should be eliminated from the complaint.

The district court then imported that standing analysis into its tolling analysis. The court "accept[ed] Plaintiffs' general proposition that they are entitled to [*American Pipe*] tolling," whereby an unsuccessful putative class action tolls the statute of limitations for all members of the purported class even where they bring a subsequent class action. ER127; *see also Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974); *Catholic Social Servs. v. INS*, 232 F.3d 1139, 1149 (9th Cir. 2000) (en banc). The court also accepted that it made no difference that the first putative class action here—the 2007 *Luther* action—was filed in "state court," not "federal court."

ER128-29; *see also* ER129 ("This is a federal lawsuit and was a lawsuit over federal claims even when litigated in state court."). Nonetheless, the court concluded that *Luther* tolled the Securities Act statute of limitations, 15 U.S.C. § 77m, *only* for those plaintiffs whom the *Luther* named plaintiffs had "standing" to represent—namely, only those who had invested in *the same offerings*. This tolling ruling converted the standing ruling into a fatal timeliness defect for investors in offerings other than those of the *Luther* named plaintiffs.

In May 2011, the district court went even further. Addressing an amended complaint raising claims only as to *14* remaining offerings, the court noted that an offering contains different *tranches* corresponding to "different rights to distribution of principal and interest payments," "different interest rate[s]," and other distinct characteristics. ER89. It concluded that named plaintiffs' standing was limited to those who had purchased into not only the same offerings, but the very same *tranches* within each offering. Under this "*tranche-based*" standing rule, plaintiffs have "suffered no injury" from "tranches" (rather, certificates) they did not buy, even if they purchased them based on the *same* misstatements in the *same* prospectus supplement. ER92-94; *see supra* n.1 (noting district court's conflation of terms). The court further held that *American Pipe* tolling was likewise limited to those investors as to whom the original *Luther* named plaintiffs had tranche-based standing. Those rulings further narrowed the securities at issue in *Maine State* to

13

just the 8 "tranches" purchased by both named plaintiffs and the *Luther* named plaintiffs—and threatened to reduce the "tranches" collectively at issue in *Maine State*, *Luther*, and *Western Conference* from 9,383 to 58.

And the district court still was not done. In November 2012, in an indirectly related case, the district court *sua sponte* reevaluated whether the *Luther* state-court action triggered *American Pipe* tolling at all. The court noted in dictum that, although it had previously "settled" the issue to the contrary, it now believed that "*American Pipe* tolling cannot apply to a class action filed in state court, even if the claims in the state class action are federal." *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *12-13 (C.D. Cal. Nov. 21, 2012) ("*Strategic Capital*"). This dictum had the potential to result in the dismissal of *Maine State* and *Western Conference* in their entirety.

### D. The Push To Settlement

With the district court having effectively whittled down the number of securities at issue in *Maine State*, *Luther*, and *Western Conference* from 9,383 to 58 (if not less, under the *Strategic Capital* dictum)—and reduced the face value of securities at issue by over $400 billion—the putative class found itself reeling with new divisions and a radically narrower scope of claims. The standing ruling meant that named plaintiffs could represent only those class members who had purchased the same certificates as themselves; they could not represent the vast majority. The

tolling ruling meant that even among those class members that named plaintiffs could represent, only some could toll the limitations period on their claims while others saw their claims rendered untimely.

In 2013—*after* the *Maine State* standing and tolling rulings had created these fissures between named plaintiffs and absent putative class members, but *before* the district court inevitably applied its rulings to *Luther* and *Western Conference* (and created an appealable order)—named plaintiffs and defendants reached an agreement-in-principle to settle the three actions. By June 2013, class counsel had, with defendants, developed a settlement plan that would bind *all* investors in the 9,383 certificates, even those orphaned by the dubious standing and tolling rulings.

The plan was to apportion $500 million among "live" and "dismissed" (or soon-to-be-dismissed) tranches based on their perceived rights on appeal, in exchange for a "broad global release" of *all* claims relating to all 9,383 certificates. No. 12-5122 D.E. 132 ¶ 22, Ex. A-1. 65% of the settlement recovery, $325 million, would go to "Category One" claims involving the 58 live "tranches." Category One claims, however, accounted for just 3% of the face value of MBS purchased by the class in the 429 offerings. 25% of the recovery, $125 million, would go to "Category Two" claims involving the tranches in which named plaintiffs but *not* the *Luther* named plaintiffs had purchased. Those claims—technically represented by named plaintiffs with standing, but time-barred under the tolling ruling—encompassed just

15

111 "tranches" and 6% of the MBS face value. Finally, just 10% of the recovery, $50 million, would go to "Category Three" claims involving *98%* (9,214 of 9,383) of the "tranches"—91% of the MBS face value—as to which no named plaintiff had standing (and which were often also time-barred). Category Three would receive a pittance even though it included the overwhelming majority of investors in the class. Nonetheless, class counsel pronounced the settlement "an outstanding result for the Class." No. 10-302 D.E. 433 at 1.

Numerous objectors begged to differ. Objectors-Appellants are members of the proposed settlement class that suffered *over one billion dollars* of losses on their purchases, yet their claims (which fall in Category Three) would be released for next to nothing. Objectors-Appellants contended that named plaintiffs and their counsel had grave conflicts of interest that rendered them unqualified under Rule 23(a), and that the settlement was wildly unfair to the vast majority of the putative class.

Brushing the objections aside, the district court on December 5, 2013, approved the settlement and certified a settlement-only class of "all purchasers or acquirers" from "March 12, 2004 through August 7, 2013" of certificates in connection with the "429 [MBS] offerings at issue." ER17; *see also* ER2. As to adequacy-of-representation, the court declared named plaintiffs free of "any conflicts of interest with other class members," noting that class counsel regarded the standing and tolling rulings as "erroneous," that "the advocacy of Class Counsel

16

was the best possible chance of obtaining any recovery for the Category Three class members" given their lack of representation, and that the participation of mediators in developing the settlement provided "structural assurances of fairness." ER32-33. As to typicality, the court noted only briefly that "although the claims in Category Three are deemed weaker than those in other categories, all class members … 'have been injured by the same course of conduct'" because their certificates were "issued in connection with the same offering documents"—a point that had eluded the court in its standing analysis. ER31-32.

The district court pronounced the settlement "fair, reasonable, and adequate" under Rule 23(e)(2). Applying a "presumption of fairness" and the indicia of fairness of *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004), the court deemed *all seven* applicable *Churchill* factors—including "the experience and views of [class] counsel"—to compel approval. ER35-43. The court rejected objectors' argument that "Class Counsel cannot simultaneously represent the interests of Category One, Category Two, and Category Three," maintaining that "nothing in the settlement history or the terms of the proposed Settlement calls into question the adequacy of Plaintiffs' Counsel in representing the class." ER44-45. Finally, the court approved class counsel's requested $85 million in attorneys' fees— 17% of the settlement and nearly *double* Category Three's recovery—as reasonable "in light of the contingent nature of any reward from these cases, coupled with the

17

financial burdens attendant to litigating these cases." ER47. The district court entered final judgment on December 17, 2013, and this appeal followed.

## SUMMARY OF ARGUMENT

**I.** The district court erred by certifying a settlement-only class whose representatives were neither adequate nor typical under Rule 23(a). Indeed, named plaintiffs lacked *standing*, under the district court's rulings, even to represent the interests of the vast majority of the class. What is more, the district court's unappealed ruling on tolling prejudiced the claims of the orphaned class members and made it impossible for them to opt out of the settlement. Without a class representative with standing to represent them, these orphaned class members (whose interests clearly favored appeal) were quite predictably thrown under the bus. In short, the district court's own rulings, which clearly were the premise of the settlement agreement, created the most glaring of intra-class conflicts of interest.

Even attributing to named plaintiffs and their counsel the best of intentions, a standing defect—particularly one that handicaps claims as to 98% of the securities covered by the settlement—is a *per se* adequacy and typicality problem that requires rejection of the settlement. The district court's zeal to settle long-running litigation, however, caused it to endorse two flatly irreconcilable propositions—that named plaintiffs and their counsel lacked standing to represent the vast majority of the class, but nonetheless could fairly and adequately represent them in settling their claims.

18

Both propositions cannot be true at the same time, particularly in a settlement as obviously lopsided as this one. Those with claims like named plaintiffs with standing made out exponentially better than the vast majority of the class, which, lacking someone at the bargaining table with standing in the district court's eyes to represent them, got fractions of a cent on the dollar.

**II.** The district court erred by approving a flagrantly one-sided class settlement that was not "fair, reasonable, and adequate" under Rule 23(e) by any stretch. Indeed, the district court erred in *presuming* the fairness of a settlement that, because it arose pre-certification, was required to comport with a higher, not lower, standard of fairness.

The district court was bound to reject any settlement that purported to release the claims of the orphaned class members that, in its view, were not even properly part of the actions. Even if the court considered the possibility that its standing and tolling rulings could be overturned on appeal, it is inconceivable that the settlement could be considered fair and reasonable with respect to the orphaned class members. The orphaned class members—representing 98% of the certificates covered by the settlement—received almost nothing for releasing claims arising from over $400 billion in MBS. The numbers speak for themselves. The proposed settlement awarded 2% of the certificates 90% of the recovery, and 98% of the certificates 10% of the recovery. The notion that such a settlement could be fair, in the absence of

separate representation of the vast majority of the class that received virtually nothing based on the cleavage created by the district court's highly debatable rulings, strains credulity. What the orphaned class members received is not only unreasonably low in comparison to the represented class members but also in comparison to other MBS class action settlements. By any objective measure, what the vast majority of the class received here was grossly unfair.

**III.** The settlement-only class certification and settlement approval cannot stand irrespective of the merits of the underlying standing and tolling rulings. But the manifest unfairness of certification and approval are further crystallized by the error of those rulings. Indeed, if the orphaned class members had been adequately represented, they would have insisted on either equal treatment under the settlement or an appeal, which would have exposed the erroneous nature of the district court's standing and tolling rulings and their entitlement to fair and equal treatment to those in Categories One and Two. The settlement is particularly unfair and unreasonable given that named plaintiffs abandoned an appeal that had a strong chance of succeeding and would have dramatically increased the value of Category Three's claims.

The "Article III standing" defects identified by the district court had nothing to do with Article III, and were instead classic Rule 23 issues that were prematurely and incorrectly resolved. There is simply no basis in law—under either Article III

20

or Rule 23—for the district court's novel "tranche-based standing" requirement. The different characteristics associated with different tranches have no bearing at all on plaintiffs' theory of injury—the virtually identical misstatements and omissions in offering documents applicable across *all* tranches—much less Article III injury.

The district court's further extension of that tranche-based standing requirement to *American Pipe* tolling only compounded the error. There is no rationale for restricting tolling to the subset of class members as to whom the *Luther* named plaintiffs had tranche-based standing. Similarly, there is no basis for retroactively revoking the benefit of tolling years later based on a district court's novel standing ruling or revoking the benefit of tolling from state-court class actions altogether.

The twin errors in standing and tolling only further undermine the assumptions reflected in the settlement and compel reversal.

## STANDARD OF REVIEW

This Court reviews the approval of proposed class settlements for abuse of discretion. Where settlement-only class certification is requested, courts are required to give "undiluted, even heightened, attention" to the qualifying criteria of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The settlement must also withstand "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required" under the fairness

criteria of Rule 23(e) "to survive appellate review." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Underlying questions of standing and tolling are issues of law and are reviewed *de novo*.

## ARGUMENT

**I.    The District Court Created Intractable Conflicts Of Interest Between Named Plaintiffs And The Vast Majority Of The Class That Should Have Precluded Certification Of The Settlement Class.**

Settlement-only class certifications present district courts with a single opportunity to judge *ex ante* whether "a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Amchem*, 521 U.S. at 621. Because the court "will lack the opportunity, present when a case is litigated, to adjust the class" as proceedings unfold, the criteria of Rule 23 "demand undiluted, even heightened, attention." *Id.* at 620. As relevant here, Rule 23(a) permits certification only if "the representative parties will fairly and adequately protect the interests of the class" and "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3)-(4). This Court has further instructed courts policing the certification criteria in the settlement context to remain "vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests, and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 946-47.

22

Here, the danger signs were far from "subtle": the district court's *own prior rulings* created stark and unavoidable incentives for class counsel and named plaintiffs to sacrifice the rights of the orphaned class members to secure a favorable settlement for themselves. The court ruled that named plaintiffs lacked standing to represent the vast majority of the class because named plaintiffs only purchased a very small number of the "tranches" of Countrywide MBS. As a result of that ruling, the district court should have either: (1) certified a settlement class only with respect to the tranches that named plaintiffs had standing to represent and dismissed the balance via an appealable (and erroneous, *see infra* III) order; or (2) rejected the settlement negotiated by named plaintiffs as fundamentally unfair to investors in unrepresented tranches.

But the district court did neither. Instead, it ignored the glaring conflicts within the class and approved an extraordinarily lopsided settlement in which named plaintiffs made out dramatically better for themselves and those they purportedly had standing to represent than the orphaned class members that they threw under the proverbial bus. Remarkably, the district court certified a settlement class even though it continued to believe that named plaintiffs did not represent the vast majority of class members, and then pointed to their lack of standing as a *justification* for the lowball settlement. Those contradictions cannot stand. The district court's

holding that named plaintiffs could not represent the lion's share of the class foreclosed their satisfaction of Rule 23(a)'s adequacy and typicality requirements.

### A. The District Court's Standing and Tolling Rulings Created Sharp Conflicts of Interest Within the Class.

**1.** The district court's rulings in the lead-up to settlement created diametrically opposed interests within the class. Named plaintiffs purported to represent a class of "all purchasers or acquirers" of certificates in connection with the "429 [MBS] offerings at issue in the [three] Actions." ER17. They alleged that Countrywide had made misrepresentations regarding its loan-origination practices in offering documents associated with *all* of the 429 offerings that, in turn, injured *all* of the proposed class members.

The district court disagreed in light of its application of a novel "tranche-based standing" requirement. ER118. The court declared that named plaintiffs "have suffered *no injury* from those investments they did not make" as "any alleged injury flowing from an alleged misstatement as to one tranche would not necessarily constitute injury to purchasers of different tranches." ER92-94 (emphasis added). Thus, in the district court's view, named plaintiffs had standing only to "represent the interests" of the small fraction of class members who had purchased the specific tranches that named plaintiffs purchased. ER123.

The district court exacerbated that misguided standing rule by holding that the *Luther* named plaintiffs likewise had had standing to represent only the fraction of

class members who had purchased the same tranches as themselves. Thus, only those class members who the *Luther* named plaintiffs had tranche-based standing to represent could obtain the benefit of *American Pipe* tolling. Large swaths of the class were therefore not only unrepresented, but subject to a time bar.

Both rulings were manifestly wrong, *see infra* III, but their impact on the class and its cohesiveness was drastic. Named plaintiffs purchased less than 2% of the 9,383 tranches encompassed by the putative class. Still fewer had also been purchased by the *Luther* named plaintiffs. That left just 0.6% of the tranches—58 of the 9,383—live for litigation under the district court's highly dubious rulings. *See* ER37 ("*Maine State*, if applied, would in Plaintiffs' estimation reduce the number of certificates at issue to 58 'live' tranches from over 9,000"). The district court thus indicated that the vast majority of the class—98% of the tranches, reflecting 91% of the face amount of securities purchased by class members—*was unrepresented by any named plaintiff*.

**2.** After the district court issued its standing and tolling rulings, it should have been obvious that named plaintiffs and their counsel could no longer adequately represent the vast majority of class interests in settlement negotiations. In fact, at that juncture, the settlement interests of those represented by named plaintiffs *sharply diverged* from the rest of the class. The brief procedural interlude before the district court formally applied its misguided standing and tolling rulings from *Maine*

*State* to *Luther* and *Western Conference* presented named plaintiffs with a critical choice: wait and appeal the adverse rulings, or settle in the interim. The vast majority of the class had everything to gain from awaiting a final judgment to appeal the dubious standing and tolling rulings that had eviscerated their claims and representation. Settlement in the immediate wake of adverse rulings had little to recommend it, and the named plaintiffs whose claims were better situated precisely because they were named plaintiffs and did not suffer fatal standing and/or tolling difficulties were poorly positioned to vindicate their interests.

By contrast, named plaintiffs—who the district court had found to have standing as to the tranches they personally purchased—had the least incentive to pursue an appeal. So too for their counsel. *See Evans v. Jeff D.*, 475 U.S. 717, 733 (1986) ("the possibility of a tradeoff between merits relief and attorney's fees" is often implicit in class action settlement negotiations). Named plaintiffs and their counsel plainly had the most to gain if they settled then and there, especially if they agreed to compromise not only their own claims, but those relating to the 98% of tranches dismissed or soon-to-be-dismissed under the district court's highly dubious rulings. By compromising the interests of the vast majority of the class, named plaintiffs and their counsel were well-positioned to gain additional and disproportionate benefits for the only class members whose interests they were representing.

That was precisely what ensued. Named plaintiffs and their counsel opted to settle, not pursue an appeal. They then proceeded to negotiate lopsided settlement terms in which their narrow slice of the class (the only slice that had standing under the district court's rulings) benefitted at the direct expense of the functionally unrepresented majority—at the very juncture when that majority was most vulnerable (*i.e.*, before the standing and tolling rulings had been appealed). Under the proposed settlement terms, a staggering 90% of the recovery went to holders of the 2% of tranches that named plaintiffs had standing to represent because they had purchased identical tranches (Categories One and Two). Specifically, $325 million (65%) went to holders of the 0.6% of tranches in Category One, $125 million (25%) to holders of the 1.4% of tranches in Category Two, and $50 million (10%) to holders of the 98% of tranches in Category Three. The Category Three class members effectively orphaned by the district court's rulings got approximately *40 cents* per $1,000 loss. Meanwhile, class counsel made out with $85 million—equivalent to 17% of the recovery and nearly double the allocation to the vast majority of the class in Category Three.

The negotiated settlement thus bore out the inherent intra-class conflicts of interest created by the district court's own rulings. Those rulings undermined the claims of all but a small percentage of the class precisely because the district court thought there was an insufficient relationship between named plaintiffs and those

27

who purchased in other tranches. The vast majority of the class had every incentive to appeal those dubious rulings (or at least attempt to negotiate a settlement that minimized the impact of those rulings by awarding equal or nearly-equal recoveries to all class members). Named plaintiffs did not share those incentives. And named plaintiffs yielded to the profound temptation to maximize the value of the claims of those they represented by granting the defendants legal peace at the expense of the interests of the bulk of class members.

The settlement terms exemplified "'important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others,'" *Amchem*, 521 U.S. at 610, and here, strongly *disfavored* a "subgroup" entailing 98% of the tranches. Where groups of class members are treated this disparately by a settlement, the district court cannot approve the settlement without, at the very least, creating formal subclasses and appointing independent counsel to represent each subclass in settlement negotiations—here, conflict-free independent counsel would have immediately realized that the settlement was a terrible deal for Category Three. *See In re Literary Works in Elec. Databases Copyright Litig*., 654 F.3d 242, 253 (2d Cir. 2011) ("how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?"). As the Supreme Court has explained, "'adversity among subgroups requires that the members of each subgroup cannot be

bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.'" *Amchem*, 521 U.S. at 627. Here, the favored minority was nonetheless permitted to negotiate on behalf of the class as a whole, even as the settlement created at least three subgroups of class members with distinct and contradictory interests.

In short, the class divisions opened up by the district court's standing and tolling rulings manifested themselves surely and promptly. Treating named plaintiffs and class counsel as if they "'possess[ed] the same interest and suffer[ed] the same injury'" as the rest of the class, *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977), contradicted the district court's stated judgment to the contrary. And even attributing named plaintiffs and their counsel the best of intentions, their rush to settlement and the asymmetrical settlement they negotiated certainly suggested the ingredients of conflict.

### B. If the District Court's Standing and Tolling Rulings Were Correct, Named Plaintiffs Were Neither "Adequate" Nor "Typical" Class Representatives.

Rule 23(a) requires named plaintiffs to demonstrate that they seek to vindicate the same basic wrongs as absent class members. *E. Tex. Motor Freight Sys.*, 431 U.S. at 403; *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974) ("it is essential that a [class representative] must be a part of that class"). The adequacy-of-representation requirement thus demands that "representative

parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4); *see also Amchem*, 521 U.S. at 626 n.20 ("The adequacy heading also factors in competency and conflicts of class counsel."). The related typicality requirement demands that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Named plaintiffs must establish "the existence of a class of persons who have suffered the *same injury* as that individual, such that … the individual's claim will be typical." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982) (emphasis added); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (certification is appropriate only where class members have "'suffered the same injury'"). The two prerequisites tend to "merge." *Falcon*, 457 U.S. at 157 n.13. Here, the district court's settlement class is premised on the correctness of its standing and tolling rulings—there is no other explanation for the vast disparity in treatment among the three categories—and yet those rulings destroy the adequacy and typicality of named plaintiffs. Simply put, the settlement class is fatally defective.

A standing defect—certainly where it pertains to the lion's share of settled claims—renders a named plaintiff *per se* inadequate and atypical. A lack of standing is no minor variation or non-alignment of interests; it would mean that named plaintiffs suffered "no injury" at all from tranches they did not buy. ER124. If named plaintiffs in fact suffered "no injury" from tranches they did not buy (but the

lion's share of the class did), they could not possibly demonstrate "the same injury" as the class. *Falcon*, 457 U.S. at 157. The theory of injury would be, by definition, not uniform, and it could not be that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 157 n.13. Named plaintiffs cannot purport to represent other class members in settlement if they lack standing to prosecute their claims, and any settlement that purports to resolve claims of unrepresented class members must be rejected. That is the case, moreover, however good named plaintiffs' intentions and sincere their belief that the settlement "'serves the aggregate interests of the entire class.'" *Amchem*, 521 U.S. at 627.

*Amchem* is highly instructive in this regard. There, the Supreme Court expressly cautioned against certifying classes for settlement that cannot be certified for litigation. Class counsel, the Court explained, "would be disarmed" if "confined to settlement negotiations" without the ability to "use the threat of litigation to press for a better offer." *Id*. at 621. Here, named plaintiffs were "disarmed" in precisely this way; had they proceeded in district court, they could not possibly litigate on behalf of Category Three. That inability was neither speculative nor superficial, but was the direct result of the district court's standing decisions. That Category Three class members received not merely *less* relief but often *no* relief under the lopsided

settlement only confirms the conflict of interest and the ineffectiveness of named plaintiffs' representation of Category Three's interests.

The district court's effort to paper over the glaring problems created by its own rulings was wholly unavailing. With respect to adequacy, the district court noted that named plaintiffs and their counsel had "vigorously prosecuted the Settlement Actions … over the last six years" and "zealously argued that the [standing and tolling] decision was erroneous." ER32. But they only did so until they did not, which is to say when it mattered. Having vigorously litigated and lost an issue that creates a huge fault line in the class is no substitute for adequacy or typicality in the wake of that ruling. Critically, they ultimately opted to settle rather than appeal the district court's rulings, and negotiated settlement terms premised on the district court's erroneous rulings that enriched themselves at the expense of Category Three. That named plaintiffs continue to express their disagreement with those rulings is hardly significant, and a poor gauge for whether they are truly aligned in their interests and injuries with other class members. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 804 (3d Cir. 1995) (cautioning against reliance on "parties' self-serving remarks"). And the district court's circular logic that "the advocacy of Class Counsel was the best possible chance of obtaining any recovery for the Category Three class members" because "no class member … sought to prosecute the claims of Category Three"

32

only begs the question why it approved a settlement in which the overwhelming majority of the class was not represented by named plaintiffs. ER33.

The district court also pointed to an outside mediator's approval of the settlement plan as a "structural assurance[]" of adequacy. ER33. The mediator, however, had to take the court's erroneous rulings as a given. *E.g.,* ER27 ("Judge Gertner and Plaintiffs believe that the Category Three class members are the least likely to recover because their claims have been, or would be, dismissed by the Court on standing and tolling grounds"). The mediator's presence is no answer to the adequacy problems created by those rulings. *Amchem* teaches, moreover, that where there are discrete interests in the class, the requisite "structural assurance" of adequacy is, at a minimum, the establishment of a subclass and separate representation for settlement negotiations. 521 U.S. at 627; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) ("instances of conflict are well within the requirement of structural protection recognized in *Amchem*"). As courts have recognized, a mediator's presence certainly "does not compensate for the absence of independent representation" of Category Three. *Literary Works*, 654 F.3d at 253; *see also id.* ("Although the mediators safeguarded the negotiation process, and the institutional plaintiffs watched out for the interests of the class as a whole, no one advanced the strongest arguments in favor of Category C's recovery.").

With respect to typicality, the district court held that named plaintiffs passed muster in just one conclusory paragraph. Specifically, the district court pronounced "all class members, including the Named Plaintiffs, [to] 'have been injured by the same course of conduct.'" ER32. But again, the court made no effort to reconcile this conclusion with its prior holding that named plaintiffs suffered "no injury" from investments in tranches they did not likewise invest in or with the glaring differences in recovery between Categories One and Two and the vast majority of class members relegated to Category Three. It cannot possibly be right that named plaintiffs who suffered "*no injury*" in connection with 98% of the tranches for standing purposes could "'have suffered *the same injury*'" as the purchasers of those tranches for settlement purposes. *Dukes*, 131 S. Ct. at 2551. However "'permissive'" typicality might be, ER32, it cannot be so diluted that plaintiffs unable to muster a case or controversy in litigation are entitled to represent—and sell out—those very interests in settlement negotiations.

At bottom, both adequacy and typicality are "guideposts" for a cohesive class that can protect absent class members. *Falcon*, 457 U.S. at 157 n.13. This was not such a class after the district court's standing and tolling rulings. The fact that, in the district court's own view, named plaintiffs and their counsel could not represent 98% of the tranches should have squarely foreclosed certification, especially given the stringent standard of review that applies to settlement-only classes, and the

lopsided nature of the settlement removes all doubt on this score. The district court sidestepped that conclusion only by eliding the serious intra-class divisions its own rulings had wrought and ignoring named plaintiffs' flagrant exploitation of such divisions in the settlement itself.

## II. The Settlement Negotiated By Named Plaintiffs Was Not Even Close To "Fair, Reasonable, and Adequate."

Even if the district court could overcome the fatal Rule 23(a) problems with named plaintiffs and their counsel created by its own rulings, the district court erred by approving a settlement negotiated by those representatives that was anything but "fair, reasonable, and adequate" under Rule 23(e)(2). Rule 23(e) is chiefly concerned with "the protection of those class members … whose rights may not have been given due regard by the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of the City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982). To survive appellate review, the district court must show it has "explored comprehensively [the *Churchill*] factors," including "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; ... and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see generally Churchill,* 361 F.3d at 575.

It is well-established, moreover, that where the proposed settlement occurs prior to formal class certification, the court must go further. Beyond applying those factors, courts must exercise "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *In re Bluetooth*, 654 F.3d at 946. That "more probing inquiry" into conflicts of interest is required to meet the "higher standard of fairness" such settlements must demonstrate. *Hanlon*, 150 F.3d at 1026.[2] The settlement here does not come close to passing muster under those heightened standards.

As an initial matter, the district court erred in applying the legal standard. Indeed, it *inverted* the standard, applying a "presumption of fairness" to the settlement on grounds that it had been "reached … through the efforts of experienced counsel" at "arm's length." ER35-36. That is the opposite of the *more* probing examination that this Court demands of pre-certification settlements. *E.g.*, *Sobel v. Hertz Corp.*, 2011 WL 2559565, at *6 (D. Nev. June 27, 2011) ("undermining the appropriateness of a presumption of fairness is the fact that this settlement was

---

[2] *See also* Manual for Complex Litigation § 30.45 (3d. ed. 1995) ("Approval under Rule 23(e) of settlements involving settlement classes ... requires closer judicial scrutiny than approval of settlements where class certification has been litigated."); *GM Pick-Up Litig.*, 55 F.3d at 805 ("more scrupulous than usual"); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("more than the usual care"); *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir. 1987) ("more careful scrutiny").

negotiated prior to the court certifying the class"). And that presumption was doubly

inapplicable where, as here, class counsel was operating under a glaring conflict of

interest created by the district court's own rulings, which created a dynamic far

different from "arm's length" negotiations.

Under the correct legal standard, the settlement was not "fair, reasonable, and

adequate" by any stretch. Indeed, the standing and tolling rulings should have made

it impossible for the district court to approve a settlement that released the rights of

parties that, in its view, were not even before the court. Having ruled that named

plaintiffs lacked standing to represent the interests of 98% of the tranches, the district

court could not turn around and bless a settlement of 100% of the claims negotiated

by those same plaintiffs on behalf of the class—without any seat at the table for the

98%—especially when the settlement terms reflected and reinforced the conflicts of

interest.

Even if the district court considered the possibility that its standing and tolling

rulings could be overturned on appeal, moreover, it is inconceivable that the

settlement terms could be deemed fair and reasonable with respect to those orphaned

class members in Category Three. Category Three claims were discounted by *over

97%* relative to those in Category Two on grounds that "the Category Two tranches,

unlike the Category Three tranches, were represented by a Named Plaintiff,"

ER26—underscoring in concrete terms the stark difference that representation by a

37

named plaintiff can and did make. Category Three claims were discounted by *over 99%* relative to those in Category One. And not only did the district court brush aside any suggestion that named plaintiffs and their counsel had a conflict of interest, but it paid substantial *deference* to the views of named plaintiffs and their counsel in approving that allocation as fair.[3] Remarkably, the court "accord[ed] 'great weight'" to the fact that "Plaintiffs' Counsel—as well as the Named Plaintiffs …—fully support the proposed Settlement" and praised counsel's "ideal position to assess the fairness of the settlement offer." ER41; *see also* ER42 (giving "special weight to the opinions of class representatives," who "support[] the terms of the proposed Settlement"). The court thus derived comfort from what should have been the very warning signs of a conflict. The requisite "comprehensive[]" exploration of the *Churchill* factors and heightened standard of fairness demanded more.

Worse still, even as the district court ignored the conflicts of interest raised by its own standing and tolling rulings, it seized on those same rulings to justify the settlement's inequitable terms. That is, the district court defended the settlement's

---

[3] The district court additionally emphasized that "only a small fraction of the class members" had opted out or requested exclusion. ER42-43. As courts have recognized, however, "because opting out of a class action is very rare … a low opt-out rate is no evidence that a class action settlement was 'fair' to the members of the class." *Eubank v. Pella Corp.*, 2014 WL 2444388, at *12 (7th Cir. 2014) (Posner, J.). In any event, the court unduly minimized the fraction of objectors by limiting its count to only *new* opt-outs and exclusion requests made after the settlement notice.

meager allocation to Category Three by pointing to the very intra-class divisions it had just papered over for purposes of class certification. It rejected objectors' contention that the total settlement amount was inadequate, for example, by noting that, under its rulings, there remained only "58 'live' tranches." ER37. And it justified the nominal recovery of the lion's share of the class by noting that, given the standing and tolling hurdles its rulings had imposed, Category Three was lucky to "obtain any recovery at all." ER44; *see also* ER27 ("Category Three class members are the least likely to recover because" they suffered from a "lack of tranche-based representation"); ER33 ("no class member … sought to prosecute the claims of Category Three" so "the advocacy of Class Counsel was the best possible chance of obtaining any recovery").

That reasoning is astonishing. The district court certified a settlement class despite the acknowledged absence of "tranche-based representation" for Category Three members, but then used that lack of representation to justify a minimal allocation of settlement proceeds to Category Three. The district court and named plaintiffs could not have it both ways. If the Category Three members truly lacked representation, the answer should have been to reject the settlement as fundamentally unfair to Category Three, not to point to the lack of representation to justify the reasonableness of a meager and conflict-laden settlement. At an absolute minimum, the court should have created a subclass for Category Three and appointed separate

counsel—counsel that would have invariably sought equal or nearly-equal treatment to other class members in settlement negotiations.

Finally, even setting aside the conflicts of interest embodied by the settlement, the settlement is unreasonably low. According to lead counsel, class members suffered substantial damages of 25-35% of the total original face value of the MBS, or $113-158 *billion* in total damages. 07/10/13 Tr. at 46-48 (Burkholz). $500 million is a long way from $113-158 billion. Objectors-Appellants alone suffered over one billion dollars of losses—more than double the total settlement amount. *Id.* $500 million is a negligible 0.11% of the MBS face value and less than one-half of 1% of the damages suffered. Recent settlements of MBS class actions have averaged 1.1% of the original face value of MBS, *see* ER140 D.E. 525 ¶ 24; this settlement is one-tenth of that average.[4]

The district court queried "whether such a [face value] comparison is useful," suggesting that the standing and tolling "obstacles" raised by this case impede any fair comparison across MBS class actions. ER37-38. But the existence of different tranches—the basis for the obstacles identified—are a fact of life in every MBS case

---

[4] In March 2014, the Federal Housing Finance Agency settled MBS cases involving materially similar allegations and claims against Countrywide and two sister companies for $9.3 billion. The case covered $57.5 billion in MBS—*one-eighth* the value of MBS covered by this settlement—and still settled for *115 times* more than the $500 million offered here.

and have not generated lopsided settlements or a raft of erroneous standing and tolling rulings. In any event, the comparison is certainly more illuminating than the comparison of absolute numbers or generalized comparison with other "securities class action settlements" that the district court *in fact* used to justify the settlement amount. *See* ER40 ("the proposed $500 million settlement represents one of the 25 largest securities class action settlements and largest MBS class action settlements to date").

The arbitrary $500 million figure was reached, and could only have been reached, through the district court's peculiar confluence of errors. Those errors artificially suppressed the baseline of "reasonable" damages far below the MBS face value. Even the most minor adjustment to the structure of the settlement and its assumptions about the differential strength of claims would have radically altered that figure. For instance, if Category Two purchasers were paid the same as those in Category One, their recovery would have been $650 million, over $500 million more than the $125 million approved. That single adjustment alone would more than double the total settlement amount. If Category Three purchasers were paid the same as those in Category Two—for the hurdles each faced were not appreciably different given the interrelatedness of the standing and tolling rulings—their recovery would have been $1.97 billion, nearly *40 times* more than the $50 million approved (reflecting the tremendous difference that representation can and did make). Even

41

more dramatically, if the vast majority of class members that comprised Category Three were paid the same as those in Category One, their recovery would have been $10.3 billion—over *200 times* their nominal recovery under the settlement. Such adjustments, moreover, may have been readily achieved by the correction of just one of the district court's many erroneous assumptions about standing and tolling.

In the final analysis, the real winners under the settlement were not only class counsel, but Countrywide. This was a suit that involved Countrywide's misrepresentations in connection with 9,383 "tranches," as to which even the district court acknowledged compelling evidence of Countrywide's misconduct in systematically disregarding underwriting guidelines. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) ("Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards."). Countrywide negotiated a settlement amount against the background assumption that a mere *2%* of the 9,383 tranches remained live for litigation. Moreover, it obtained the release of 100% of the claims, despite settling 98% of the tranches (9,215) for just 10% of the already-modest sum.

Yet what was good for named plaintiffs, class counsel, and Countrywide came on the backs of the vast majority of the class. The settlement was the paradigm of collusion and not even close to "fair, reasonable, and adequate."

42

**III.    The District Court's Underlying Standing And Tolling Rulings Were Fundamentally Flawed.**

The district court's standing and tolling rulings gave rise to insuperable Rule 23(a) problems and a settlement that cannot survive Rule 23(e) review.  That those rulings are meritless, however, magnifies the manifest unfairness of the settlement to the vast majority of class members.  Under the correct view of the law, the claims of Category Three members were every bit as valuable as those of other class members, and all class members should share in a settlement that reflects the extent of injury from defendants' value-destroying conduct.  The unfairness of the settlement is only underscored by the fact that named plaintiffs abandoned an appeal that stood a strong chance of success.  While paying lip service to the "erroneous" nature of the rulings, ER32, they supported settlement terms that *presumed* an inexplicably low chance of success on appeal.  Named plaintiffs thus took the easy way out and chose to settle on relatively more favorable terms for themselves at the expense of the appeal that was unquestionably in the interests of Category Three.

**A.    The Standing Rulings Contravene Well-Settled Principles.**

At the heart of these actions was the claim that defendants made uniformly false and misleading statements and omissions regarding Countrywide's loan-origination practices in offering documents for *all* the 429 MBS offerings in which class members purchased certificates.  The district court nonetheless ruled that plaintiffs only had "Article III standing" to advance that claim with respect to the

43

specific offerings in which they bought their certificates.  It then narrowed that rule still further, holding that plaintiffs had "Article III standing" to sue only with respect to the specific *tranches* within each offering that they themselves bought.  ER92-94; *see supra* n.1.  Under that doubly restrictive view of standing, named plaintiffs could not represent class members who purchased different tranches—even if the tranches are components of a single offering and purchased based on the same language in the same offering document.   The court thus disagreed that Countrywide's misrepresentations and omissions "injured all proposed class members" and held that plaintiffs "suffered no injury from those [tranches] they did not" purchase.  ER92.   That tranche-based standing rule was mistaken on multiple levels.   It conflates a question of injury with a question of damages, and even more fundamentally, conflates a question of standing with a question of Rule 23 class certification.

*First*, in focusing on individual tranches, the district court conflated "injury" with *damages*.   The Second Circuit in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), made precisely this distinction in rejecting a tranche-based standing rule.  The district court here noted that each tranche "provided a different investment opportunity with unique characteristics" (payment priority, credit ratings, and so forth).  ER93.  But as the Second Circuit explained, that "some Certificates may be entitled to cash flows from the loans

44

backing them earlier than others" only means that "[t]heir ultimate damages will of course vary depending on their level of subordination." 693 F.3d at 164. Those differences do not change the fact that *all* tranches were backed by Countrywide-originated mortgage loans. Thus, all had "the same 'necessary stake in litigating' whether th[at] lender[] in fact abandoned their underwriting guidelines." *Id.* And the claimed *injury*—Countrywide's misrepresentations of its loan-origination practices—is the same irrespective of the tranche. *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 166 (S.D.N.Y. 2011) ("The question of whether the offering documents were materially misleading will be answered the same way regardless of the varying knowledge levels, risk levels, and loss levels of purchasers of different tranches.").[5]

The district court suggested that "[b]ecause the loan groups backing the Certificates differed from tranche to tranche, the statements [in the same offering documents] … were essentially different statements for each tranche, given that the point of reference for those statements—the loan groups—differed at the tranche

---

[5] The district court attempted to distinguish the Second Circuit's reasoning on grounds that "[w]hat matters for RMBS litigation alleging misstatements … is what the defendants said about those standards," not "[t]he actual underwriting standards[] and the originator's conformance to them." *Strategic Capital*, 2012 WL 5900973, at *11. That only proves the point. Here, what defendants said about the loan-origination standards was substantially identical across every offering document.

level." ER93-94. The court's underlying assumption, however, was factually inaccurate. In many offerings, all the tranches were backed by a single pool of loans. No. 10-302 D.E. 241 at 4. At a minimum, then, there would have been no different loan groups, and thus no variation in "injury," across tranches in those offerings.

But even in offerings where different tranches *were* backed by different loan groups, every MBS purchased was backed by Countrywide mortgages. *All* the offering documents had near-identical (if not identical) statements detailing Countrywide's compliance with specific guidelines to originate those loans. *All* the tranches were downgraded by the Countrywide-originated loans' abysmal rate of defaults and delinquencies. And the district court's suggestion that a single statement in a single offering document applicable to *all* tranches could constitute "essentially different statements" merely because the tranches are backed by a different mix of Countrywide-originated loans was passing strange.

*Second*, and more fundamentally, the district court conflated a Rule 23 issue with Article III standing. There was no "injury" problem at all, but there certainly was not an *Article III injury-in-fact* problem. The court's inquiry into whether the class representatives had Article III standing to represent class members that invested in other tranches mixes apples and oranges. A class representative only has Article III standing to vindicate his or her own injuries. The question whether others

in the purported class suffered sufficiently similar injuries for the named plaintiff to represent them is answered by reference to Rule 23, not Article III.

Here, there is no serious Article III question at all. There was no dispute that named plaintiffs *personally* satisfied the familiar tripartite test—injury-in-fact that is fairly traceable to the complained-of action and redressable by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Under controlling caselaw, that sufficed to establish Article III standing to bring the class action. As this Court has held in no uncertain terms, "[i]n a class action, standing is satisfied *if at least one named plaintiff* meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (emphasis added); *accord Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011); *Fleming v. Pickard*, 581 F.3d 922, 924 n.3 (9th Cir. 2009); *Casey v. Lewi*s, 4 F.3d 1516, 1519 (9th Cir. 1993); *Harmsen v. Smith*, 693 F.2d 932 (9th Cir. 1982). That should have been the end of the Article III inquiry.[6]

---

[6] *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 422 (6th Cir. 2012) ("'Once [a plaintiff's individual] standing has been established, whether a plaintiff will be able to represent the putative class … depends solely on whether he is able to meet the additional criteria encompassed in Rule 23'"); *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) (decision below "'conflat[es] the standing inquiry with the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative'"); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("'at least one named plaintiff [must be able to] assert a claim directly against that defendant, and at that point … the inquiry shift[s] to a class action analysis'"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306-07 (3d Cir. 1998)

47

Rather than concoct an Article III issue, with its far-reaching effects on standing and tolling, the district court should have simply asked whether any differences among tranches defeated adequacy and typicality based on the specific claims that named plaintiffs advanced. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) (claim that named plaintiff denied general-manager promotion lacked standing to represent members denied assistant-general-manager promotion "more appropriately addresses whether [her] claim is typical"); *Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998) (court "confuse[d] the issue of a plaintiff's standing under Article III vis-à-vis a defendant with the relationship between a potential class representative and absent class members, which is governed by Rule 23"). "[T]he question whether [representatives] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy." Wright & Miller, *Federal Practice and Procedure* § 1785.1 (3d. ed.); *see also* Newberg on Class Actions § 2:6 (5th ed. 2014). And it was wholly premature to resolve what was at its core a Rule 23 issue on a motion to dismiss, much less elevate it into a constitutional concern.

---

("'Once threshold individual standing by the class representative is met' … 'the issue [becomes] one of compliance with the provisions of Rule 23'").

Moreover, had the district court correctly applied the Rule 23 lens, it would have averted the problems that fatally undermined the proposed settlement. Treating what was really a Rule 23 problem as an "Article III standing" issue allowed the district court to reach fundamentally inconsistent holdings that whipsawed those in Category Three. Labeling essentially the same inquiry as two different things allowed the court to suggest there was a standing problem that rendered Category Three claims virtually worthless, but that named plaintiffs were adequate and typical enough to compromise Category Three claims for a pittance while faring far better themselves. In reality, any differences among tranches either render named plaintiffs inadequate and atypical representatives (in which case they have no business compromising Category Three claims) or they do not. But the district court cannot have it both ways by labeling what is really a Rule 23 standing issue an Article III issue for one purpose.

Moreover, treating the "Article III" issue for what it is—a Rule 23 issue—also exposes the error of the district court's tolling ruling. Although the tolling ruling is wrong on its own terms, *see infra* III.B, labeling the defect one of Article III standing obscures what would otherwise be a glaring problem by making the defect seem more fundamental. Once it is properly understood as a mere disagreement about whether named plaintiffs are adequate and typical for purposes of a litigation class, the error of the tolling decision comes into even clearer focus: A class cannot lose

the benefit of *American Pipe* tolling simply because a later court takes a different view of whether the case can proceed as a class action under Rule 23.

*Finally*, the weight of authority lends no support to a tranche-based standing rule. Though few courts have opined directly on whether "standing" in MBS actions must be established tranche-by-tranche (much less certificate-by-certificate), the only Circuit to weigh in has squarely rejected that rule. *See NECA-IBEW*, 693 F.3d at 164-65; *accord N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 114 (2d Cir. 2013).[7] And the many district courts that have permitted plaintiffs to serve as class representatives of other investors without drawing any tranche-level restrictions (even as they have, in some situations, drawn offering-level restrictions) have suggested the same.[8] Indeed, because virtually all MBS class

---

[7] The only other circuit case to address standing in an MBS class action, *Plumbers' Local Union No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), is not to the contrary. Named plaintiffs there had purchased in two trusts but sued eight trusts. Noting that "[e]ach trust [was] backed by loans from a different mix of banks"—unlike here, where Countrywide established every trust and Countrywide-originated loans backed every offering— the First Circuit held that named plaintiffs lacked standing to raise claims as to the other six trusts. *Id.* at 771. As for the two trusts in which named plaintiffs purchased certificates, the court indicated that they had standing to bring claims about misrepresentations about loan-origination practices, implying that plaintiffs had standing to sue on behalf of all tranches within those trusts.

[8] *E.g., In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 778 (S.D.N.Y. 2012) ("Defendant has identified no substantive differences among the tranches that would warrant treatment of the tranches as separate securities here for Article III standing purposes."); *Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortgage Sec. Trust 2006-3*, 825 F. Supp. 2d

actions entail named plaintiffs who have not invested in all tranches of all offerings, the district court's rule would all but extinguish MBS class actions.

Accordingly, the district court's foundational premise—that Article III injury-in-fact barred named plaintiffs from representing all but the claims of the few class members who purchased the same tranches as themselves—was meritless. That premise nonetheless had far-reaching consequences, wiping out claims as to 98% of tranches originally in the class and fundamentally shaping the tangled path to settlement two and a half years later.

### B. The Tolling Rulings Contravene Well-Settled Principles.

The district court coupled its novel and misguided standing rule with an equally novel and misguided tolling rule. Ordinarily, "the commencement of a class action suspends the applicable statute of limitations … as to *all asserted members* of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe*, 414 U.S. at 554 (emphasis added). Plaintiffs thus contended

---

1082, 1152 (D.N.M. 2011) ("The Court does not find the Defendants tranche-based standing argument persuasive."); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 584-85 (S.D.N.Y. 2010) (plaintiffs who bought in 19 of 48 offerings had standing because all 48 were made pursuant to three registration statements); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) ("plaintiffs with a valid securities claim may represent the interests of purchasers of other types of securities … where the alleged harm stems from the same allegedly improper conduct"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (stock purchasers had standing to represent note purchasers where same offering documents were at issue).

that the 2007 *Luther* state-court filing had tolled the statute of limitations on their securities claims.  On its face, *Luther* had been brought on behalf of a virtually identical putative class of "all persons and entities who purchased or acquired" certificates "pursuant or traceable to the Registration Statements and Prospectus Supplements" issued by Countrywide affiliates in offerings between 2004 and 2007. No. 12-5125 D.E. 1-2 ¶ 189 (Consol. Compl.).

By extending the logic of its tranche-based standing rule to the 2007 *Luther* action, however, the district court ruled that the *Luther* named plaintiffs had had standing to sue only with respect to the particular tranches that they purchased.  The court further ruled, moreover, that only the fraction of putative class members whom the *Luther* named plaintiffs had had standing to represent could now have the statute of limitations on their claims tolled by *Luther*'s 2007 filing.  For all others, the court determined, the statute of limitations simply "continued to run" and their claims were now time-barred.  ER91.

That tolling analysis cannot withstand scrutiny.  As an initial matter, by importing the tranche-based standing requirement into *American Pipe*, the district court treated standing and tolling as coterminous.  But every Circuit to have addressed the issue has held otherwise.  To the contrary, *American Pipe* tolling is not contingent on whether the plaintiff had standing in the earlier-filed action.  *See Griffin v. Singletary*, 17 F.3d 356, 360-61 (11th Cir. 1994) (tolling based on action

in which representatives lacked standing); *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097-98 (3d Cir. 1975) (tolling based on filing by named plaintiffs later determined to lack standing). And this is clearly the rule suggested by *American Pipe* itself, which asks only whether an individual would have been in the class "had the suit been permitted to continue as a class action." 414 U.S. at 554; *see also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("The filing of a class action tolls the statute of limitations 'as to all *asserted members* of the class'") (emphasis added).

This Court has strongly signaled the same, having repeatedly applied *American Pipe* tolling based on prior class actions that involved jurisdictional defects. In *Catholic Social Services v. INS*, the Court applied tolling in a situation in which the court lacked jurisdiction to hear *any* of the original named plaintiffs' claims. 232 F.3d at 1149. That Congress had stripped jurisdiction over all the original class representatives was no impediment to the applicability of *American Pipe* tolling. The Court has similarly permitted tolling during the pendency of class actions that were dismissed for lack of personal or subject-matter jurisdiction. *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1186 (9th Cir. 2009) (personal jurisdiction); *Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1175 (9th Cir. 1986) (subject-matter jurisdiction). *A fortiori*, standing defects with the original named plaintiffs—even if

53

actual standing defects—have no bearing on tolling.  Yet the district court assumed the contrary.

The district court compounded that error by treating tolling as *retroactively* revocable.  Not only did the district court render tolling contingent on standing, but it rendered it contingent on *later*-discovered standing defects.  Even the district court recognized that allowing an assessment of the standing of named plaintiffs *in 2007* to retroactively deprive absent class members of the benefit of tolling must have outer limits.  The court thus acknowledged that where the standing of an original plaintiff "is a matter of bona fide dispute, it may well be unfair to subsequently bar plaintiffs who reasonably … relied on that plaintiff to represent their interests." *Putnam Bank v. Countrywide Fin. Corp.*, 860 F. Supp. 2d 1062, 1069-70 (C.D. Cal. 2012).

The *Luther* plaintiffs' standing in state court was at least "a matter of bona fide dispute," disputed only years after the fact by the federal district court below. Indeed, the district court's standing ruling was fundamentally mistaken, *see supra* III.A, but certainly was debatable enough to avoid the strong medicine of depriving those in Category Three of *American Pipe* tolling in 2013.

Permitting retroactive revocation of tolling, moreover, contravenes both policies of *American Pipe*—efficiency of the litigation process and fair notice to defendants.  It thwarts efficiency because the threat of revocation compels more

plaintiffs to needlessly opt out of class actions and file duplicative individual claims to preserve their interests—rather than "rely on the named plaintiffs to press their claims," *Crown, Cork*, 462 U.S. at 353—whenever a named plaintiff's standing is even slightly less than unassailable. That in turn saddles absent class members with a near-impossible obligation to rigorously police not only all class-action proceedings brought in their interest, but the standing of the named plaintiffs bringing such proceedings. That obligation, however, cannot be squared with the fact that tolling has long extended even to class members wholly "unaware of the proceedings brought in their interest." *Am. Pipe*, 414 U.S. at 552; *see also Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("tolling rule is not limited to those class members who can prove reliance upon the pendency of the class action").

The perpetual prospect of revocation based on later-discovered standing defects also undermines notice to the defendant. The original complaint supplies bright-line notice to "defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *Am. Pipe*, 414 U.S. at 555. Applying uncertain standing concepts to redefine the class members as to whom tolling applies muddies that message, leaving both defendants and plaintiffs unsure as to who is

considered a "potential plaintiff[]" and vulnerable to "unfair surprise." *Crown, Cork*, 462 U.S. at 353.

The district court's final nail in the *American Pipe* coffin—its *Strategic Capital* dictum that only federal-court actions, not state-court actions, can be the basis for tolling—was announced *sua sponte*, without relevant briefing, in the teeth of a holding to the opposite effect in *Maine State*. Beyond its procedural irregularities, moreover, not one other federal court has categorically confined *American Pipe* to federal-court class actions. To the contrary, every court to weigh in has indicated that statutes of limitation can, at a minimum, be tolled by state-court class actions that involve federal claims, as *Luther* did. *See Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 563 (7th Cir. 2011) ("The source of law, and not the identity of the forum, determines the effect of a failed class action."); *Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987) (applying *American-Pipe* to state-court class action); *Machesney v. Ramsgate Ins., Inc.*, 2014 WL 2605479, at *4 (E.D. Mich. June 10, 2014) (same); *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 2012 WL 426267, at *3 n.2 (D.N.J. Feb. 7, 2012) ("it does not appear to the Court that the fact that the prior class action suit was filed in state court is relevant to the application of *American Pipe*").

As the district court properly recognized on its first go-round, *Luther* "was a lawsuit over federal claims even when litigated in state court." ER129. Walling off

such putative class actions from tolling would be still more untethered to the animating policies of *American Pipe.* It would induce undisputed members of the putative class with exclusively federal claims, as here, to burden the federal courts with identical individual claims simply to avert potential hurdles to their recovery down the line.[9] And it would have no bearing on defendant's notice, for a defendant would face no unfair surprise from a follow-on suit that raises the identical claims to those of a previous state-court action.

* * *

At bottom, both the district court's tranche-based standing rule and its related tolling rule were deeply flawed, further underscoring the inequities of the sweeping release of claims negotiated by the unrepresentative class representatives. Worse still, they created the stark intra-class divisions that undergirded the assumptions about the relative strength of claims around which the settlement was structured. In

---

[9] *In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006), lent no support to the district court's dictum. The Seventh Circuit held that a state-court class action raising state antitrust-law claims did not toll the time to file a federal-court suit raising "factually similar" federal antitrust-law claims. *Id.* at 793-94. As the Seventh Circuit itself has noted, "[t]he point of that decision … was not that a change of forum was dispositive; it was that state and federal antitrust laws differ." *Sawyer*, 642 F.3d at 562. Here, both suits advanced identical, federal claims. And those federal claims were subject to concurrent jurisdiction (not exclusive federal jurisdiction, as in *Copper*), making the dangers of duplication real and avoidable. *Cf. Copper*, 436 F.3d at 794 ("state claimants are not being *forced* … to file duplicative claims since … it is necessary at some point to file suit in federal court").

radically reducing the number of live claims in the litigation, both premises ineluctably paved the way toward the arbitrarily low and one-sided settlement. That both premises cannot stand only further undermines the settlement certification and approval below.

## CONCLUSION

For the reasons set forth above, this Court should reverse the judgment below.

Respectfully submitted,

<u>s/PAUL D. CLEMENT</u>
PAUL D. CLEMENT
  *Counsel of Record*
JEFFREY M. HARRIS
CANDICE CHIU
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

DAVID J. GRAIS
MARK B. HOLTON
OWEN L. CYRULNIK
KATHRYN E. MATTHEWS
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, NY 10036

*Counsel for Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd.*

June 24, 2014

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, *Maine State Retirement System v. Countrywide Fin. Corp.*, No. 14-55093 (9th Cir.) is a related appeal filed by different objectors to the same judgment below. The following appeals, like this consolidated appeal, arise out of MBS suits brought against Countrywide before Judge Mariana R. Pfaelzer of the Central District of California and "raise the same or closely related issues" about standing and tolling:

- *Federal Deposit Insurance Corporation as receiver for Strategic Capital Bank v. Countrywide Financial Corp.*, No. 12-57299 (9th Cir.)

- *Western and Southern Life Ins. v. Countrywide Financial Corp.*, No. 12-57303 (9th Cir.).

- *Federal Deposit Insurance Corporation as receiver for Security Savings Bank v. Countrywide Financial Corp.*, No. 13-56613 (9th Cir.).

- *Federal Deposit Insurance Corporation as receiver for Guaranty Bank v. Countrywide Securities Corporation*, No. 13-56675 (9th Cir.)

- *Federal Deposit Insurance Corporation as receiver for Strategic Capital Bank v. J.P. Morgan Securities L.L.C.*, No. 13-56781 (9th Cir.)

- *Federal Deposit Insurance Corporation as receiver for Colonial Bank v. Countrywide Securities Corporation*, No. 13-56783 (9th Cir.)

- *American Fidelity Assurance Co. v. Countrywide Financial Corp.*, No. 14-55002 (9th Cir.).

- *The Prudential Life Insurance Co. v. Countrywide Financial Corp.*, No. 14-55660 (9th Cir.).

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
JEFFREY M. HARRIS
CANDICE CHIU
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd.*

June 24, 2014

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7). The brief, excluding exempted portions, contains 13,977 words, as calculated by Microsoft Word 2013, and is printed in a proportional Times New Roman font at 14 point.

Dated: June 24, 2014

<u>s/Candice Chiu</u>
Candice Chiu

# ADDENDUM

## Table of Contents

**Page**

15 U.S.C. § 77k ...................................................................................1a

15 U.S.C. § 77*l*(a) ..............................................................................5a

15 U.S.C. § 77m ..................................................................................6a

15 U.S.C. § 77*o* .................................................................................7a

Fed. R. Civ. P. 23(a) ...........................................................................8a

Fed. R. Civ. P. 23(e) ...........................................................................9a

**15 U.S.C. § 77k**
**Civil liabilities on account of false registration statement**

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

(b) Persons exempt from liability upon proof of issues

Notwithstanding the provisions of subsection (a) of this section no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof--

(1) that before the effective date of the part of the registration statement with respect to which his liability is asserted (A) he had resigned from or had taken such steps as are permitted by law to resign from, or ceased or refused to act in, every office, capacity, or relationship in which he was described in the registration statement as acting or agreeing to act, and (B) he had advised the Commission and the issuer in writing that he had taken such action and that he would not be responsible for such part of the registration statement; or

(2) that if such part of the registration statement became effective without his knowledge, upon becoming aware of such fact he forthwith acted and advised the Commission, in accordance with paragraph (1) of this subsection, and, in addition, gave reasonable public notice that such part of the registration statement had become effective without his knowledge; or

(3) that (A) as regards any part of the registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and (B) as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert, (i) he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) such part of the registration statement did not fairly represent his statement as an expert or was not a fair copy of or extract from his report or valuation as an expert; and (C) as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself) or purporting to be a copy of or extract from a report or valuation of an expert (other than himself), he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement of the expert or was not a fair copy of or extract from the report or valuation of the expert; and (D) as regards any part of the registration statement purporting to be a statement made by an official person or purporting to be a copy of or extract from a public official document, he

2a

had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue, or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement made by the official person or was not a fair copy of or extract from the public official document.

(c) Standard of reasonableness

In determining, for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

(d) Effective date of registration statement with regard to underwriters

If any person becomes an underwriter with respect to the security after the part of the registration statement with respect to which his liability is asserted has become effective, then for the purposes of paragraph (3) of subsection (b) of this section such part of the registration statement shall be considered as having become effective with respect to such person as of the time when he became an underwriter.

(e) Measure of damages; undertaking for payment of costs

The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) of this section for damages in excess of the total price at which the

securities underwritten by him and distributed to the public were offered to the public. In any suit under this or any other section of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

(f) Joint and several liability; liability of outside director

(1) Except as provided in paragraph (2), all or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

(2)(A) The liability of an outside director under subsection (e) of this section shall be determined in accordance with section 78u-4(f) of this title.

(B) For purposes of this paragraph, the term "outside director" shall have the meaning given such term by rule or regulation of the Commission.

(g) Offering price to public as maximum amount recoverable

In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public.

## 15 U.S.C. § 77*l*(a)
## Civil liabilities arising in connection with prospectuses and communications

(a) In general

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

**15 U.S.C. § 77m**
**Limitation of actions**

No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

**15 U.S.C. § 77*o***
**Liability of controlling persons**

(a) Controlling persons

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

(b) Prosecution of persons who aid and abet violations

For purposes of any action brought by the Commission under subparagraph (b) or (d) of section 77t of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this subchapter, or of any rule or regulation issued under this subchapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

## Fed. R. Civ. P. 23(a)
## Class Actions

(a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

## Fed. R. Civ. P. 23(e)

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, I electronically filed the foregoing Appellants' Opening Brief with the Clerk of Court of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which provides electronic service of the filing to all counsel of record who have registered for ECF notification in this matter.

s/Paul D. Clement
Paul D. Clement