Nos. 14-55093, 14-55120, 14-55121, 14-55122, 14-55125, 14-55128, & 14-55140

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, et al.,
*Plaintiffs-Appellees*,

– and –

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation;
COUNTRYWIDE HOME LOANS INC.; CWALT, INC., a Delaware corporation;
CWMBS, INC., a Delaware corporation; CWABS, INC., a Delaware corporation;

[Caption continued on following page.]

Appeal from the United States District Court
for the Central District of California
Nos. 2:10-cv-00302-MRP; 2:12-cv-05122-MRP; and 2:12-cv-05125-MRP
The Honorable Mariana R. Pfaelzer

PLAINTIFFS-APPELLEES' ANSWERING BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
JOSEPH D. DALEY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610/667-7706

COHEN MILSTEIN SELLERS
  & TOLL PLLC
STEVEN J. TOLL
JULIE GOLDSMITH REISER
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone: 202/408-4600

COHEN MILSTEIN SELLERS
  & TOLL PLLC
JOEL P. LAITMAN
CHRISTOPHER LOMETTI
77 Pine Street, 14th Floor
New York, NY 10005
Telephone: 212/838-7797

Attorneys for Plaintiffs-Appellees
[Additional counsel appear on signature page.]

964871_1

CWHEQ, INC., a Delaware corporation; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; BANK OF AMERICA CORPORATION; NB HOLDINGS CORPORATION; J.P. MORGAN SECURITIES INC.; DEUTSCHE BANK SECURITIES INC.; BEAR STEARNS & CO.; BANC OF AMERICA SECURITIES, LLC; UBS SECURITIES LLC; MORGAN STANLEY & CO., INC.; EDWARD D. JONES AND CO., LP; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN SACHS & CO; CREDIT SUISSE SECURITIES (USA), LLC; GREENWICH CAPITAL MARKETS, INC., AKA RBS Greenwich Capital; BARCLAYS CAPITAL INC.; HSBC SECURITIES (USA); BNP PARIBAS SECURITIES CORP; MERRILL LYNCH PIERCE FENNER & SMITH INCORPORATED; STANFORD L. KURLAND; DAVID A SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR,

*Defendants-Appellees*,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First Pacific Bank of California, as Receiver for Affinity Bank, as Receiver for CF Bancorp, as Receiver for Citizens National Bank, as Receiver for Eurobank, as Receiver for First Banking Center, as Receiver for First Dupage Bank, as Receiver for Horizon Bank, as Receiver for Imperial Capital Bank, as Receiver for Independent Bankers Bank, as Receiver for Los Padres Bank, as Receiver for Palos Bank & Trust Co., as Receiver for Prosperan Bank, as Receiver for SCB Bank, as Receiver for ShoreBank, as Receiver for Statewide Bank, as Receiver for USA Bank, as Receiver for Venture Bank, and as Receiver for Warren Bank,

*Objector-Appellant.*

*Western Conference of Teamsters Pension Trust Fund, et al. v. Countrywide Financial Corporation, et al.*
Ninth Circuit Nos. 14-55093, 14-55120, 14-55121, 14-55122, 14-55125, 14-55128, & 14-55140

## CORPORATE DISCLOSURE STATEMENT

None of the Plaintiffs-Appellees is a corporation.

- i -

# TABLE OF CONTENTS

**Page**

I. JURISDICTIONAL STATEMENT ..................................................1

II. COUNTERSTATEMENT OF ISSUES ........................................1

III. COUNTERSTATEMENT OF THE CASE ....................................1

    A. Summary of the Underlying Litigation ...............................1

    B. The Underlying Actions' Long and Winding Road, Including Prior Journeys to This Court and the California Appellate Court ........3

        1. The *Luther* Action ......................................................3

        2. The *Western Conference* Action.................................5

        3. The *Maine State* Action ............................................6

        4. The *Strategic Capital Bank* Action............................8

    C. Mediation Efforts Spanning Four Years Yield a $500 Million Settlement and a Plan of Allocation Recommended by a Retired Federal Judge........................................................................9

        1. Mediation Led by Professor Green ..............................9

        2. Judge Gertner Recommends the Tripartite Plan of Allocation...................................................................11

    D. Preliminary and Final Approval of the Settlement .............14

        1. Preliminary Approval.................................................14

            a. Preliminary Approval Hearing .......................14

            b. Plaintiffs' Supplemental Submissions............16

            c. Preliminary Approval of the Settlement.........17

**Page**

          d.     Class Notice Yields Few Opt-Outs and Objectors .........18

    2.    Final Approval Hearing ...........................................................19

          a.     Plaintiffs' Presentation ...................................................19

          b.     Objectors CDOs/FDIC ....................................................20

          c.     Objectors First National/LL Funds.................................21

  E.    Final Approval Order ........................................................................22

    1.    Rules 23(a) and 23(b)(3) Are Satisfied.....................................23

    2.    The Proposed Settlement and Plan of Allocation Are
        Fair, Reasonable, and Adequate.................................................26

IV.    SUMMARY OF ARGUMENT .....................................................................33

V.    STANDARD OF REVIEW ..........................................................................36

VI.    ARGUMENT.................................................................................................36

  A.    Named Plaintiffs and Class Counsel Zealously Guarded the
      Class's Interests ................................................................................36

    1.    Objectors' Contention that Named Plaintiffs and Class
        Counsel Should Have Rejected the Settlement and
        Appealed the District Court's Standing and Tolling
        Rulings Fails .............................................................................36

    2.    The Named Plaintiffs and Class Counsel Satisfied Rule
        23 Adequacy and There Were No Disabling Conflicts of
        Interest Requiring Subclasses ...................................................42

    3.    The Named Plaintiffs Satisfied Rule 23 Typicality .................48

- iii -

**Page**

B.   The District Court Did Not Abuse Its Discretion in Finding the
     Settlement and Plan of Allocation Fair, Reasonable, and
     Adequate ................................................................................. 52

C.   The Objectors Improperly Advance Merits-Based Challenges to
     the District Court's Underlying Rulings ............................................ 57

D.   The Scope of the Settlement's Release Language is Appropriate ...... 58

     1.   Claims and Entities Not Alleged in a Complaint
          Nonetheless May Be Released Under the "Identical
          Factual Predicate" Doctrine ....................................................... 59

     2.   Objectors' "No Consideration" Argument Fails ...................... 62

     3.   The District Court Was Not Required to Issue Written
          Rulings on Every Objection ....................................................... 63

VII.  CONCLUSION ................................................................................. 64

- iv -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Air Line Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.*,
   630 F.2d 1164 (7th Cir. 1980) ........................................................50

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)............................................................*passim*

*American Pipe & Construction Co. v. Utah*,
   414 U.S. 538 (1974)...................................................................7, 8, 29

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ........................................................51

*Bradley v. Milliken*,
   828 F.2d 1186 (6th Cir. 1987) ......................................................60

*Churchill Vill., L.L.C. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ...................................................27, 54

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ..........................................50, 59, 61

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ........................................................55

*FDIC v. Countrywide Fin. Corp.*,
   No. 2:12-CV-4354-MRP, 2012 U.S. Dist. LEXIS 167696
   (C.D. Cal. Nov. 21, 2012)....................................................*passim*

*Gelboim v. Bank of Am. Corp.*,
   ___ U.S. ___, 134 S. Ct. 2876 (2014).............................................39

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...............................................*passim*

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..............................................48, 49, 51

**Page**

*Hassine v. Jeffes*,
   846 F.2d 169 (3d Cir. 1988) ................................................................50

*Heuser v. Kephart*,
   215 F.3d 1186 (10th Cir. 2000) .........................................................63

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) ................................................................60

*Huene v. United States*,
   743 F.2d 703 (9th Cir. 1984) .............................................................38

*In re Advanced Battery Techs. Sec. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ......................................................53

*In re "Agent Orange" Prod. Liab. Litig.*,
   818 F.2d 145 (2d Cir. 1987) ..............................................................55

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
   No. 09 MDL 2058, 2010 U.S. Dist. LEXIS 37799
   (S.D.N.Y. Apr. 9, 2010)....................................................................60

*In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*,
   269, F.R.D. 468 (E.D. Pa. 2010).......................................................53

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .......................................................47, 57

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
   726 F.2d 1075 (2d Cir. 1984) ............................................................54

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3d Cir. 2009) ..............................................................47

*In re Integra Realty Res., Inc.*,
   354 F.3d 1246 (10th Cir. 2004) ....................................................41, 58

964871_1

**Page**

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ......................................................*passim*

*In re Pacific Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) .......................................................*passim*

*In re Pet Food Prods. Liab. Litig.*,
  629 F.3d 333 (3d Cir. 2010) ...............................................................47

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ...............................................................53

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ............................................40, 41

*Kornberg v. Carnival Cruise Lines, Inc.*,
  741 F.2d 1332 (11th Cir. 1984) .........................................................51

*Literary Works in Elec. Databases Copyright Litig. v.*
  *Thomson Corp.*,
  654 F.3d 242 (2d Cir. 2011) .......................................................46, 47

*Luther v. Countrywide Fin. Corp.*,
  195 Cal. App. 4th 789 (2011) ...............................................................5

*Luther v. Countrywide Home Loans Servicing LP*,
  533 F.3d 1031 (9th Cir. 2008) ..............................................................4

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  722 F. Supp. 2d 1157 (C.D. Cal. 2010) ...............................................7

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 2:10-CV-0302-MRP, 2011 U.S. Dist. LEXIS 125203
  (C.D. Cal. May 5, 2011) .......................................................................7

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 2:10-CV-0302-MRP, 2011 U.S. Dist. LEXIS 53359
  (C.D. Cal. Apr. 20, 2011) ...............................................................8, 39

- vii -

**Page**

*Marshall v. Holiday Magic, Inc.*,
  550 F.2d 1173 (9th Cir. 1977) ........................................................41, 43, 61, 63

*McKay v. Ingleson*,
  558 F.3d 888 (9th Cir. 2009) ...........................................................................61

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
  863 F. Supp. 2d 928 (N.D. Cal. 2012) ..............................................................62

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*,
  797 F.2d 799 (9th Cir. 1986) ...........................................................................58

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ...........................................................................55

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) .........................................................................................45

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) .........................................................................47

*Radosti v. Envision EMI, LLC*,
  717 F. Supp. 2d 37 (D.D.C. 2010) ...................................................................53

*Redwen v. Sino Clean Energy, Inc.*,
  No. CV-11-3936, 2013 U.S. Dist. LEXIS 100275
  (C.D. Cal. July 9, 2013) ...................................................................................57

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ...............................................................59, 60, 61

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) .............................................................24, 48, 49

*Skilstaf, Inc. v. CVS Caremark Corp.*,
  669 F.3d 1005 (9th Cir. 2012) .............................................................60, 61, 63

964871_1

**Page**

*Sobel v. Hertz Corp.*,
No. 3:06-CV-00545-LRH, 2011 U.S. Dist. LEXIS 68984
(D. Nev. June 27, 2011) ................................................................53

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ...........................................................58

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982) ...........................................................59

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) ............................................................63

*UAW v. GMC*,
497 F.3d 615 (6th Cir. 2007) ..........................................................48

*Williams v. GE Capital Auto Lease*,
159 F.3d 266 (7th Cir. 1998) ..........................................................59

*Williams v. Rohm & Haas Pension Plan*,
658 F.3d 629 (7th Cir. 2011) ..........................................................57

*Zarowitz v. BankAmerica Corp.*,
866 F.2d 1164 (9th Cir. 1989) ........................................................64

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§77.................................................................................................2, 3
§77k...............................................................................................16

28 U.S.C.
§1291.....................................................................................37, 38, 39
§1292(b).........................................................................................8
§1452(a).........................................................................................5

**Page**

Federal Rules of Civil Procedure

Rule 23 ................................................................................*passim*
Rule 23(a) ...........................................................................*passim*
Rule 23(a)(3) ..............................................................................48
Rule 23(a)(4) ..............................................................................42
Rule 23(b) ...................................................................................22
Rule 23(b)(3) ......................................................................*passim*
Rule 54(b) ......................................................................8, 37, 39

964871_1

## I.    JURISDICTIONAL STATEMENT

Plaintiffs-Appellees ("Plaintiffs") agree with the jurisdictional statements asserted by Objectors-Appellants Broderick CDO 2 Ltd., *et al.* ("CDOs") and First National Bank & Trust of Rochelle and LL Funds, LLC ("FNBR").[1]

## II.   COUNTERSTATEMENT OF ISSUES

1.    Whether the District Court ***acted within its discretion*** in holding the Settlement fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23, given its multi-year oversight of the underlying actions and efforts that secured an unprecedented $500 million recovery for the Settlement Class.

2.    Whether the District Court ***acted within its discretion*** in approving the Settlement's Plan of Allocation.

## III.  COUNTERSTATEMENT OF THE CASE

### A.    Summary of the Underlying Litigation

The three underlying actions whose global Settlement this appeal concerns are:

*Luther v. Countrywide Financial Corp.*, No. 12-CV-5125-MRP (C.D. Cal.) ("*Luther*"); *Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corp.*, No. 12-CV-5122-MRP (C.D. Cal.) ("*Western Conference*"); and *Maine State Retirement System v. Countrywide Financial Corp.*, No. 10-CV-00302-

---

[1]    Because Objector-Appellant Federal Deposit Insurance Corporation ("FDIC") has adopted wholesale CDOs's Opening Brief, Plaintiffs' arguments directed at CDOs apply equally to FDIC.

964871_1

MRP (C.D. Cal.) ("*Maine State*") (collectively, "Actions" or "Settlement Actions").
ER17.[2]

Plaintiffs alleged that Countrywide Financial Corporation ("Countrywide") and its affiliates, along with various underwriter banks (together, "Defendants"), made false and misleading statements in violation of the Securities Act of 1933 ("Securities Act"), and in connection with 429 mortgage-backed securities ("MBS") offerings. ER17-ER18 and nn. 1 & 2. Plaintiffs sought to represent a class of all persons/entities who acquired certain MBS (a/k/a "Certificates") between January 2005 and December 2007. CD436:¶10.

Plaintiffs' allegations stem from Countrywide's home-loan origination practices between 2004 and 2007. ER17. The operative *Luther* Complaint alleges that the offerings' materials contained false and misleading statements about the processes used to originate, and the purported quality of, mortgages that were packaged, securitized, and sold to investors in the offerings. CD436:¶11. The entire securitization process allegedly was conducted at Countrywide's direction. *Id*.

Plaintiffs allege that despite the falsehoods, the Certificates were rated as "investment grade" – meaning investors purchased securities that were riskier than

---

[2]     Throughout this Brief, "ER__" denotes the Excerpts of Record filed by CDOs, and "CD__" denotes materials in the omnibus clerk's docket in *Maine State* (unless noted otherwise).

964871_1

represented. CD436:¶13. Plaintiffs further allege that the Certificates' values collapsed as the truth concerning the underlying mortgages' quality emerged; these Actions followed. *Id.*

### B. The Underlying Actions' Long and Winding Road, Including Prior Journeys to This Court and the California Appellate Court

As the District Court noted, the lengthy and complex procedural history of the Actions "merits detailed recitation, for it provides necessary context in assessing" the Settlement's "essential fairness." ER18.

### 1. The *Luther* Action

In November 2007, plaintiff David Luther filed *Luther* in the Los Angeles, California Superior Court. ER19. Brought as a class action, *Luther* alleged Securities Act violations in connection with 188 Countrywide MBS offerings (*id.*), and was the first MBS class case filed following the financial crisis. CD436:¶16.

In December 2007, Defendants removed *Luther* to the Central District of California federal court under the Class Action Fairness Act of 2005. ER19. Plaintiffs moved to remand the matter, arguing that strict non-removability features of the Securities Act forbade removal. CD436:¶19. The District Court agreed, granting the remand motion. ER19.

Two sets of Defendants petitioned this Court for appellate review; after granting the petitions and ordering simultaneous briefing, this Court heard oral argument on

- 3 -

964871_1

July 14, 2008.  CD436:¶¶21-23.  This Court subsequently affirmed the remand decision.  *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008).  *Luther* returned to California state court in September 2008.  CD436:¶23.

While the *Luther* federal appeal was pending, institutional investor Washington State Plumbing & Pipefitting Pension Trust filed a putative class action in California state court, alleging Securities Act claims on behalf of purchasers in nearly 400 Countrywide offerings.  ER19.  With the additional offerings, that action materially expanded upon *Luther*'s scope.  CD436:¶24.

After counsel amended the *Luther* complaint to include additional named plaintiffs (CD436:¶27), *Luther* and *Washington State* were consolidated and *Luther* was tapped as the lead action.  ER20.  The Superior Court appointed several institutional investors as Co-Lead Plaintiffs (including Vermont and Maine state pension funds, among others), and approved their selection of Co-Lead Counsel.  *Id*. On October 16, 2008, those Plaintiffs filed a consolidated complaint encompassing 20 registration statements, 429 Countrywide offerings, and 9,300-plus MBS tranches; that pleading remains the operative "Complaint" in *Luther*.  *Id*.; *see also* Consolidated Complaint (attached as Exhibit 1 to Dkt. No. 1 in *Luther*) (hereafter, "*Luther*/CD1/Ex. 1:¶__").

In March 2009 Defendants filed demurrers to the Complaint, contending, *inter alia*, that its claims were subject to exclusive federal subject matter jurisdiction under

- 4 -

the Securities Litigation Uniform Standards Act of 1998's ("SLUSA") amendments to the Securities Act. ER20. The Superior Court subsequently dismissed *Luther* as barred by SLUSA (ER21), entering judgment on March 3, 2010. CD436:¶46.

The *Luther* Plaintiffs appealed to the California Court of Appeal. ER21. On May 18, 2011, that court reversed the Superior Court's ruling, unanimously concluding that the state court's concurrent jurisdiction over the *Luther* claims had survived SLUSA's amendments. *Id.*; *see Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789 (2011).

In May 2012, *Luther* again returned to federal court because two mortgage originators whose loans were securitized into some of the MBS at issue had initiated bankruptcy proceedings. ER21. Defendants filed removal notices under 28 U.S.C. §1452(a) "related to" bankruptcy jurisdiction. ER21. The case thereafter proceeded in federal court.

### 2.    The *Western Conference* Action

On November 17, 2010, while *Luther* was on appeal in California state court, Western Conference of Teamsters Pension Trust Fund filed a new action in California Superior Court. ER22; *see also Western Conference of Teamsters Pension Trust Fund v. Countrywide Fin. Corp.*, No. BC449726 (Cal. Super. Ct. L.A. Cnty.). Like *Luther*, *Western Conference* alleged Securities Act claims against the *Luther* Defendants;

unlike *Luther*, the new action alleged that Bank of America ("BofA") and N.B. Holdings were liable as Countrywide's successors-in-interest. ER22.

In June 2012, after Defendants successfully removed *Western Conference* and *Luther* to federal court under "related to" bankruptcy jurisdiction, the cases were coordinated for briefing and hearings on motions to dismiss. *Id*.

Defendants moved to dismiss *Luther* and *Western Conference*, but the District Court deferred ruling in light of the parties' settlement negotiations. *Id*. The Settlement was reached prior to the motion's resolution. *Id*.

### 3. The *Maine State* Action

Shortly after *Luther*'s 2010 state-court dismissal, one of the lead plaintiffs – Maine State – filed a putative class action before the District Court, asserting the same Securities Act claims with respect to the same MBS offerings on behalf of the same putative Class. ER22. The filing was intended to preserve the Class's interests against "timeliness" arguments in the event that the California Court of Appeal affirmed *Luther*'s dismissal. ER22-ER23.

Following its appointment of lead plaintiff (Iowa Public Employees Retirement System), and class counsel in *Maine State*, the District Court rendered several decisions that affected *Maine State*'s scope.

First, the District Court held that the *Maine State* plaintiffs had Article III and statutory standing to sue "'only with respect to the 81 Offerings in which the named

plaintiffs [in *Luther*] purchased.'" *Id.* (quoting *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010)). The court further held that so-called *American Pipe* tolling could not suspend the statute of limitations for investors who had purchased in MBS offerings other than those in which the *Luther* named plaintiffs had purchased. *Maine State*, 722 F. Supp. 2d at 1166-67.[3]

Second, the District Court held that the *Maine State* plaintiffs must establish **tranche**-based standing in addition to **offering**-based standing for each security at issue. ER23; *see also Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302-MRP, 2011 U.S. Dist. LEXIS 125203, at *25-*26 (C.D. Cal. May 5, 2011) (because "each Certificate is a separate security … Plaintiffs have standing to assert their claims with respect only to those Certificates a named Plaintiff has purchased"). The rulings "effectively narrowed *Maine State* to involve only eight specific MBS tranches that had been purchased by both the *Maine State* … and the *Luther* named plaintiffs." ER23.

The District Court issued a third order that also figures into this appeal. On April 20, 2011, the court dismissed with prejudice successor-liability claims against BofA and N.B. Holdings, leaving Countrywide as the only corporate issuer defendant.

---

[3] Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, the filing of a class action tolls the statute of limitations as to all asserted members of the class. *Maine State*, 722 F. Supp. 2d at 1166.

- 7 -

ER24 n.3; *see Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302-MRP, 2011 U.S. Dist. LEXIS 53359 (C.D. Cal. Apr. 20, 2011).

Plaintiffs did not accept these rulings without protest. The *Maine State* Plaintiffs moved the District Court to enter a Rule 54(b) final judgment on its offering- and tranche-based standing and tolling orders, and its successor-liability ruling, so that immediate appeals might be taken. CD258-CD260; CD263-CD265. Alternatively, they asked the court to certify its orders for interlocutory appeal under 28 U.S.C. §1292(b). CD258:3.

The District Court denied both motions (CD262; CD286), squelching Plaintiffs' attempts at immediate appellate review.

### 4. The *Strategic Capital Bank* Action

On November 21, 2012, the District Court issued an opinion in a related case, *FDIC v. Countrywide Fin. Corp.*, No. 2:12-CV-4354-MRP, 2012 U.S. Dist. LEXIS 167696 (C.D. Cal. Nov. 21, 2012) ("*Strategic Capital*"), reevaluating the extent to which *Luther*'s state-court filing had triggered *American Pipe* tolling of other actions. ER24. The District Court concluded that "*American Pipe* tolling **cannot apply to a class action filed in state court**, even if the claims in the state class action are federal." *Strategic Capital*, 2012 U.S. Dist. LEXIS 167696, at *44.[4] Accordingly, the

---

[4]     Throughout this Brief, ***emphasis*** is added and internal citations are omitted unless otherwise noted.

2007 *Luther* filing could not be relied upon to toll the statute of limitations in later-filed *Maine State* and *Western Conference*; if applied, the ruling would "likely result" in their dismissals.  ER24.

### C. Mediation Efforts Spanning Four Years Yield a $500 Million Settlement and a Plan of Allocation Recommended by a Retired Federal Judge

#### 1. Mediation Led by Professor Green

Professor Eric Green is a professional mediator, having retired from a 30-year career as a law school professor focusing on, *inter alia*, negotiation, mediation, and resolution of mass torts.  CD459:¶2.  While presently a co-founder of "Resolutions, LLC," Professor Green also co-founded JAMS/Endispute.  *Id*.

In early 2009 the *Luther* parties approached Professor Green to serve as a mediator, and met with him on June 26, 2009, to discuss preliminary settlement prospects.  CD459:¶¶7,8; CD433:10.  Although those discussions broke off due to continued litigation and *Luther*'s state-court dismissal, negotiations resumed following the *Luther* Plaintiffs' successful state-court appeal and the *Maine State* Plaintiffs' near-completion of fact discovery.  CD459:¶9.  The renewed negotiations resulted in two full-day, in-person mediation sessions in November and December 2012, attended by a dozen-plus counsel and Defendants' and Plaintiffs' representatives.  CD433:10; CD459:¶¶9, 11, 17.

Following the second mediation session the parties remained at an impasse, with each side holding divergent views on almost every issue – including standing, Defendants' liability, loss causation, and classwide damages. CD433:10; CD459:¶13.

Despite the impasse, Professor Green facilitated continued settlement negotiations in the following months, including at least 20 telephonic conferences from December 2012 to April 2013. CD459:¶17. While these discussions helped reduce the distance between Plaintiffs' settlement demand and Defendants' counteroffer, a significant gap remained. *Id.* On April 3, 2013, Professor Green submitted to the parties a $500 million "mediator's proposal." *Id.* On April 4, 2013, both sides accepted his proposal. CD433:10.

Professor Green's declaration in support of the Settlement recounts the mediation efforts' complexity:

- Prior to the late-2012 sessions, both sides provided "detailed mediation memoranda and supporting documentation" that discussed, *inter alia*, issues of timeliness and standing, loss causation, and the parties' damages analyses. CD459:¶10.

- Given the Actions' nature, the issues involved "were far more complex than those presented in a typical securities class action." *Id.*; *see also* CD459:¶18 (noting the "sheer complexity of this matter, even as compared to otherwise complex securities class actions").

- Continued litigation posed "great risks for both sides" – and for Plaintiffs "in particular." CD459:¶16.

- Plaintiffs faced "several challenges in establishing" damages. CD459:¶15; *see also* CD459:¶13 (noting Defendants' position that Class

damages should be offset by an $8.5 billion BofA and Countrywide settlement in New York state court).[5]

- Even if Plaintiffs succeeded at trial, the jury could award damages well below the Settlement figure. CD459:¶15.

Professor Green also attested to the negotiations' arm's-length nature, observing that both sides "zealously advanced their respective arguments" in their clients' best interests, and each "demonstrated a willingness to continue to litigate rather than accept a settlement" not in those best interests. CD459:¶14.

In sum, Professor Green opined that the Settlement "is a reasonable result, obtained at arm's-length after a difficult, protracted, adversarial negotiation, and is consistent with the risks and potential rewards of the claims asserted" when compared with the "'no-agreement alternative' of continued uncertain litigation." CD459:¶6; *see also* CD459:¶20 (same).

### 2.    Judge Gertner Recommends the Tripartite Plan of Allocation

A Harvard Law School professor and mediator/arbitrator, Judge Nancy Gertner (Ret.) previously served as a federal District Judge from 1994 to 2011. CD460:¶1. In her sworn declaration, Judge Gertner noted that she had presided over "thousands of complex actions." *Id*.

---

[5]     *See In the Matter of the Application of The Bank of New York Mellon*, Index No. 651786/2011 (N.Y. Super. Ct.) ("*BNY Settlement*") (class members holding Countrywide certificates may participate in settlement).

Class Counsel asked Judge Gertner to help them formulate a fair and equitable Plan of Allocation for the Settlement. CD460:¶2. Given the Actions' complexity and the number of Certificates encompassed by the Settlement, Class Counsel presented several possible allocation scenarios – each with accompanying legal and factual support. CD460:¶3. Those presentations took place via submissions to Judge Gertner on June 13, 2013, and an in-person session on June 19, 2013. CD460:¶¶3-4.

Judge Gertner recommended that the Class agree to the Plan of Allocation set forth in the Class Notice, pronouncing it "a well-reasoned, fair and equitable distribution" of the Settlement. CD460:¶2. Judge Gertner based her recommendation on the Plan's legal support as compared to other, potential allocations, as well as its overall fairness and equitability. CD460:¶5. She also considered the District Court's prior rulings in the Actions, as well as other courts' standing and tolling precedents, and plans of allocation adopted in other MBS class action settlements. *Id.*

Judge Gertner supported awarding Certificate holders in Category One 65% of the Settlement – $325 million – because their claims subjected Defendants "to the greatest possibility of liability at trial." CD460:¶6. Figuring into that equation was the likelihood that the Category One claims would be upheld at the pleading stage in *Luther* based upon the District Court's prior rulings in *Maine State* – as each of the 58 tranches had been purchased by *Luther*'s Plaintiffs. *Id.*

Judge Gertner also agreed with the 25% allocation ($125 million) to the 111 tranches in Category Two. CD460:¶7. Those tranches warranted a smaller recovery than Category One because they had "previously been dismissed [in *Maine State*] or would have been dismissed" in *Luther* upon application of the District Court's prior rulings. *Id*. Category Two tranches also had "relatively stronger [standing] claims on appeal" than Category Three, because they were held by one or more of the Named Plaintiffs in the Actions, and thus were entitled to a larger apportionment of the Settlement. *Id*.

Finally, Judge Gertner opined that the 10% allocation ($50 million) to Category Three tranches was justified. "Claims based on these tranches" had already been dismissed by the District Court on both standing and tolling grounds. CD460:¶8. Therefore, in Judge Gertner's judgment, the Category Three claims "do not have as strong appellate rights as do the represented tranches," justifying a "lesser recovery" than claims based on tranches in Categories One and Two. *Id*.

Judge Gertner specifically noted that Class Counsel at "all times were focused on the fairness to all members of the class in all three categories of tranches" and "vigorously represented the interests of all Class Members, including those in Category Three, while mindful of the differences in the relative strengths of their

appellate rights." CD460:¶9. The same observation applied to the Class's representatives. *Id.*[6]

In sum, Judge Gertner "unreservedly" recommended the Plan of Allocation because it "appropriately reflects the relative viability and strength of the claims" within the three Categories. CD460:¶2.

### D. Preliminary and Final Approval of the Settlement

#### 1. Preliminary Approval

##### a. Preliminary Approval Hearing

Following the successful mediation, Class Counsel moved for preliminary approval of the Settlement. *See, e.g.*, CD397-CD398. The hearing took place on July 10, 2013. CD413.

At that hearing, in addition to discussing preliminary approval generally, the District Court focused on two issues that are germane to this appeal:

First, the District Court noted that there existed individual actions against Countrywide in which some plaintiffs represented by separate counsel might be affected by the Settlement. CD411/15:23-16:1; *id.*/16:16-23.[7] Class Counsel assured

---

[6] Like Judge Gertner, Professor Green declared that Class Counsel advocated for the interests of ***all*** Class members, "including those … in Category Three." CD459:¶19 ("Class Counsel vigorously advocated for these Category Three Class Members" and expressly "recognized that these Category Three class members had appeal rights").

[7] The 7/10/13 Transcript is on the *Maine State* docket at CD411.

the court that, in addition to issuing a Class Notice, Class Counsel intended to send a separate notice to each plaintiff's counsel in the individual actions – alerting them to the Settlement, and informing them that unless their clients opted out they would be bound by its terms. *Id.*/16:2-6; *id.*/17:17-18:1. The District Court agreed that the additional notice was necessary – especially given the release's potential impact on Category Three plaintiffs – and insisted on reviewing and approving the communication. *Id.*/18:21-19:14; *id.*/54:1.

Second, the District Court addressed the Plan of Allocation – "the most important part of [the Settlement]." *Id.*/45:6-7. After the court noted that it appeared Category One and Two tranches got the bulk of the Settlement monies (*id.*/45:17-18), both Defendants' counsel and Class Counsel explained, in general terms, how the Plan worked. *Id.*/45:19-52:15. The District Court agreed with Class Counsel's assertion that "[s]ome of the tranches were damaged more than other tranches" (*id.*/47:20-22), and interjected questions about the Plan during a lengthy colloquy with Class Counsel. *Id.*/47:23-52:9.

At the colloquy's end, the District Court ordered a supplemental submission on the Plan of Allocation to help ensure that it was fair, just, and reasonable. *Id.*/52:21-53:1; *accord id.*/54:1-7.

964871_1

### b. Plaintiffs' Supplemental Submissions

Following the preliminary approval hearing, Class Counsel submitted to the District Court: (i) a "Supplemental Plan of Allocation Submission" ("Supplemental Submission") and (ii) a "Proposed Letter to Counsel of Record in Private Actions" ("Private Action Letter"). CD414-CD415.

The former set forth additional information about the Plan of Allocation, noting that the Plan and its distribution formula tracked the statutory measure of damages set forth in Securities Act §11, and that it followed the approach taken in other court-approved MBS settlements. CD414:1. The Supplemental Submission explained the differences among the three Categories, noting that the likelihood of success on the merits (and appeal) varied among them, warranting the tripartite allocation. CD414:5-7. The Supplemental Submission also provided several illustrative examples of loss calculations (CD414:9-14); those calculations had been formulated by a Yale-trained economist. CD414:8.

The Private Action Letter informed counsel in the individual actions of the $500 million Settlement, and that the individual-action plaintiffs were members of the proposed Settlement Class. CD415/Ex. A:1-2. The Letter attached a copy of the court-approved Class Notice and an attachment listing each of the 429 offerings at issue in the Actions. CD415//Ex. A:1. The Letter also steered those counsel to additional information concerning the Settlement – including the "particular

Certificates comprising the Offerings" – posted on the Settlement's dedicated website. *Id*. And Class Counsel expressly told the individuals' counsel that their clients could exclude themselves from the Class; if they did not, "any claims [they have] may be released through the Settlement." CD415/Ex. A:2.

After receiving this supplemental information, the District Court ordered a second preliminary hearing and directed Plaintiffs to "specifically address the issue of adequacy of representation" at that hearing. CD421. At that second hearing, the District Court engaged Plaintiffs' Counsel in a detailed discussion of the Plan of Allocation, noting "I want to be sure about . . . the adequacy factor." *Luther*/CD172/4:20-21.

### c. Preliminary Approval of the Settlement

On August 7, 2013, the District Court issued an order preliminarily approving the Settlement. CD430. The preliminary approval order, in relevant part: (i) certified a Settlement Class under Rule 23(a) and 23(b)(3); (ii) appointed Settlement Class representatives and Class Counsel; (iii) preliminarily approved the Settlement; (iv) approved the form and manner of notice to the Settlement Class, including the Private Action Letter; and (v) entered a scheduling order for the final settlement approval and fairness hearing. ER28.

### d. Class Notice Yields Few Opt-Outs and Objectors

Following preliminary approval, the court-approved claims administrator mailed 52,883 copies of the Class Notice to potential Class members. ER28. Out of the 52,883 recipients, just two groups of Class members objected to the Settlement – the same two groups bringing this appeal. *Id.*[8]

The first group of objectors consisted of several institutional investors (the CDOs), along with the FDIC as receiver for 19 failed banks. *Id.* The CDOs/FDIC asserted that: (i) the Plaintiffs and Class Counsel could not adequately represent the Settlement Class; and (ii) the overall $500 million Settlement was neither fair nor adequate. *Id.*

The second group of Objectors comprised FNBR. *Id.* FNBR's objections were threefold: (i) non-parties cannot be released for the claims asserted in the Actions; (ii) the release was overly broad because it included Class members who would not receive consideration; and (iii) Plaintiffs failed to satisfy Rule 23's "typicality" and "adequacy" requirements. *Id.*

Plaintiffs responded to Objectors' arguments in an omnibus reply brief. CD543.

---

[8]    Class Counsel also received 117 requests for exclusion, of which 48 had previously filed their own actions against Countrywide. *Id.*

### 2. Final Approval Hearing

At the October 28, 2013 final approval hearing, the District Court engaged in extended colloquies with the parties' and Objectors' counsel. *See* 10/28/13 Transcript (CD587).

### a. Plaintiffs' Presentation

Class Counsel highlighted certain facts that militated in favor of the Settlement's approval, including: (i) Professor Green's efforts in mediating the Settlement; (ii) Countrywide's tenuous financial position and the tangible risk of its bankruptcy; (iii) the $8.5 billion *BNY Settlement* in which some Class members would share; and (iv) the positive reaction to the Settlement from a majority of Class members. CD587/9:19-14:9.

Class Counsel also discussed Named Plaintiffs' adequacy under Rule 23, noting that: (i) all of the claims in *Luther* were able to be settled even if they were subject to possible dismissal under the District Court's *Maine State* rulings; and (ii) subclasses and separate representation were not required because the settled claims arose from the same factual predicate. CD587/15:11-18:15. The involvement of Professor Green and Judge Gertner helped provide "structural assurances" that the Settlement and Plan of Allocation resulted from proper and adequate representation. CD587/17:25-19:25. And the precedents were clear that plans of allocation can provide for "different

- 19 -

treatment of different claims based on the strengths and weaknesses of the claims." CD587/20:4-8. The District Court agreed. CD587/20:9.

The District Court also noted that "there isn't, in my mind, any question about the fact that you have vigorously pursued … this case." CD587/8:13-16.

### b. Objectors CDOs/FDIC

The CDOs/FDIC Objectors shifted the focus to settlements in other MBS class actions with a three-faceted argument: First, that the "favored segment" of the classes in these other MBS settlements were not as small as the present litigation's; second, that the "discount" to the "disfavored" parts of the classes was not "nearly so great" as here; and third, that there existed a "difference in the law" regarding standing at the time of those settlements "versus the state of the law now." CD587/23:10-23; *id.*/24:5-25:8.

The CDOs/FDIC Objectors further contended that the District Court's requirement of tranche-based standing "is not widely accepted" (CD587/25:20-21), claiming that the District Court had "***elected to disregard the precedent of the Second Circuit***" (CD587/25:22-23) – but neglected to explain why Second Circuit precedents should bind a Ninth Circuit district court.

964871_1

### c. Objectors First National/LL Funds

FNBR rehashed arguments from their briefing, indicating that the "fundamental issue" they had with the releases was that some investors ineligible for Settlement funds were nonetheless waiving potential future claims. CD587/29:18-21.

FNBR also asserted that the represented plaintiffs "beat down" the claims of the "unrepresented class," and thus should have secured separate counsel for the unrepresented plaintiffs. CD587/35:3-6.

The District Court disagreed: "I don't think that ever happened." CD587/35:7; *accord* CD587/35:11-13. After further questioning by the Court, Objectors' counsel conceded that he "***can't personally speak to what happened***." CD587/35:14-16.

Following the Objectors' presentations and a rebuttal by Plaintiffs, the District Court indicated that it was going to "tentatively" approve the Settlement. The District Court also noted, however, that it wanted to "take one last look at the settlement documents and write something which is an adequate order." CD587/50:5-7; CD587/50:18-19 ("nothing is final until the Court has written an order").

The District Court then gave the assembled litigants one more opportunity to address any outstanding issues. CD587/51:11; *id.*/52:8.

No Objectors spoke up.

964871_1

### E. Final Approval Order

Approximately five weeks after the final approval hearing, the District Court issued an order approving the Settlement and Plan of Allocation, and awarding attorneys' fees and expenses. ER16-ER48 ("Final Approval Order").

The District Court exhaustively described the Settlement's negotiation process overseen by Professor Green, and the Plan of Allocation that Judge Gertner helped develop. ER24-ER27. And the District Court summarized the preliminary and final approval hearings (ER27-ER29), noting specifically that the Objectors' counsel had appeared at the latter hearing and "proffered arguments in opposition to the proposed settlement." ER29.

Turning to Plaintiffs' final-approval motion, the District Court methodically laid out the process contemplated by Rule 23: The proposed Settlement Class must first satisfy the four traditional requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – after which the court must consider whether the proposed settlement itself is "'fair, reasonable, and adequate'" and deserving of final approval. ER29-ER30. Notably, the District Court recognized that its scrutiny in the context of a *pre*-certification class must be "'undiluted, even heightened.'" ER29 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).

The District Court then noted that, in addition to the four criteria *supra*, at least one of three additional criteria set forth in Rule 23(b) must also be satisfied. ER30.

Here, because Plaintiffs sought Rule 23(b)(3) certification, they needed to show (i) that questions of law or fact common to the Class predominated over questions affecting only individual members, and (ii) that a class action was superior to other available methods of adjudicating the controversy. *Id.* Those general class-certification standards, observed the District Court, apply equally to settlement classes, "with one exception": courts need not inquire whether the case, if tried, "'would present intractable management problems.'" *Id.* (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997)).

### 1. Rules 23(a) and 23(b)(3) Are Satisfied

The District Court concluded that Rule 23(a) and 23(b)(3) requirements had been satisfied.

**Numerosity.** Because the Settlement Actions covered 9,000-plus MBS tranches in nearly 430 offerings and the claims administrator send out 52,883 settlement notices, the District Court found that the Settlement Class likely comprised "thousands of investors," satisfying numerosity. ER30.

**Commonality.** The District Court found "commonality" satisfied, given that common questions were capable of being addressed on a classwide basis – including: (i) whether the Defendants violated federal securities laws; and (ii) whether the offering documents contained material misrepresentations concerning the underlying mortgages. ER31.

- 23 -

**Typicality.** The claims or defenses of the representative parties were typical of the Class's, found the District Court, because Plaintiffs and the Class shared a common argument that the offering documents allegedly misstated that Countrywide had complied with its loan-underwriting guidelines in originating the loans backing the at-issue MBS. *Id.*

The District Court rejected FNBR's contention that the Named Plaintiffs' claims were not typical of Category Three claims because the latter were weaker, from a legal standpoint, than claims in Categories One and Two. ER31-ER32. That contention "misapprehends the 'permissive' typicality standard," held the District Court, noting that "typicality" requires only that a representative's claims be "'reasonably co-extensive'" with those of absent class members; "they need not be substantially identical." ER32 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)). Indeed, even though the Category Three claims were weaker, "***all*** class members, including the Named Plaintiffs," had been injured by the same course of conduct. ER32.

**Adequacy.** "Adequacy of representation," observed the court, turns on whether "'named plaintiffs and their counsel have any conflicts of interest with other class members.'" *Id.* Here, the Actions' procedural histories "amply show[] … beyond serious dispute" that Class Counsel vigorously prosecuted the Actions on the entire Class's behalf in both state and federal court for six years. *Id.*

- 24 -

964871_1

Despite that vigorous prosecution, the District Court recounted, CDOs/FDIC Objectors contended that its prior rulings on standing had "'disarmed the named plaintiffs'" from fairly and adequately protecting the Class's interests, and Class Counsel purportedly had a conflict of interest with a majority of the Class due to their: (i) acceptance of the Settlement; and (ii) failure to appeal the court's *Maine State* rulings. *Id.*

The District Court disagreed, noting that Class Counsel had "consistently and zealously" argued that the *Maine State* standing and timeliness decisions were erroneous. *Id.* Moreover, in opposing Defendants' latest motion to dismiss, the *Luther* Plaintiffs still argued that they possessed standing "to represent all 429 offerings at issue." *Id.* Nor was there any indication in the record that *Maine State* had disincentivized Class Counsel from prosecuting the entire Class's claims "in a zealous fashion." ER32-ER33. (Indeed, Class Counsel ***had*** sought interlocutory review of the *Maine State* rulings.)

The Objectors were attempting to capitalize on "hindsight," concluded the District Court, and at the time of the *Maine State* decision, no absent Class members – including the Objectors – sought to come forward and prosecute the Category Three claims. ER33. Thus, Class Counsel's advocacy "was the best possible chance" of obtaining any recovery for Category Three members. *Id.*

The District Court also noted that the conflict-of-interest contention failed to appreciate the Settlement's "structural assurances." *Id*. (citing *Amchem*, 521 U.S. at 627). Judge Gertner had assisted Plaintiffs in developing a Plan of Allocation, and both she and Professor Green evaluated that Plan and "independently concluded that it was fair to all class members." *Id*.

Finally, observed the court, the Actions had garnered "significant media attention" over the prior six years, and had generated several notable state and federal court decisions. *Id*. Putative Class members – "a majority of whom are highly sophisticated investors" – thus had ample opportunities to learn of the litigation, evaluate the adequacy of the Named Plaintiffs' protection of their rights, and "pursue their own claims if desired." *Id*. (The court later noted that several absent Class members had done just that, prior to the Settlement. ER42.)

Given the foregoing, the District Court held that Rule 23(a)'s four criteria were satisfied. ER34.[9]

### 2. The Proposed Settlement and Plan of Allocation Are Fair, Reasonable, and Adequate

After deeming settlement certification appropriate, the District Court considered whether the Settlement and Plan of Allocation were fair, reasonable, and adequate. ER35-ER45.

---

[9]    The District Court also found Rule 23(b)(3) "predominance" and "superiority" were satisfied. ER34. Objectors do not challenge those findings on appeal.

The court first noted the axiom that settlements are afforded a "presumption of fairness" if: (i) negotiations occurred at arm's-length; (ii) there was sufficient discovery; (iii) the settlement's proponents are experienced in similar litigation; and (iv) only a small fraction of the Class objects. ER35. The District Court found the presumption warranted here. ER35-ER36 (discussing factors).

The District Court then considered the "*Churchill* factors" in determining whether the Settlement was fair, reasonable, and adequate (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)), finding those factors weighed "in favor of final approval." ER36.

**Strength of Plaintiffs' Case.** The first *Churchill* factor considers plaintiffs' likelihood of success on the merits versus the settlement amount. *Id.* Plaintiffs here faced numerous hurdles, including: (i) the *Maine State* standing and tolling rulings that, if applied to *Luther*, would reduce the number of Certificates at issue to just 58 "live" tranches (from over 9,000); and (ii) the *Strategic Capital* tolling ruling that would effectively require dismissal of ***all*** remaining tranches in *Maine State* and *Western Conference*. ER37. In addition, Plaintiffs faced stiff challenges on the issues of "damages" and "loss causation." *Id.* Given the "significant legal obstacles" affecting the Actions' strength, the court found that this factor weighed in favor of approval. ER38.

As part of its "strength" analysis, the District Court rejected CDOs/FDIC's objection that the $500 million Settlement was not generous enough as compared to other MBS class actions in light of the "face value" of the Certificates involved. ER37. The District Court questioned whether that face-value comparison was "useful," for it overlooked that some Certificates yielded (and will likely continue to yield) payments to investors. *Id*. Moreover, any attempted comparison between MBS class actions is "meaningless" without knowing their relative strengths, weaknesses, and risks. ER38.

**Risk, Expense, Complexity, and Likely Duration of Further Litigation Versus Immediate Recovery.** Absent a "'clearly inadequate'" settlement, observed the District Court, approval is preferable to lengthy and expensive litigation "'with uncertain results.'" *Id*.

The court noted that the parties had litigated the Actions for six years at the state and federal level and employed sophisticated and experienced counsel who, absent the Settlement, would have continued litigating indefinitely, with uncertain recovery and continued litigation costs. *Id*. The District Court also noted the significant risk to recovery from continued litigation, highlighting testimony from the Chief Risk Officer at Countrywide's parent entity that placing Countrywide into bankruptcy "remains a possibility." *Id*. Further compounding the uncertainty of recovery, the District Court's dismissal of successor-in-interest claims against BofA

- 28 -

964871_1

meant Plaintiffs would have to fight Countrywide's other creditors for an uncertain portion of a bankruptcy estate. ER38-ER39. And, even absent bankruptcy, "it remains unclear whether Countrywide's assets are sufficient to cover its accumulated liabilities." ER39.

The District Court also recognized that there would be "major uncertainties on appeal" for the *Maine State* and *Western Conference* plaintiffs, requiring this Court to resolve "three discrete questions" in their favor. *Id.*

First, Plaintiffs would have to convince this Court that they had both Article III and Securities Act standing to assert claims relating to Certificates that they had not purchased. *Id.* True, the Second Circuit had found a limited, originator-based form of standing, but the District Court had "thoroughly considered and reluctantly rejected" that reasoning. *Id.* (And, as pointed out at oral argument and conceded by CDOs/FDIC's counsel, no other circuit court had yet adopted the Second Circuit's reasoning. CD587/26:1-5.)

Second, this Court would have to conclude that the state-court *Luther* filing had triggered *American Pipe* tolling for the federal actions. ER39.

Finally, even assuming this Court agreed with that proposition, it would also have to hold that the tolling saved other offerings and tranches unrelated to ones purchased by the *Luther* Plaintiffs. *Id.*

In sum, found the District Court, an immediate settlement avoided the risks associated with "bankruptcy, protracted litigation, [and] appellate review." *Id.*

**Risk of Maintaining Class Action Status Through Trial.** The District Court noted that the Actions' suitability for class action status "had never been fully litigated." *Id.* Indeed, the "individualized nature" of MBS actions would have posed "significant management issues at trial, potentially jeopardizing" the Plaintiffs' ability to maintain class action status through trial. ER39-ER40.

**The Amount Offered in Settlement.** The District Court observed that the $500 million Settlement was one of the 25 largest securities class action settlements ever, and the "largest MBS class action" settlement to date; indeed, it "easily surpasses the next largest" MBS settlement of $315 million. ER40. Here, given the risk and uncertainty of continued litigation in the hopes of obtaining an even-larger recovery, the $500 million "weighs in favor of final approval." *Id.*

**Extent of Discovery Completed and Stage of the Proceedings.** The District Court found that both sides had benefited from "sufficient discovery" over six years that allowed them to "adequately assess the relative strengths and weaknesses" of their positions. *Id.* at ER40-ER41 (noting discovery production in *Luther* and *Maine State*). (All told, Class Counsel reviewed some *16.5 million* pages of documents. CD433:2.)

**Counsel's Experience and Views.** Courts accord "'great weight'" to counsel's recommendations, observed the District Court, and the "expertise and capabilities of counsel on both sides" here was beyond dispute. ER41.

**Class Members' Reaction.** This factor involves: (i) views of the class representatives; (ii) number of opt-out or exclusion requests; and (iii) the number and "'vociferousness'" of the objectors. ER42. All three considerations supported final approval. *Id.*

Class representatives' opinions are afforded special weight, said the District Court, as they have a better understanding of the case than absent Class members. *Id.* Here, the Named Plaintiffs – "a majority of which are sophisticated institutional investors – fully support" the Settlement, and Class representatives not only attested to understanding and supporting the Settlement's terms, but two of them had "attended and participated in the mediation sessions." ER41-ER42.

The District Court thought it notable that, out of 52,883 class notices mailed to potential Class members, the claims administrator received "only 117 requests for exclusion" – and of those, 48 had already filed their own opt-out actions prior to the Settlement. ER42. Proportionately, then, the 69 new exclusions represented "only a small fraction" of the overall Class. ER43.

Relatedly, just 37 entities had filed objections; thus, of the 52,883 potential Class members, "only a small fraction of the class" objected. *Id.* In addition, the

- 31 -

number of objectors "appears even less significant" in light of the fact that 35 of the 37 "are represented by a single law firm." *Id.*

**The Objections.** "Perhaps more important than the quantity" of objectors "is the substance of their objections." *Id.* The District Court emphasized that it had "***carefully considered and rejected each of the objectors' arguments***" presented "in written submissions" or "at the fairness hearing." *Id.* For example, the District Court rejected complaints that the Plan of Allocation was unfair because it contemplated distributing the Settlement proceeds to different claimants based on the perceived strength of their claims. ER43-ER44. That a plan of allocation reflects the relative strengths and weaknesses of claims "does not, in itself, render a proposed settlement unfair." ER44 (citing cases).

Likewise, the District Court thought it "fatal" to the Objectors' argument that they "never adequately explain ***why***" the Category Three members should receive a larger share based upon their claims' strength. *Id.* Indeed, in order for those claimants to obtain any recovery beyond what the Settlement already gives them, "[t]he stars must align." *Id.* They would have to prevail on at least three discrete issues before this Court, while withstanding challenges on both damages and loss causation, and they must hope that Countrywide "avoids bankruptcy or insolvency" during the litigation's pendency. *Id.* All of that is preliminary to an actual trial, "which presents another set of obstacles" to any recovery. *Id.* All in all, concluded

- 32 -

the District Court, "it is remarkable that the Category Three class members will obtain any recovery at all." *Id.*

The court next rejected Objectors' suggestion that because of purported conflicts of interest between the representative and absent plaintiffs, Class Counsel could not simultaneously represent all three Categories, and should have stepped aside in favor of separately represented subclasses. ER44-ER45. "The Court finds no support for such an argument," it noted, explaining that ***this*** Court holds that not every distinction among class members requires subclasses. ER45. Rather, subclasses are necessary where the differences "'affect the adequacy of representation'" – and here, "nothing in the settlement history or the terms of the proposed Settlement calls into question" the adequacy of the Class representatives or Class Counsel. *Id.*

In sum, concluded the District Court, the Settlement and its terms are "fair, reasonable, and adequate." *Id.*

## IV.  SUMMARY OF ARGUMENT

The Objectors fall well short of the requisite strong showing that the District Court abused its discretion in approving the Settlement and Plan of Allocation.

Emblematic of that failure is the overriding theme woven throughout Objectors' arguments: that the Named Plaintiffs and Class Counsel supposedly abandoned the Class by accepting the $500 million Settlement instead of forging on and appealing

several underlying rulings that the Objectors believe unfairly dilute their recoveries under the Settlement and its Plan of Allocation.

That theme is a hollow one.  It fails to acknowledge that (i) Plaintiffs *did* seek immediate, interlocutory review of the several rulings years ago, and (ii) Countrywide's increasingly tenuous financial condition made continued litigation extremely risky.  The present Settlement – the largest MBS class settlement by nearly $200 million – was a great result and is a testament to Plaintiffs' vigorous, multi-year litigation of these Actions in state and federal courts.

The District Court agreed, and its conclusions warrant this Court's deference. The District Court considered – and rejected – the Objectors' arguments about a supposed lack of "adequacy" and "typicality," correctly finding that Plaintiffs and their counsel had zealously prosecuted the Actions over the past six years, including journeys to state and federal appellate courts.  The District Court further found that any complaints about supposed intra-Class conflicts and missing subclasses were undermined by adequate "structural assurances," including:  (i) the hands-on involvement of a respected mediator; (ii) a (retired) federal judge's oversight of the formulation of the Plan of Allocation; and (iii) extensive publicity about the Actions giving absent Class members ample opportunities to evaluate whether Plaintiffs were protecting their rights.  The District Court's conclusions, based on precedent and record facts, warrant this Court's deference.

- 34 -

Nor did the District Court abuse its broad discretion in finding the Settlement and Plan of Allocation to be fair, reasonable, and adequate. Through extensive briefing and several hearings, the District Court fully aired the Settlement and Plan's *bona fides*, considered all objections, and ultimately decided that $500 million in-hand was a much better result for the Class than the extensive risk of continuing to litigate the Actions – especially in light of Countrywide's potential bankruptcy. The court similarly was satisfied that the Plan of Allocation reasonably accounted for the Categories' relative strengths – especially given Judge Gertner's endorsement of the Plan's fairness – and appellate courts have repeatedly affirmed similar plans in which allocations reflected claimants' strengths and weaknesses.

Objectors try to challenge the District Court's underlying rulings issued *years* before the Settlement. But those merits rulings are not the focus of this appeal, and the authorities hold that this Court need not – and should not – re-visit those rulings as part of its deferential review of the Settlement's approval.

Finally, the FNBR Objectors' arguments about the Settlement's release fail. This Court holds that settlements may release "factually related" potential claims – even against non-parties – and FNBR's arguments simply ignore both that precedent and the record facts supporting its application here.

## V.   STANDARD OF REVIEW

This Court reviews approval of a class action settlement for an abuse of discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000). The same abuse-of-discretion standard applies to approval of a settlement's allocation plan. *Id.* at 460. Those decisions are "committed to the sound discretion of the trial judge because he is 'exposed to the litigants, and their strategies, positions, and proof.'" *Hanlon*, 150 F.3d at 1026. Thus, appellate review of a class action settlement "is extremely limited." *Mego*, 213 F.3d at 458.

Although Objectors acknowledge that abuse-of-discretion standard, CDOs also try to shoehorn in *de novo* review of the District Court's ***prior*** rulings on standing and tolling. CDOs Br. 22. As discussed *infra* in §VI.C., those underlying rulings are not the issue in this appeal, and CDOs's suggested heightened review is inapplicable.

## VI.   ARGUMENT

### A.   Named Plaintiffs and Class Counsel Zealously Guarded the Class's Interests

#### 1.   Objectors' Contention that Named Plaintiffs and Class Counsel Should Have Rejected the Settlement and Appealed the District Court's Standing and Tolling Rulings Fails

The linchpin of CDOs's brief is that the District Court's standing and related tolling rulings were vulnerable to reversal, and so the Named Plaintiffs and Class Counsel abdicated their duties to the Class by not ***waiting*** to appeal them – instead,

accepting the Settlement. *See, e.g.*, CDOs Br. 26 ("vast majority of the class had everything to gain from awaiting a final judgment to appeal the dubious" holdings); *id.* at 28 (Class had "every incentive to appeal those dubious rulings"); *id.* at 32 (Named Plaintiffs and Class Counsel "opted to settle rather than appeal"). CDOs then use that premise to prop up the arguments that follow: *e.g.*, purported intra-Class conflicts, the Settlement amount's inadequacy, the three-Category allocation's inappropriateness, *etc*.

But Objectors' linchpin premise fails under the weight of record facts and the realities of this multi-district litigation:

**No right of immediate appeal.** CDOs ignore that there was no immediate right to appeal ***any*** of the District Court's rulings – no matter how vulnerable Named Plaintiffs believed them to be. *See* 28 U.S.C. §1291 (reserving appellate jurisdiction for "final" decisions); *see also* Fed. R. Civ. P. 54(b) (in multi-claim, multi-party litigation, any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ***does not end the action as to any*** of the claims or parties"). Absent extraordinary, interlocutory review, the Class had to await entry of final judgments in the Actions to challenge on appeal the District Court's rulings.

Furthermore, final judgments likely were many years away. While the *Maine State* and *Western Conference* matters may have faced dismissal in their entirety once the District Court applied its *Strategic Capital* ruling to them (ER24), their appeals

would have been delayed for years while Plaintiffs litigated the related *Luther* matter (which was unaffected by *Strategic Capital* because it was the originally-filed state court case) through summary judgment, trial, and post-trial motion practice.

Notably, the *Maine State* plaintiffs ***did*** seek, but were denied, interlocutory appellate review of the District Court's offering- and tranche-based standing and tolling orders, and its successor-liability ruling. CD258-CD260; CD263-CD265. The CDOs ignore those attempts, fatally undermining their contention that Named Plaintiffs abandoned the Class for a self-serving Settlement. *Cf.* CDOs Br. 26 ("named plaintiffs … had the least incentive to pursue an appeal").

### Individual appeals needed to await resolution of multi-district litigation.

Because the Actions are actually just three cases that the District Court was managing in a coordinated fashion as part of a 42-case, multi-district litigation ("MDL"), *In re Countrywide Financial Corp. Mortgage-backed Securities Litigation*, No. 11-ML-02265, even an entry of judgment in *Luther*, *Maine State*, or *Western Conference* would not have allowed this Court to assume jurisdiction over an appeal from ***any*** of the Actions pursuant to §1291. Instead, Named Plaintiffs would have to await the resolution of each of the 42 cases before bringing an appeal as of right. *Huene v. United States*, 743 F.2d 703, 705 (9th Cir. 1984) ("where an order disposes

of only one of two or more cases consolidated at the district court level, the order is not appealable under 28 U.S.C. § 1291 absent a Rule 54(b) certification").[10]

**Absent settlement, the entire Class risked receiving no recovery.** In addition to the risks of awaiting final judgments and subsequent appellate resolution in the 42 MDL cases, looming large over the entire litigation was the ever-present threat of Countrywide's bankruptcy.

As BofA's Chief Risk Officer testified in another Countrywide matter during the Actions' pendency in 2011, "[o]ne of the options that was available to us, ***and continues to be available to us, is to put Countrywide into bankruptcy***." *See* CD544/Ex. B/717:16-18. That legitimate bankruptcy threat must be considered in conjunction with the fact that Plaintiffs' successor-in-interest claims against BofA were dismissed.[11] Countrywide's bankruptcy would have left the Class fighting with Countrywide's other creditors for an uncertain share of an estate unlikely to be large enough to satisfy all of Countrywide's outstanding liabilities. Indeed, the record shows that during the Actions' pendency, Countrywide's eroding assets likely were insufficient to satisfy a judgment for the full scope of the potential damages in the

---

[10] The Supreme Court recently agreed to decide whether appellate jurisdiction exists absent a Rule 54(b) certification when an appeal is taken from only one case in an MDL proceeding. *Gelboim v. Bank of Am. Corp.*, ___ U.S. ___, 134 S. Ct. 2876 (2014).

[11] *See Maine State*, 2011 U.S. Dist. LEXIS 53359, at *28 (BofA not legally responsible for Countrywide's liabilities).

- 39 -

Actions, let alone the claims asserted by its other creditors. *See* CD544/Ex. C:11 (June 6, 2011 report notes residual value of Countrywide's assets is just $4.8 billion); *see also* CD544/Ex. D/3516:12-22 (expert economist testifies that "under any calculation" Countrywide's total litigation exposure is "far greater" than it has the ability to pay; there exists a "major risk" that Countrywide's assets will further erode).

Thus, in light of a potential Countrywide bankruptcy that would render any future judgment in the Class's favor meaningless, the immediate certainty of the $500 million Settlement warranted final approval. Courts facing similar situations agree. *See, e.g.*, *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (affirming final approval of settlement due, in part, to district court's finding that continuing "lawsuits would expose Pacific Enterprises to a substantial risk of bankruptcy"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) (settlement's "certainty of payment … is advantageous to the class," when considering that the "'prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures'").

The District Court cited many of these risks in its Final Approval Order. *E.g.*, ER38 (risk of Countrywide's bankruptcy); ER38-ER39 (BofA's non-responsibility for Countrywide's acts/omissions); ER39 (successful appeal would require resolution of three discrete questions in Plaintiffs' favor); ER37 (citing challenges in establishing damages and loss causation); ER39-ER40 (risk of maintaining class action status

through trial); *id.* (foreshadowing "significant case management issues" at trial). These record facts thus support approval of the Settlement and, because not "clearly erroneous," support a finding that the District Court did not abuse its discretion. *See Mego*, 213 F.3d at 458 ("we will affirm if the District Court judge applies the proper legal standard and his findings of fact are not clearly erroneous").

At bottom, if Objectors truly believed that Plaintiffs were marching down the wrong path by taking an immediate $500 million versus the enormous risk of little-to-no recovery years later, they easily could have protected themselves: opt out, file their *own* actions – and when those actions were dismissed on timeliness grounds, appeal the dismissals and their underlying standing and tolling rationales. *See Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977) (if objectors-appellants "were dissatisfied" with settlement's terms, "they could opt out of the class"); *Mego*, 213 F.3d at 462-63 (although plan of allocation admittedly "favor[ed]" one class group, concerns about possible conflicts of interest were alleviated by the "practical consideration[]" that the non-favored group was "free to opt-out of the class"); *see also In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1269 (10th Cir. 2004) ("had the appellants wished to preserve their right to appeal the bankruptcy court's denial of the dispositive motion, they could have done so by opting out of the settlement and receiving a judgment on the merits in the district court").

### 2. The Named Plaintiffs and Class Counsel Satisfied Rule 23 Adequacy and There Were No Disabling Conflicts of Interest Requiring Subclasses

"Adequacy" under Rule 23(a)(4) turns on whether representative plaintiffs and class counsel (i) have any material conflicts of interest with other class members, and (ii) will prosecute the action vigorously on the class's behalf. *Hanlon*, 150 F.3d at 1020.

The District Court concluded that those criteria had been satisfied. ER32. After noting that the Actions' "procedural history amply shows" vigorous prosecution on both state and federal levels (*id.*), it rejected Objectors' arguments concerning supposed (i) inadequate protections and (ii) conflicts of interest. ER32-ER34.

As they do now, the CDOs/FDIC Objectors contended that the Named Plaintiffs had somehow been "'disarmed'" by the court's standing rulings, and that Class Counsel had a material conflict of interest with a majority of the Class due to their decision to accept the Settlement instead of appealing the court's *Maine State* tolling and standing rulings. ER32.

But the District Court deemed those contentions "unavailing," noting that Class Counsel had "consistently and zealously" argued that its *Maine State* rulings were "erroneous." *Id.*; *see also* CD258-CD260; CD263-CD265 (*Maine State* counsel **had** sought immediate appellate review of those decisions). In addition, observed the

District Court, the *Luther* plaintiffs continued to assert that they possessed standing to represent **all** 429 offerings at issue (ER32) – and it issued no contrary ruling in *Luther*.

"Nor [was] there any indication" that the *Maine State* decisions had dissuaded Class Counsel from further prosecuting the entire Class's claims "in a zealous fashion." ER32-ER33. "By all appearances," concluded the District Court, Class Counsel's efforts were actually "the best possible chance of obtaining any recovery for the Category Three class members." ER33. Objectors' contrary assertions were an "attempt to capitalize on hindsight," and undermined by their failure to step forward and prosecute the Category Three claims following the *Maine State* rulings. *Id*.

The foregoing rulings comport with the District Court's multi-year supervision of the Actions, and are amply supported by the record. Thus, they warrant this Court's deference. *Mego*, 213 F.3d at 458. These rulings also find support in this Court's precedents. *See, e.g.*, *Marshall*, 550 F.2d at 1177 (objectors complaining of purported conflicts of interest should not "be allowed to play the role of spoilers … when they could have chosen not to be bound by the settlement"); *Pacific Enters.*, 47 F.3d at 378 (no abuse-of-discretion in rationale that settlement's certainty was preferable to risk of continued litigation that could have prompted defendant's bankruptcy).

964871_1

Deference also should be afforded the District Court's rejection of Objectors' "conflict of interest" charge. The District Court correctly noted that *Amchem* acknowledged that there could be "fair and adequate representation" of even "diverse groups and individuals" affected by a settlement when there existed "'structural assurances'" of fair representation. ER33. Here, those assurances included:

- Judge Gertner assisted in developing a Plan of Allocation that was fair to all Class members, including Category Three claimants;

- Professor Green and Judge Gertner each evaluated that Plan, and "both independently concluded" that it was fair to all Class members;

- the Actions had been the subject of "significant media attention" over six years, generating "several notable state and federal court decisions"; and

- a majority of the Class were highly sophisticated investors, who had "ample opportunity" to learn of the Actions and evaluate whether the Named Plaintiffs were adequately protecting their rights – and if not, to "pursue their own claims if desired."

ER33; *cf. Amchem*, 521 U.S. at 627-28 ("structure of negotiations" may help provide requisite structural assurance).[12]

Despite the foregoing, Objectors insist that *Amchem* and its progeny required subclasses and separate representation here. CDOs Br. 27-36; FNBR Br. 18-21. They are mistaken, for several reasons.

First, *Amchem* never constructed a bright-line rule that subclasses are required whenever there are potential conflicts among class members; rather, it requires merely

---

[12] The record reflects additional structural assurances. CD543:14-15.

- 44 -

that when such potential conflicts are present, there is "structural assurance of fair and adequate representation for the diverse groups and individuals affected." 521 U.S. at 627; *accord Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999). That structural assurance is present here. *See supra*.

Moreover, *Amchem* was an atypical mass-tort action involving a "sprawling" settlement class containing both present and future claimants, in which the latters' injuries had not yet manifested, class members had been exposed to different asbestos-containing products, and many "'share[d] little in common … with each other.'" 521 U.S. at 622-24.

Here, in contrast, any injuries suffered by the Class have manifested, and in the same manner for each claimant – no matter their Category status. *See Luther*/CD1/Ex. 1:¶¶175-188. The damage has been done, and Class members know their rights of recovery through the comprehensive Class Notice and Plan of Allocation. *Cf. Amchem*, 521 U.S. at 628 (criticizing "[i]mpediments" to adequate class notice there). Objectors here have not appealed the Class Notice's adequacy.

Finally, *Amchem* involved the troubling situation in which the class action "was not intended to be litigated." *Id*. at 601. Instead, the parties agreed upon a class definition and a settlement ***before*** formally initiating litigation, and then "within the space of a single day" presented the district court with a complaint, an answer, a proposed settlement, and a class certification motion. *Id*. at 601-02. Given that

attempted *fait accompli* and the stark differences in class membership, the Supreme Court criticized the settling parties for having attempted a global compromise with no assurances of fair and adequate representation. *Id*. at 627.

In contrast, prior to the Settlement the oldest of the underlying Actions had been actively litigated for six years. During that time, the *Luther* Plaintiffs – later, joined by the *Maine State* and *Western Conference* Plaintiffs – continually sought to assert (and protect on appeal in both state and federal court) claims on behalf of a Class encompassing ***all*** 429 offerings. That putative litigation Class, with its manifested injuries, is identical to the proposed Settlement Class approved by the District Court. And in these Actions, Plaintiffs have consistently argued that the District Court erred in its *Maine State* holdings concerning standing and the statute of limitations, advancing the arguments on behalf of every Class member. Furthermore, the putative Class of 429 offerings in *Luther* remained intact at the time of Settlement.[13]

---

[13] Objectors' reliance on *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242 (2d Cir. 2011) to argue for subclasses is unavailing. In that case, which involved different levels of compensation for copyright infringement claims based on three different categories of copyrighted works, the Second Circuit held separately represented subclasses were required. *Id*. at 254. That ruling was not based, however, on the fact that one category received a lower recovery than the other two; in fact, the Second Circuit expressly held that "[i]t was not only appropriate but also ***necessary*** for Category C claims to recover less than Category A and B claims" because "Category C claims . . . are indisputably worth less than Category B claims." *Id.* at 253. Instead, the inadequacy finding stemmed from a settlement provision indicating that if the total claims exceeded $18 million, the compensation of claims for Category C works would be reduced *pro rata*, without any reduction in the recovery

- 46 -

Objectors also ignore that the federal reporters are replete with decisions affirming differing recoveries for differently situated class members *sans* subclasses. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 814 (5th Cir. 2014) (differences in class members' recovery formulae "were 'rationally related to the relative strengths and merits of similarly situated claims'"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) (no abuse of discretion in declining to create subclasses where plan of allocation split claimants into three different groups receiving different amounts); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) (no abuse of discretion despite settlement awarding "injury" claims with lion's share of $24 million settlement fund, and capping less-valuable "purchase" claims at $250,000 total); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145-46 (8th Cir. 1999) (property owners to receive different compensation depending upon distance from oil refinery: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable.").[14]

---

for Category A or B claims until the recovery for Category C claims reached zero. *Id.* at 246, 254. Unlike in *Literary Works*, the Category Three claims here are guaranteed 10% of the total settlement fund, without any reduction based on the amount of Category One or Category Two claims submitted.

[14] FNBR's assertion that the District Court utilized "distinguishable" authority for its observation that "'not every distinction among class members requires the creation of a subclass'" is incorrect. FNBR Br. 19. The District Court's observation is

- 47 -

In light of the foregoing, the District Court's conclusion that "nothing" in the record "calls into question the adequacy of Plaintiffs' Counsel in representing the class" (ER45) warrants this Court's deference. Objectors' contrary *ipse dixit* falls far short of a "'***strong*** showing that the district court's decision was a clear abuse of discretion.'" *Hanlon* 150 F.3d at 1027.

### 3. The Named Plaintiffs Satisfied Rule 23 Typicality

Rule 23's "typicality" criterion requires that representative plaintiffs' claims or defenses be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This Court notes the requirement is not especially demanding: it is satisfied when other class members "'have the same or similar injury'" as the class representatives, and have been injured by the "'same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Indeed, under Rule 23(a)'s "permissive standards," representative claims are typical if they are "'***reasonably co-extensive*** with those of absent class members; they need not be substantially identical.'" *Rodriguez*, 591 F.3d at 1124; *Hanlon*, 150 F.3d at 1020 (same)

Applying those considerations here, the District Court observed that the Named Plaintiffs, "like the other class members, purchased or otherwise acquired certificates

---

***precisely*** what the cited cases stand for. *See, e.g.*, *UAW v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007) ("'[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.'").

- 48 -

issued in connection with the same offering documents." ER31. Thus, the "Named Plaintiffs and the Class members share a common argument that these offering documents contain misrepresentations regarding Countrywide's underwriting practices." *Id*. And, although the Category Three claims "are deemed weaker" than the other categories' claims, "*all* class members" were injured by the same course of conduct. ER32.

Those conclusions deserve this Court's deference. The District Court correctly stated this Circuit's law on "typicality," and applied that law to record facts whose recitation was not clearly erroneous. *Pacific Enters.*, 47 F.3d at 377.

Disregarding controlling precedent, CDOs suggest that because the District Court had held that the Named Plaintiffs suffered "'no injury'" from certain tranches in which they did not purchase MBS, this holding foreclosed them from having suffered "'"*the same injury*"'" that "typicality" demands. CDOs Br. 34 (Objectors' emphasis). CDOs further contend that "[a] standing defect . . . renders a named plaintiff *per se* inadequate and atypical." *Id*. at 30. CDOs's assertions are thrice wrong.

First, CDOs overlook authority holding that "typicality" is satisfied by "'same *or similar*'" injuries stemming from the defendant's "'same course of conduct'" (*Hanon*, 976 F.2d at 508), and that class members' claims merely need be "'*reasonably* co-extensive'" with each other. *Rodriguez*, 591 F.3d at 1124; *see also*

- 49 -

*Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) ("'typicality'" does "not require that all of the putative class members share *identical* claims") (emphasis in original).

Second, CDOs ignore that *all* of the claims associated with *all* of the Certificates/tranches remain viable in *Luther* and *Western Conference* (CD543:3), and the District Court's standing rulings as to tranches not purchased by any Named Plaintiffs have not been subjected to appellate finality. *Cf. Air Line Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1167-68 (7th Cir. 1980) ("*TWA*") (approving settlement that included claims previously barred for lack of subject matter jurisdiction). Until that finality crystalizes, the Named Plaintiffs have standing to represent each Class member, and they may pursue classwide settlement of those claims.

Third, even if *Maine State*'s standing rulings were applied to *Luther* to reduce the Class to purchasers of 58 tranches – an event that never occurred – CDOs's argument still fails, as claims that could not necessarily be litigated by a party nonetheless may be included within that litigation's settlement. *See Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (claims that "'might not have been presentable'" in class litigation nonetheless can be included within its settlement); *TWA*, 630 F.2d at 1167-68 (approving settlement including claims previously barred for lack of subject matter jurisdiction). Surely, if courts may approve settlements

- 50 -

containing claims over which they would have lacked subject matter jurisdiction, representative plaintiffs whose standing in connection with certain claims has not been finally determined by any appellate court may nonetheless represent those claims in a settlement context.

CDOs's co-Objectors fare no better.

In their attack on typicality, FNBR rehash their prior complaint regarding Categories receiving different recoveries. FNBR Br. 16-17. That complaint falls short, however, for it is well-settled that class members' disparate recoveries do not torpedo "typicality." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) ("Differences in the amount of damages between the class representative and other class members does not affect typicality."); *cf. Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment"). What matters, more than individual recoveries, is that the defendants' "'same course of conduct'" resulted in the same "'or similar'" injuries to the entire class. *Hanon*, 976 F.2d at 508.

As the District Court recognized, that precise situation exists here. Its typicality finding warrants deference. *Pacific Enters.*, 47 F.3d at 377.

**B.    The District Court Did Not Abuse Its Discretion in Finding
the Settlement and Plan of Allocation Fair, Reasonable, and
Adequate**

CDOs attack the Settlement's and Plan of Allocation's overall fairness, reasonableness, and adequacy on several grounds (CDOs Br. 35-42), but none of their arguments warrant overriding the District Court's sound judgment.

For starters, they contend that the District Court's final-approval analysis never reached the heightened level of scrutiny required, with the court "***invert[ing]***" the proper legal standard by applying a *verboten* "'presumption of fairness'" to the Settlement.  *Id.* at 36 (emphasis in original).  Yet, neither assertion withstands reasoned scrutiny.

The District Court expressly cited the "'undiluted, even heightened'" attention this Court requires lower courts to employ upon certifying a settlement class (ER29) – and the record confirms that the District Court did precisely that.  Prior to its Final Approval Order, the District Court undertook a full airing of relevant concerns:

- the court held ***two*** preliminary approval hearings, on July 10, 2013 and August 1, 2013, along with a telephonic conference on July 5, 2013, during which the court *sua sponte* raised questions regarding the Plan of Allocation and the adequacy of representation;

- at the first preliminary approval hearing, the court required supplemental briefing explaining the proposed Plan of Allocation;

- Class Counsel subsequently provided the Supplemental Submission and the Private Action Letter;

- prior to the second preliminary approval hearing, the court issued a scheduling notice stating that it had yet to reach a final decision on preliminary approval, and directed Plaintiffs to address the issue of adequacy of representation at the upcoming hearing;

- at the August 1, 2013 hearing, the court directed several questions to Class Counsel concerning the adequacy of representation of Category Three Class members; and

- the court's Final Approval Order rebuts the Objectors' attacks on typicality and adequacy, taking pains to identify the Settlement's "structural assurances" of fairness – including the hands-on involvement of Professor Green and Judge Gertner, the publicity attendant to the Settlement, and the ability of the (predominantly sophisticated) Class members to decide whether to participate in the Settlement or to opt out.

Likewise, CDOs's contention that the District Court simply rubber-stamped the Settlement by "presum[ing]" its fairness without further scrutiny ignores the vast record.[15] As detailed *supra* at §III.E.2, the District Court faithfully recited the several factors underlying the presumption (ER35), and **then** proceeded through the myriad

---

[15]    Contrary to CDOs's argument, courts have long applied a presumption of fairness to pre-certification settlements reached after arms'-length negotiation by experienced counsel following adequate discovery. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269, F.R.D. 468 (E.D. Pa. 2010); *In re Advanced Battery Techs. Sec. Litig.*, 298 F.R.D. 171, 179 (S.D.N.Y. 2014); *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 56 (D.D.C. 2010). The lone case cited by CDOs for the contrary proposition, *Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH, 2011 U.S. Dist. LEXIS 68984 (D. Nev. June 27, 2011), does not actually support it. *Sobel* did not hold that the presumption of fairness is *per se* inapplicable to pre-certification settlements; its rejection of the presumption was based on two factors not present here: that "highly relevant discovery had not [yet] taken place," and that the settlement was a coupon settlement, which "'requires greater scrutiny'" and is "'generally disfavored.'" *Id.* at *19-*21.

*Churchill* factors – explaining how each was amply satisfied by record facts and thus supported the Settlement's fairness, reasonableness, and adequacy. ER36-ER45. While CDOs barely acknowledge those record facts – and FNBR ignore them, and *Churchill*, altogether – their recitation and application by the District Court warrants this Court's deference absent evidence they were clearly erroneous. *Pacific Enters.*, 47 F.3d at 377.

CDOs complain that the District Court used its prior rulings to justify and approve the Settlement's terms (CDOs Br. 38-39), but that complaint overlooks the realities of litigation in general and settlement-approval in particular. District courts often hearken to their own adverse rulings, whether already made, or likely to be issued, while discussing the risks of continued litigation in an approval analysis – and circuit courts routinely affirm those approvals. *See, e.g.*, *Churchill*, 361 F.3d at 575-77 (affirming settlement where district court relied upon, *inter alia*, its previous adverse rulings while approving settlement); *see also In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1080, 1086 (2d Cir. 1984) (district court did not abuse its discretion in approving settlement where summary judgment was "'very likely,'" and the "'likely'" power of corporation's independent directors would "of course, preclude[] success on the merits"); *Pacific Enters.*, 47 F.3d at 375 (prior to settlement district court had "indicated that many defendants were 'probably going to win' on summary judgment"). Indeed, reviewing courts may affirm settlement approval even

- 54 -

when the prior rulings are questionable. *See, e.g.*, *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 173 (2d Cir. 1987) (affirming $180 million settlement despite the district court's "bold and imaginative" choice-of-law analysis and "patently speculative" conclusion).

CDOs's insistence that the overall $500 million Settlement is "unreasonably low" (CDOs Br. 40) fails to acknowledge that this is the largest MBS class settlement by a wide margin (and one of the largest securities class action settlements ever), and rests on bald speculation that more settlement funds were available. But this Court rejects such speculation. *E.g.*, *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) (fairness of a proposed settlement must not "be judged against a hypothetical or speculative measure of what ***might*** have been achieved by the negotiators") (emphasis in original). Relatedly, this Court has held that even if a recovery were small – which this one is decidedly not – "'[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.'" *Mego*, 213 F.3d at 459; *Pacific Enters.*, 47 F.3d at 377 (rejecting argument that $12 million settlement compared to "over $1 billion" potential recovery is "unjust"). Indeed, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974).

CDOs's characterization of the "average[]" recovery in other MBS class actions based on the percentage of original face value supposedly recovered is a misleading comparison, for it fails to account for class size or the magnitude of recovery, the facts and circumstances of the other MBS cases, and the District Court's underlying rulings. And the CDOs pointedly ignore the specter looming over this matter that renders the $500 million recovery substantial under the circumstances – namely, the real risk of Countrywide's bankruptcy (and BofA's asserted non-responsibility for Countrywide's liabilities). *Cf.* ER38 (District Court notes "[i]t is difficult to [over]state the risks to recovery if litigation had continued."); *see also* §VI.A.1. *supra*. Given the foregoing, the District Court properly rejected the Objectors' arguments. ER38.[16]

Next, Objectors repeatedly assert that, in light of the allocation differences received by various categories of Class members, the Plan of Allocation is unfair. *See, e.g.*, CDOs Br. 19-20, 27, 37-39; FNBR Br. 16-18, 20-21. But variation in the treatment of different class members' claims does not make a plan of allocation unfair or unreasonable. Instead, "'[a] plan of allocation that reimburses class members based

---

[16]     And, given the foregoing, it is regrettable that CDOs stoop to *ad hominem* attacks on the parties and their counsel by asserting the Settlement "was the paradigm of collusion." CDOs Br. 42. That baseless characterization is belied by record facts including, *inter alia*, six years of pitched litigation in trial and appellate courts, Professor Green's mediation efforts, and Judge Gertner's assistance in developing the Plan of Allocation. The characterization also reduces to a rubber-stamp mockery the District Court's multi-year oversight of the Actions and its careful consideration of Settlement approval.

on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits.'" *Redwen v. Sino Clean Energy, Inc.*, No. CV-11-3936, 2013 U.S. Dist. LEXIS 100275, at *29 (C.D. Cal. July 9, 2013). Appellate courts have repeatedly affirmed plans of allocation that contemplate differential treatment of class members based on the strengths and weakness of their claims. *E.g.*, *Mego*, 213 F.3d at 461-62 (affirming approval of plan of allocation that "leaves a large portion of the class without a recovery"); *Deepwater Horizon*, 739 F.3d at 813-14; *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011).

In sum, given precedent and record facts, the District Court acted well within its discretion in finding the overall Settlement and Plan of Allocation fair, reasonable, and adequate.

### C. The Objectors Improperly Advance Merits-Based Challenges to the District Court's Underlying Rulings

CDOs spend 16 pages challenging the correctness of the District Court's underlying *merits* rulings – specifically, its tolling and standing rulings. CDOs Br. 43-58. Their efforts are wasted.

This appeal concerns whether the District Court abused its discretion in approving the Settlement and Plan of Allocation as fair, reasonable, and adequate. In reviewing that approval, however, this Court need not concern itself with the District

Court's underlying rulings.  *See, e.g.*, *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986) ("If the merits of a cause of action underlying a compromise agreement could, as a matter of course, be inquired into in an action to enforce the settlement, neither settlement nor the policies it promotes would be fostered."); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 306 (3d Cir. 2011) ("merits inquiry is particularly unwarranted in the settlement context"); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1269 (10th Cir. 2004) (refusing appellants' urging to revisit underlying merits while reviewing settlement).

What matters is that those rulings helped bring both sides to the mediation table. Defendants obviously embraced the rulings, but realized that they could be overturned on appeal and spawn even more liability exposure.  Conversely, while Plaintiffs thought those rulings were erroneous, they also realized that there was a substantial risk the rulings would be upheld on appeal – and more importantly, that while those appeals were pending, Countrywide's ability to satisfy any settlement or litigated judgment would become increasingly doubtful.

### D.     The Scope of the Settlement's Release Language is Appropriate

FNBR argue that the Settlement's "release" features are too broad, inappropriately releasing potential claims that they (or others) may want to bring

against non-party (i) ratings agencies and (ii) MBS trustees, like The Bank of New York Mellon ("BNYM"), at some time in the future. FNBR Br. 11-15.

Their arguments find no support, however, for they are belied by record facts, binding Circuit precedent (that Objectors ignore), and litigation realities.

### 1. Claims and Entities Not Alleged in a Complaint Nonetheless May Be Released Under the "Identical Factual Predicate" Doctrine

It is beyond cavil that a release can be broader than a complaint's four corners. As this Court explains, "'[t]he weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim "based on the identical factual predicate as that underlying the claims in the settled class action.'"" *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006); *accord Class Plaintiffs*, 955 F.2d at 1287. Other courts agree. *See, e.g.*, *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (courts "may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action"); *Williams v. GE Capital Auto Lease*, 159 F.3d 266, 274 (7th Cir. 1998) (stating the rule, and citing *Class Plaintiffs* and *TBK Partners*

approvingly).  Importantly, "[a] class settlement may also release factually related claims against parties ***not named as defendants***."  *Reyn's*, 442 F.3d at 748.[17]

The record here comports with that "weight of authority" noted by *Reyn's*. Potential claims against ratings agencies pertaining to the Certificates necessarily would be based on the same underlying factual predicates as Plaintiffs' claims against Countrywide.  *See, e.g.*, *Luther*/CD1/Ex. 1:¶¶7-9, 152-174. Thus, the Settlement properly releases claims against these non-parties.  *Reyn's*, 442 F.3d at 748.

FNBR argue that Plaintiffs should have "evaluate[d] the liability or exposure of the various agencies" that rated the Countrywide MBS at issue in the Actions.  FNBR Br. 11.  However, such challenges to Plaintiffs' litigation strategy and decisions regarding which claims to assert – and against whom – are entirely improper and unsupported.  *Cf. Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987) ("mere disagreement over litigation strategy … does not, in and of itself, establish inadequacy of representation"); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 09 MDL 2058, 2010 U.S. Dist. LEXIS 37799, at *6 (S.D.N.Y. Apr. 9, 2010) (citing *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004) (class counsel has

---

[17]     Seeking to bar future suits based on released claims makes eminent sense, for otherwise a defendant "would be exposed to the same risks it had settled to avoid, through indemnification demands from third parties sued by class members seeking to impose liability arising from the same events and facts."  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 (9th Cir. 2012).

- 60 -

discretion to decide what claims to bring on behalf of the class and whom to name as defendants)). In addition, comparison to other actions against the rating agencies is inappropriate because they involve different types of claims and circumstances.

Claims against BNYM for its "failings as Trustee" (FNBR Br. 13) likewise would be based on the same factual predicate as Plaintiffs' settled claims. For example, allegations that a trustee failed to properly execute its duties and responsibilities in light of alleged misrepresentations contained in the offering documents would necessarily rest on the same underlying factual basis as Plaintiffs' claims in the Actions. Thus, the release is proper. *Reyn's*, 442 F.3d at 748.

FNBR completely ignore these record facts and authorities, including seminal decisions like *Reyn's*, *Class Plaintiffs*, or *Skilstaf*. The Objectors have thus failed to rebut the factual predicate doctrine's application here, and are foreclosed from belatedly asserting such arguments in their Reply Brief. *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009) (arguments "not raised clearly and distinctly in the opening brief" are waived).

At bottom, if FNBR truly regarded the Settlement's release language as improperly broad, they had a viable alternative: opt out of the Settlement, and pursue their own actions against the Defendants, as well as against the ratings agencies and trustees that they now assert they would (perhaps) like to sue in the future. *See, e.g.*, *Marshall*, 550 F.2d at 1177 (objectors-appellants "dissatisfied" with settlement's

- 61 -

terms "could opt out of the class"); *Mego*, 213 F.3d at 463 (non-favored class members free to opt out). [18]

### 2. Objectors' "No Consideration" Argument Fails

FNBR also carp that the Settlement's potential release of the ratings agencies and BNYM fails for a purported lack of "consideration" on BNYM's part. FNBR Br. 11, 15.

The Objectors' arguments are misplaced. There is no requirement that non-party entities contribute to a prior settlement in order to secure releases of potential future claims against them. *See, e.g.*, *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 949-50 (N.D. Cal. 2012) (rejecting argument that non-party entities cannot be releasees because they "did not bargain for any benefit in, nor contribute to, the settlement" releasing potential claims against them: "Plaintiffs cite to no authority for the proposition that Defendants must contribute to the settlement in order for the settlement to release them, and the Court finds no such rule."). Indeed, the very fact that a settlement may release factually related claims against parties ***not named as defendants*** in that action means, perforce, that those released entities may not have paid any consideration into the settlement.

---

[18]     Indeed, some putative Class members ***did*** opt-out of the Settlement (ER42), meaning they are not bound by the releases. Notably, at least one of them is represented by FNBR's counsel. CD587/42:22-43:9.

Objectors rely upon *Heuser v. Kephart*, 215 F.3d 1186 (10th Cir. 2000) to argue that a settlement agreement lacking consideration "is not enforceable" (FNBR Br. 11), but *Heuser*'s unsurprising observation is inapposite here. The *Heuser* court was criticizing a purported settlement in which one of the **settling sides** had advanced an "illusory promise" as its consideration. 215 F.3d at 1192. *Heuser* was not addressing a situation in which unnamed potential defendants may be protected by earlier settlements/releases in matters involving factually related claims. *Cf. Skilstaf*, 669 F.3d at 1016 (defendants in separate action protected by settlement language barring future suits against "'any other person'" based on released claims).

### 3. The District Court Was Not Required to Issue Written Rulings on Every Objection

FNBR incorrectly suggest that the Settlement's approval is infirm because the Final Approval Order did not expressly address their objection to the release's breadth. FNBR Br. 10 n.1. This Court has long held that in approving a class action settlement, a district court need not explicitly respond to every objection raised. *See, e.g.*, *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (rejecting objector's argument that reversal was warranted because "district court did not give an express, detailed response to the objections"); *Marshall*, 550 F.2d at 1179 (district court's failure "to give detailed responses to appellants' objections does not call for throwing out a settlement in a complicated lawsuit").

- 63 -

Rather, it is sufficient that the record reflects an objector's opportunity to be heard, and the court's consideration of his objections. *Cf. Zarowitz v. BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989). That opportunity and consideration occurred here, where the "release" objections enjoyed a generous airing – both in the parties' papers and at oral argument – and the Final Approval Order expressly noted that fact. ER43 ("[t]he Court has carefully considered and rejected each of the objectors' arguments").

## VII. CONCLUSION

The District Court's discretionary approval of the Settlement and Plan of Allocation should be affirmed.

DATED: August 25, 2014       Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
JOSEPH D. DALEY
THOMAS E. EGLER
SCOTT H. SAHAM
ASHLEY M. ROBINSON

_____

s/ Joseph D. Daley
JOSEPH D. DALEY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

- 64 -

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ
SHARAN NIRMUL
KIMBERLY JUSTICE
JENNIFER L. JOOST
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)

DEUTSCH & LIPNER
SETH E. LIPNER
1325 Franklin Avenue, Suite 225
Garden City, NY  11530
Telephone:  516/294-8899
516/742-9416 (fax)

THE MEHDI FIRM
AZRA Z. MEHDI
One Market
Spear Tower, Suite 3600
San Francisco, CA  94105
Telephone:  415/293-8039
415/293-8001 (fax)

COHEN MILSTEIN SELLERS
  & TOLL PLLC
STEVEN J. TOLL
JULIE GOLDSMITH REISER
JOSHUA S. DEVORE
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone:  202/408-4600
202/408-4699 (fax)

964871_1

COHEN MILSTEIN SELLERS
  & TOLL PLLC
JOEL P. LAITMAN
CHRISTOPHER LOMETTI
RICHARD SPEIRS
DANIEL B. REHNS
77 Pine Street, 14th Floor
New York, NY 10005
Telephone: 212/838-7797
212/838-7745 (fax)

Attorneys for Plaintiffs-Appellees

964871_1

## STATEMENT OF RELATED CASES
(Circuit Rule 28-2.6)

- *FDIC as receiver for Strategic Capital Bank v. Countrywide Financial Corp.*, No. 12-57299 (9th Cir.)

- *Western and Southern Life Ins. v. Countrywide Financial Corp.*, No. 12-57303 (9th Cir.).

- *FDIC as receiver for Security Savings Bank v. Countrywide Financial Corp.*, No. 13-56613 (9th Cir.).

- *FDIC as receiver for Guaranty Bank v. Countrywide Securities Corp.*, No. 13-56675 (9th Cir.)

- *FDIC as receiver for Strategic Capital Bank v. J.P. Morgan Securities L.L.C.*, No. 13-56781 (9th Cir.)

- *FDIC as receiver for Colonial Bank v. Countrywide Securities Corp.*, No. 13-56783 (9th Cir.)

- *American Fidelity Assurance Co. v. Countrywide Financial Corp.*, No. 14-55002 (9th Cir.)

- *The Prudential Life Insurance Co. v. Countrywide Financial Corp.*, No. 14-55660 (9th Cir.)

_____
s/ Joseph D. Daley
JOSEPH D. DALEY

964871_1

## RULE 32(a)(7)(C) CERTIFICATE

The undersigned counsel certified that PLAINTIFFS-APPELLEES' ANSWERING BRIEF uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,984 words according to the word count provided by Microsoft Word 2010 word processing software.

s/ Joseph D. Daley
_____
JOSEPH D. DALEY

964871_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Joseph D. Daley
JOSEPH D. DALEY

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: jdaley@rgrdlaw.com

964871_1