**Nos. 14-55093, 14-55120, 14-55121, 14-55122, 14-55125, 14-55128, & 14-55140**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND,
*Plaintiff-Appellee*,

and

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC.; CWALT, INC., a Delaware corporation; CWMBS, INC., a Delaware corporation; CWABS, INC., a Delaware corporation; CWHEQ, INC., a Delaware corporation; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; BANK OF AMERICA CORPORATION; NB HOLDINGS CORPORATION; J.P. MORGAN SECURITIES INC.; DEUTSCHE BANK SECURITIES INC.; BEAR STEARNS & CO., LP; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN SACHS & CO.; CREDIT SUISSE SECURITIES (USA), LLC; GREENWICH CAPITAL MARKETS, INC., AKA RBS GREENWICH CAPITAL; BARCLAYS CAPITAL INC.; HSBC SECURITIES (USA); BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH PIERCE FENNER & SMITH INCORPORATED; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR,
*Defendants-Appellees*,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First Pacific Bank of California, as Receiver for Affinity Bank, as Receiver for CF Bancorp, as Receiver for Citizens National Bank, as Receiver for Eurobank, as Receiver for First Banking Center, as Receiver for First Dupage Bank, as Receiver for Horizon Bank, as Receiver for Imperial Capital Bank, as Receiver for Independent Bankers Bank, as Receiver for Los Padres Bank, as Receiver for Palos Bank & Trust Co., as Receiver for Prosperan Bank, as Receiver for SCB Bank, as Receiver for ShoreBank, as Receiver for Statewide Bank, as Receiver for USA Bank, as Receiver for Venture Bank, and as Receiver for Warren Bank,
*Objector-Appellant*.

————————

On Appeal from the United States District Court for the Central District of California
The Honorable Mariana R. Pfaelzer, Nos. 10-302, 12-5122, 12-5125

————————

**REPLY BRIEF FOR OBJECTORS-APPELLANTS BRODERICK CDO 2 LTD., CIMARRON CDO, LTD., CRYSTAL COVE CDO, LTD., DUKE FUNDING IX, LTD., G SQUARE FINANCE 2006-1 LTD., HOUT BAY 2006-1 LTD., KLEROS PREFERRED FUNDING, LTD., MILLSTONE II CDO LTD., MILLSTONE III CDO, LTD., AND MILLSTONE IV CDO, LTD.**

————————

Counsel Listed on Inside Cover

DAVID J. GRAIS

MARK B. HOLTON

OWEN L. CYRULNIK

KATHRYN E. MATTHEWS

GRAIS & ELLSWORTH LLP

1211 Avenue of the Americas

New York, NY 10036

PAUL D. CLEMENT

  *Counsel of Record*

JEFFREY M. HARRIS

CANDICE C. WONG

BANCROFT PLLC

1919 M Street NW

Suite 470

Washington, DC 20036

(202) 234-0090

pclement@bancroftpllc.com

*Counsel for Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Broderick CDO 2 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Cimarron CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Crystal Cove CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Duke Funding IX, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

G Square Finance 2006-1 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Hout Bay 2006-1 Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Kleros Preferred Funding, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone II CDO Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone III CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Millstone IV CDO, Ltd. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 3

I.   The District Court's Standing And Tolling Rulings Precluded
     Certification Of A Settlement Class. ............................................... 3

     A.   The Standing and Tolling Rulings Created a Stark Conflict of
          Interest Within the Class. ..................................................... 4

     B.   The District Court's Adequacy and Typicality Rulings Are
          Flatly Inconsistent With Its Standing and Tolling Rulings. ................ 9

     C.   Opt-Out Rights, Media Attention, and the Involvement of
          Mediators Could Not Cure the Inherent Adequacy and
          Typicality Defects .............................................................. 13

II.  The Settlement Was Far From "Fair, Reasonable, And Adequate." ............. 15

     A.   The District Court's Approval of the Settlement as Fair Is
          Incompatible With Its Standing and Tolling Rulings. ........................ 15

     B.   The Settlement Is Unreasonably Low. ........................................ 18

III. The Standing And Tolling Rulings Were Fundamentally Flawed. ............... 21

     A.   The Standing and Tolling Rulings Are Relevant Because They
          Underscore the Magnitude of the Rule 23(a) and 23(e) Errors.
          ...................................................................................... 21

     B.   The Standing Rulings Are Untenable. ........................................ 22

     C.   The Tolling Rulings Are Untenable. .......................................... 25

CONCLUSION ....................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc*., 630 F.2d 1164 (7th Cir. 1980) ...................................................12

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)...........................................................................25

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...................................................................... *passim*

*Bates v. United Parcel Serv., Inc*.,
511 F.3d 974 (9th Cir. 2007) ............................................................10

*Burnett v. New York Central Railroad Co*.,
380 U.S. 424 (1965)...........................................................................28

*Catholic Soc. Servs. v. INS*,
232 F.3d 1139 (9th Cir. 2000) ..........................................................27

*Churchill Vill., L.L.C. v. Gen. Elec*.,
361 F.3d 566 (9th Cir. 2004) ............................................................16

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ...............................................................7

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977)...........................................................................11

*Ellis v. Costco Wholesale Corp*.,
657 F.3d 970 (9th Cir. 2011) ............................................................10

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*,
2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)....................................27

*Greenspun v. Bogan*,
492 F.2d 375 (1st Cir. 1974) .............................................................21

*Hatfield v. Halifax PLC*,
564 F.3d 1177 (9th Cir. 2009) ..........................................................27

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ................................................................16

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ..................................................................5

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009) ....................................................................5

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ..................................................................14

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ................................................................19

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ..................................................................16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ..................................................................22

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) ................................................................5

*Pickett v. Holland Am. Line-Westours, Inc.*,
35 P.3d 351 (Wash. 2001) ......................................................................21

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset
Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011) ..................................................................22

*Valenzuela v. Kraft, Inc.*,
801 F.2d 1170 (9th Cir. 1986) ..............................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ..........................................................................10

**Statutes and Rule**

15 U.S.C. § 77l(a) ..................................................................................24

15 U.S.C. § 77k.......................................................................................24

Fed. R. Civ. P. 23(e)(2) .............................................................................20

**Other Authorities**

Cornerstone Research, *Securities Class Action Settlements, 2013 Review and Analysis* ................................................................................20

7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1785.1 (3d ed. 1998) ...............................................................23

**INTRODUCTION**

Appellees' briefs strive to paint this case as just another class settlement resolving an ordinary assortment of litigation risks and uncertainties. Appellees repeatedly urge deference to the district court's ultimate approval of the settlement based on the court's evaluation of the risks and uncertainties posed by its standing and tolling rulings. According to appellees, the standing and tolling rulings merely reflect differences in the strength of class members' claims, and are not sufficient to defeat a finding of adequacy or typicality.

This, however, is no ordinary case. The standing and tolling rulings are fundamentally different in kind from a situation in which a merits ruling might inject some variation among the class in terms of the strength of class members' claims or the amount of damages to which each class member is entitled. To the contrary, the district court's highly dubious standing rulings pronounced named plaintiffs categorically *unable to represent* the vast majority of the class, much less fairly and adequately, and then its equally dubious tolling ruling deemed the vast majority of claims worthless. The court sharply restricted the named plaintiffs' standing to the specific tranches of residential mortgage-backed securities ("MBS") they had personally purchased, and then restricted the benefit of *American Pipe* tolling to the specific tranches of MBS that the 2007 *Luther* named plaintiffs had purchased. The net result was not just some minor factual variation among class members, but an

orphaning and evisceration of claims involving 98% of the tranches originally at issue in the case.

Precisely because the standing and tolling rulings created not just minor fault lines but glaring conflicts of interest, the district court was obligated to ensure that the interests of all class members were protected in settlement negotiations. But, remarkably, the same district court that reduced named plaintiffs to representing just 2% of the tranches in the class turned around and deemed those same named plaintiffs adequate and typical representatives of the *entire* class in the settlement. And then to complete its flip-flop-flip, the district court approved a blatantly lopsided allocation of settlement funds that directly reflects the standing and tolling rulings that rendered the class representatives inadequate stewards of the vast majority of the class, awarding the 2% of represented tranches 90% of the pie, and the 98% of unrepresented tranches only a 10% slice. The sense of whiplash—and reversible error—is unmistakable. But if named plaintiffs lacked Article III standing to represent 98% of the class, then they surely lacked standing to release their claims.

In the end, the district court's standing and tolling rulings created *per se* adequacy and typicality problems that foreclosed certification of the settlement class or, at a minimum, required separate representation for the class members who could not be represented by the named plaintiffs. The ultimate settlement that was reached

by the named plaintiffs only crystallized the flagrant conflicts of interests that should have precluded class certification in the first place.

## ARGUMENT

### I. The District Court's Standing And Tolling Rulings Precluded Certification Of A Settlement Class.

The judgment below rests on a stark contradiction that appellees do not come close to reconciling. The district court first held that the vast majority of the class had interests unrepresented by any named plaintiff with standing; in the district court's view, as a matter of fundamental Article III standing, named plaintiffs could represent only the small fraction of class members who had purchased the specific tranches that named plaintiffs purchased. It went on to issue a tolling ruling further exacerbating the conflict between the represented 2% and the vast majority of the class. The district court then turned around and held that the unrepresented 98% *were* adequately represented by the very named plaintiffs who lacked Article III standing to even represent them. Then to complete the circle, the district court approved a lopsided settlement that reflected the very standing and tolling rulings that created the massive conflict between the represented 2% and the vast unrepresented majority. Appellees strain mightily to harmonize the propositions and to will the conflict away, but their arguments are wholly without merit.

### A. The Standing and Tolling Rulings Created a Stark Conflict of Interest Within the Class.

The district court ruled that named plaintiffs had standing to represent only those investors that bought the same tranches of securities as themselves. The district court then held that the 2007 *Luther* putative class action, which raised essentially identical claims, tolled the statute of limitations only for those investors who had bought certificates in the same tranches as the *Luther* named plaintiffs. Those rulings eviscerated the claims relating to *98%* of the tranches at issue and rendered the class "representatives" quite literally unrepresentative of the vast majority of the class.

In an attempt to defend the adequacy of the subsequent "representation" leading to a lopsided, meager settlement for the 98%, appellees emphasize that named plaintiffs and their counsel had vigorously represented the whole class for years. *See* Pls.'-Br. 46; Defs.'-Br. 11. But their advocacy in the lead-up to the standing and tolling rulings that created the massive conflict is not at issue. What is at issue is the *aftermath*. From the standing and tolling rulings on, named plaintiffs and their counsel, whatever their best intentions, simply could not represent the vast majority of the class, much less represent them adequately or typically.

A standing defect creates a *per se* adequacy and typicality problem. Lack of standing does not merely go to the strength of a claim, but the very ability to advance that claim. This is categorically different from the other rulings, cited by appellees,

where surmountable variations in the strength of class members' claims did not create fundamental conflicts. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 814 (5th Cir. 2014) (no "fundamental conflict between the 'differently weighted interests' of class members from different geographical regions"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (no "'antagonistic interests'" between types of policyholders beyond their "'different percentages of the settlement monies'"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (no conflict between property-holders from Zones of varying proximity from oil seepage beyond differences in "extent of the pollution" and "damages"). Whereas geographical distinctions might make "'causation … more difficult'" to establish for some claimants, and distinctions between policyholders and property-holders may correspond with a different "extent of … injury," the difference between standing and no-standing is far more fundamental. 739 F.3d at 814; 579 F.3d at 272. The standing rulings here rendered named plaintiffs *unable to represent* certain class members, creating a radically more concrete disparity among class members.

Named plaintiffs unable to litigate claims are, by definition, unable to settle those claims. A party that lacks standing to vindicate claims equally lacks standing to release them. As the Supreme Court has specifically recognized, "[c]lass counsel confined to settlement negotiations could not use the threat of litigation to press for

a better offer" and thus were "disarmed." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997). Here, the district court believed that Article III *prohibited* named plaintiffs from litigating on behalf of investors in 98% of the tranches. According to the court, named plaintiffs "suffered no injury" from tranches they did not buy, ER92-94, did not "represent the interests" of those who did buy them, ER123, and had "no personal stake in the outcome" of those purchases, ER123-24. Indeed, those claims were treated as dismissed, and indeed dead.[1] Thus, named plaintiffs "*could not use the threat of litigation* to press for a better [settlement] offer" for the 98% of claims they could not even represent. Instead, they had every incentive to compromise the claims of absent members to "press for a better offer" for those plaintiffs they did actually represent. That is simply common sense. And it is a very real *structural* problem that none of appellees' protestations of good faith and good intentions can ultimately overcome.

Appellees' efforts to ignore the glaring conflicts created by the standing rulings fall far short. For example, appellees note that they maintained that the district court's rulings were erroneous and sought leave to appeal in *Maine State* (but

---

[1] In an attempt to minimize the impact of the district court's rulings, appellees note that the tranches in *Luther* and *Western Conference* had not yet been dismissed. Pls.'-Br. 50. But appellees themselves previously recognized that application of *Maine State* was preordained and that, in effect, only "58 tranches … are still 'live.'" Pls.' Memo Seeking Final Approval 28. The district court's approval order likewise assumed that only "58 'live' tranches" remained. ER24.

not in *Luther* or *Western Conference*). Pls.'-Br. 42-43. But vocalizing disagreement with a ruling that creates a glaring conflict is not enough to make the conflict go away. And in all events, actions speak louder than words and they never in fact appealed the rulings. Before the district court had even applied the standing rulings to *Luther* and *Western Conference*, named plaintiffs rushed to settle the claims in the narrow procedural interlude. They negotiated a settlement, moreover, that plainly reflected the rulings that gave rise to the conflict, allocating *90%* of the recovery to investors in the 2% of "Represented Tranches" and *10%* to the 98% of "Unrepresented Tranches." Notice of Settlement 5. Tellingly, named plaintiffs now parrot the district court's claim that Category Three's meager settlement was their "'best possible chance of obtaining any recovery.'" Pls.'-Br. 43. Their willingness to advance that claim while still purporting to adequately represent Category Three plainly illustrates the conflict. If the label of a "'fundamental'" conflict of interest is not appropriate in this extreme case, it is hard to imagine any case where it would apply. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Appellees also expend pages arguing that because leave to appeal was denied in *Maine State*, an appeal would require a long wait, and a long wait would entail risks. *See* Pls.'-Br. 37-40. But the risks were hardly uniform across the class. The 98% had everything to gain, and virtually nothing to lose, from an appeal. Conversely, the represented 2% (and in particular, the 0.6% facing neither standing

7

nor tolling obstacles) had little to gain from the appeal and thus only the downsides of delay. The specter of Countrywide's bankruptcy, far from justifying named plaintiffs' conduct, only *exacerbated* that conflict of interest; the 98% had reason to discount the bankruptcy risk and pursue the appeal, while the 2% and class counsel had every reason to take the bankruptcy risk to heart and forgo the appeal on the others' behalf. Thus, the upside and downside risks of appeal were just one more illustration of the glaring conflict created by the district court rulings.

The same conflict was front and center when it came to the pros and cons of settling in lieu of appeal. The named plaintiffs had everything to gain from settling immediately from their position of strength. They would benefit from any allocation of recovery predicated on the adverse rulings, and could exploit defendants' obvious interest in compromising the claims of the 98% before they could test the district court's dubious and devastating standing and tolling rulings on appeal. And named plaintiffs had little to no interest in awaiting an appeal because the very rulings to be appealed did not implicate them, while even a favorable appellate decision would only restore all class members to a level playing field.

In sum, the standing and tolling rulings immediately created a fundamental misalignment of interests in the class over how to proceed next. Contrary to appellees' suggestion, a district court ruling can create a conflict without attaining "appellate finality." Pls.'-Br. 50. Indeed, since all settlements precede an appealable

8

final judgment, appellees' view would perversely suggest that there is no such thing as a conflict of interest in settlement negotiations. As soon as the conflicts of interest became apparent, the named plaintiffs could not "act on behalf of a single giant class," *Amchem*, 521 U.S. at 626, and certification of the class was plainly inappropriate.

### B.    The District Court's Adequacy and Typicality Rulings Are Flatly Inconsistent With Its Standing and Tolling Rulings.

Rather than addressing these stark conflicts of interest by refusing to certify the proposed settlement class—or, at the very least, by creating subclasses and appointing separate representation—the district court tried to have it both ways. The same district court that held that named plaintiffs lacked Article III standing to represent 98% of securities at issue in the class deemed those same named plaintiffs adequate and typical class representatives under Rule 23(a). There is no way to harmonize the two positions, and appellees' efforts to do so fail.

Appellees first contend that standing and Rule 23 entail "conceptually distinct analyses" that can conceivably come out differently. Defs.'-Br. 22. That is true, but only because adequacy is *more* demanding. A named plaintiff with standing can still be an inadequate representative. But a named plaintiff without standing is no representative at all (and thus, necessarily inadequate and atypical). To be sure, the *district court* created problems here by conflating the two analyses. It failed to follow this Court's binding direction that "[i]n a class action, standing is satisfied if

9

at least one named plaintiff meets the requirements [of Article III]," and that whether a plaintiff may present claims on behalf of others with similar interests turns *not* on standing, but on typicality and adequacy. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011). Had the district court seen the "standing" issue for what it is—a Rule 23 issue—it would have either found named plaintiffs inadequate (consistent with its standing analysis) or adequate (consistent with its Rule 23 analysis); either way, it would have evaded the glaring inconsistency between its two analyses. But once it deemed the named plaintiffs unable to represent 98% of tranches based on the fundamental prerequisites of Article III standing, it could not possibly turn around and find them adequate representatives of all with typical claims.

Appellees' efforts to explain why a named plaintiff without standing to represent 98% of tranches could nonetheless be adequate and typical get nowhere. The whole point of Rule 23(a) is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). A named plaintiff who cannot represent most class members *at all* because of an Article III defect necessarily cannot represent them adequately. That is, if named plaintiffs "suffered no injury" from tranches they did not buy, ER92-94, and cannot "represent the interests" of those

who did buy them, ER123, they plainly do not "'possess the same interest and suffer the same injury'" as the rest of the class, as Rule 23(a) requires. *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). Nor can such class members be deemed "similar" enough, as appellees suggest, by virtue of common allegations (which, under *Dukes*, do not even necessarily suffice for commonality). *See* Pls.'-Br. 49; Defs.'-Br. 22-23 & n.13. Whatever minor dissimilarities are tolerated by Rule 23, they surely do not extend to dissimilarities deemed so significant that they rise to the level of a standing defect under Article III.

Appellees also assert that "if Named Plaintiffs were adequate and typical enough to appeal the standing rulings (as Objectors contend they should have done instead of settling), then they were necessarily adequate and typical enough to enter into a classwide settlement … for the Class." Defs.'-Br. 3-4. That argument is flawed at its premise. The fact that named plaintiffs could have appealed the standing rulings has nothing to do with their adequacy or typicality; it is a mere recognition of every litigant's basic entitlement to appeal any ruling, including one addressing standing. In all events, in light of the dilemma created by the district court's ruling, it is likely that the only step the named plaintiffs could take adequately and typically on behalf of the entire class was to appeal out of the district court whose standing ruling created the conflict. But if the conflict was so profound that named plaintiffs could not even do that, then the district court's ultimate adequacy and

typicality rulings are that much more flawed. Nor is it relevant that objectors believed that the district court ruling was wrong and that the named plaintiffs should have had standing to represent them. The *district court* obviously did not share that belief—and having so held, it could not turn around and tout the named plaintiffs' representativeness for purposes of adequacy and typicality.

Finally, appellees maintain that standing uncertainties should not preclude class settlement. But appellants have never contended otherwise. District courts can continue to approve class settlements that comport with Rule 23, even in the wake of a standing ruling that divides the class into haves and have-nots. The solution is to either approve a settlement of only the narrower set of claims adequately represented by existing counsel, or approve a settlement of all claims after providing separate representation to the absent class members. The district court here did neither, approving a settlement of all claims, even though the orphaned class members were deprived of the fundamental protections of Rule 23.

Appellees rely on *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164 (7th Cir. 1980), but that decision only underscores why their arguments are wrong. That case held that "[w]here … the jurisdictional question is not settled with finality, parties should not be forced to litigate the issue of jurisdiction if they can arrive at a settlement that is *otherwise appropriate* for district court approval." *Id.* at 1168-69 (emphasis added). That

settlement was "otherwise appropriate" because, for instance, objectors never claimed that the class members suffering the jurisdictional defect were inadequately represented or afforded unfair recovery. To the contrary, the district court *created a subclass* for those impacted and appointed separate counsel, who negotiated a substantial recovery for the subclass. *Air Line Stewards* thus confirms that the Rule 23(a) criteria must be satisfied notwithstanding any standing or jurisdictional uncertainties, and that those issues can be addressed by providing separate representation. In light of the standing and tolling rulings, the proper course was to simply deny certification of the proposed settlement class, but—at a minimum—the district court was obligated to ensure that the orphaned class members were represented by conflict-free counsel.

### C. Opt-Out Rights, Media Attention, and the Involvement of Mediators Could Not Cure the Inherent Adequacy and Typicality Defects.

The district court's standing and tolling rulings were fatal to certification of the settlement class because "the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is *to represent solely the members of their respective subgroups.*'" *Amchem*, 521 U.S. at 627 (emphasis added). Appellees nonetheless contend that separate representation was unnecessary in light of other "'structural assurances' of fair representation," Pls.'-Br. 44, but the purported protections they highlight are illusory.

13

Appellees primarily emphasize that class members "easily could have protected themselves" by opting out of the settlement class. Pls.'-Br. 41; Defs.'-Br. 17-19. But that gets matters backwards. The opt-out right is a fundamental component of every (b)(3) class that properly satisfies all the 23(a) and (b)(3) requirements. The opt-out right only arises after a (b)(3) class has been properly certified, so it is no answer to an adequacy or typicality problem that class members who are unrepresented or have atypical claims can always opt out.[2]

Nor were the other "structural assurances" appellees identify more robust. Neither "media attention" nor the assistance of independent mediators, Pls.'-Br. 44, was an adequate substitute for actual *representation* of the unrepresented class members. The mediators had to take the district court's standing and tolling rulings as a given. In fact, Judge Gertner's involvement in developing the plan of allocation commenced in June 2013, years after the *Maine State* rulings. Courts, moreover, have emphasized that even "highly respected and capable" mediators may provide "*some* 'structural assurance'" yet not "enough to satisfy Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011) (emphasis added).

---

[2] Appellees' claim that "many Class Members opted out," Defs.'-Br. 17, is at odds with the district court's finding that the opt-outs "represent[] only a small fraction of the class." ER43.

In the end, there is no justifying allowing the 2% of represented tranches to bind the 98% of unrepresented tranches through a global compromise that threw the latter under the proverbial bus. The standing and tolling rulings created not just minor factual variations, but *per se* adequacy and typicality problems that unequivocally rendered the named plaintiffs incapable of representing the majority of the class, much less doing so fairly and adequately. The settlement they negotiated, moreover, only crystallized the stark divisions between the represented and unrepresented—divisions that had nothing to do with actual strengths or weaknesses of plaintiffs' claims. Under this Court's "heightened" attention to whether "absent [class] members can fairly be bound by decisions of class representatives" in the settlement context, certification of the settlement class was plainly inappropriate. *Amchem*, 521 U.S. at 620-21.

## II. The Settlement Was Far From "Fair, Reasonable, And Adequate."

### A. The District Court's Approval of the Settlement as Fair Is Incompatible With Its Standing and Tolling Rulings.

As appellees concede, the district court applied a "'presumption of fairness'" in its Rule 23(e) analysis that this Court has never before acknowledged, much less applied to a settlement reached before formal class certification. Pls.'-Br. 53-54. Appellees likewise do not deny that the district court gave "great weight" to the opinion of named plaintiffs and their counsel that the settlement was fair. ER41. Appellees nonetheless maintain that the district court *did* apply the "even higher

level of scrutiny for evidence of collusion or other conflicts of interest" that this Court requires of pre-certification settlements. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). But no conception of scrutiny—let alone heightened scrutiny—could possibly entail affirmatively deferring to named plaintiffs who have been declared unable to represent 98% of tranches, much less pronouncing them "arms-length" negotiators whose plan should be presumed fair. ER35.

To be sure, "[d]istrict courts often hearken to their own adverse rulings" on the merits in evaluating the risks of continued litigation for Rule 23(e) purposes. Pls.'-Br. 54; *see, e.g., Churchill Vill., L.L.C. v. Gen. Elec*., 361 F.3d 566, 576 (9th Cir. 2004) (court had previously "concluded that the plaintiffs were unlikely to succeed on the merits"); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 375 (9th Cir. 1995) (court had previously "indicated that many defendants were 'probably going to win' on summary judgment"). But adverse *merits* rulings are fundamentally different in kind from adverse *standing and tolling* rulings. Hearkening back to standing and tolling rulings that determine that the named plaintiffs have no ability to even represent the 98% is hardly a promising basis for allowing them to compromise the claims of the unrepresented 98% for next to nothing.

Indeed, even erroneous standing and tolling rulings do not explain the disparate treatment of Categories Two and Three. If, as appellees concede, the only

distinction between Categories Two and Three was a standing handicap, their disparate recoveries make little sense. Precisely because the district court rendered tolling contingent on standing, any reversal on one front would bode a reversal on the other; the two were interdependent. Yet appellees and the district court apparently assumed that those appealing the tolling decision had a *six times* greater likelihood of success than those appealing the standing decision.[3] Category Two thus received, by even conservative estimates, *30 times* greater recovery than Category Three.

The standing and tolling rulings here underscore the adequacy and typicality problems and precluded approval of the settlement as fair. If the district court truly considered the possibility that its rulings were wrong, as appellees suggest, then the allocation of recovery among the three categories of claims was necessarily inequitable. There would certainly be no justification—other than the standing and tolling rulings—for treating Category Three claims as virtually worthless and far less valuable than Category One and Two claims. Conversely, if the district court considered its rulings to be correct, as the allocation strongly suggests, then Category

---

[3] Comparing the Category One and Two recoveries ($24.96 versus $4.75 per $1,000 initial certificate value of MBS, according to the settlement notice) suggests that the parties assessed a 19% likelihood of success for a tolling appeal. Comparing the Category Two and Three recoveries ($4.75 versus $0.16) suggests that the parties assessed an inexplicably lower 3% likelihood of success for a standing appeal.

17

Three class members were unrepresented by any named plaintiff with standing. And any settlement negotiated by unrepresentative representatives is necessarily unfair. Either way, this settlement cannot pass muster under Rule 23(e).

### B. The Settlement Is Unreasonably Low.

Even apart from the standing and tolling rulings, the settlement amount is not reasonable. Appellees hold up $500 million as a large number in the absolute, but that kind of high-level focus on "'aggregate interests of the entire class'" is precisely what the Supreme Court has cautioned against. *Amchem*, 521 U.S. at 627. A good deal for the class as a whole cannot justify an unfair deal for a discrete subgroup. Nor can a purported risk that disproportionately affects one subgroup (like Countrywide's threatened bankruptcy, which fell most acutely on the 2%) justify them selling out the interests of others.

What the aggregated $500 million sum elides is the radically unfair *allocation* of that amount to Category Three. For all of appellees' nitpicking over the total face amount of MBS and pro rata recoveries, the highly lopsided distribution of the recovery is not in dispute. Appellees nowhere deny that the overwhelming majority of relief went to the "Represented Tranches," while a vanishing fraction went to the "Unrepresented Tranches." To be sure, not every differential allocation renders a settlement unreasonable. *See* Pls.'-Br. 56-57 ("'A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.'"). But

the problem with predicating differential allocations on the distinction between a tranche's "represented" or "unrepresented" status is that it has nothing to do with the extent of plaintiffs' injuries from the alleged misconduct and everything to do with the rulings that gave rise to the adequacy problem in the first place.

For instance, appellees cite *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000), as a case where this Court approved a settlement that left a segment of the class—"Early Purchasers"—with no recovery. But that was a fair allocation precisely because the Early Purchasers *suffered no damages* and, in fact, *profited* from their Mego stock purchase; unlike "Late Purchasers," they purchased early on when prices were low and more than "recover[ed] their purchase price on the open market" as the Mego stock price rose. *Id.* at 461 n.2. Here, Category Three members have sustained damages every bit as significant as Category One and Category Two class members—damages certainly not reflected in the negligible fractions of recovery that they received under the plan of allocation.

Nor do appellees' different figures for the total face amount of MBS change this settlement's poor comparison to other MBS class settlements. Even adopting appellees' figure of $353 billion as the total face amount, the $500 million recovery reflects only 0.14% of the face value—still many orders of magnitude below the

average of 1.1% in recent settlements of securities-fraud claims involving MBS.[4] That comparison is of little surprise; after all, Countrywide was able to negotiate the release of claims arising from 9,383 tranches against a background assumption that only 2% stood any chance of recovery. Meanwhile, appellees' efforts to resist the comparisons by asserting "unique … standing and timeliness obstacles" in this case are untenable. Defts.-Br. 33. The existence of claims spanning different tranches— the predicate of the standing and tolling rulings—is inherent to every MBS class action (and is generally not thought to give rise to massive inequalities among the class).

The only thing unique here is the district court's potent combination of tranche-based standing and tolling errors. Correcting even just one of the district court's premises below would have dramatically altered the overall amount and allocation of the recovery. As it stood, the settlement was far from "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

---

[4] Even assuming a $353 billion face amount, $500 million is just 0.40-0.57% of the estimated damages (25-35% of the face amount). *Compare* Cornerstone Research, *Securities Class Action Settlements, 2013 Review and Analysis* 12 (7.4% of estimated damages was the median securities class settlement from 1996-2013 involving, as here, § 11 and § 12(a)(2) claims).

**III.   The Standing And Tolling Rulings Were Fundamentally Flawed.**

   **A.   The Standing and Tolling Rulings Are Relevant Because They Underscore the Magnitude of the Rule 23(a) and 23(e) Errors.**

Appellees unsurprisingly seek to wall off the district court's problematic rulings as "merits" questions so that this Court, like the mediators, must take them as a given. But that is not the law. The Rule 23(a) and Rule 23(e) errors are reversible error on their own. It is bad enough that the standing and tolling rulings created a massive conflict of interest between the named plaintiffs (and the lucky few who purchased in the same tranches) and the vast bulk of the class. But the fact that those rulings were erroneous does more than just add insult to injury. It renders the fact that investors in 98% of the tranches received fractions of a cent on the dollar entirely unfair, unreasonable, and inadequate. As the primary authority cited by appellees notes, "'[t]his is not to say that a reviewing court should not look to the merits of the Plaintiffs' case, but that review should be limited to assessing rough probabilities of success as they existed at the time of the settlement.'" Defs.'-Br. 36 (quoting *Pickett v. Holland Am. Line-Westours, Inc.*, 35 P.3d 351, 357 (Wash. 2001)); *see also Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) (generally, a "court … need not engage in a trial of the merits," but "when one side is so obviously correct in its assertions of law and fact … to approve the settlement would be an abuse of discretion"). The meritless standing and tolling rulings are obviously not correct and "to approve the settlement would be an abuse of discretion."

## B.     The Standing Rulings Are Untenable.

Named plaintiffs and the district court adopted an irrationally low assessment of the likely success of appealing the district court's standing rulings.  The district court's foundational premise that Article III standing barred named plaintiffs from representing investors that had purchased other tranches was deeply flawed.

Appellees paint *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), as an "outlier," Defs.'-Br. 37, but it is an outlier only in the sense that it is the first and only court of appeals decision to opine directly on the tranche-based standing theory endorsed by the district court.  Appellees do not dispute that the Second Circuit resoundingly rejected the district court's theory.[5]  Appellees thus contend that the Second Circuit's decision was wrong, arguing that *NECA* "conflates standing (whether the named plaintiff has been personally injured by the alleged misconduct) and class certification (whether that plaintiff can represent others who have the same claims)."  Defs.'-Br. 39.  As noted, however, the *district court*—not the Second Circuit—conflated the two by elevating a Rule 23 issue into a matter of Article III standing.  *See* 7AA Charles Alan Wright et al.,

---

[5] Appellees suggest that *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp*., 632 F.3d 762, 770 (1st Cir. 2011), "agreed with the district court," but it did not.  Defs.'-Br. 37.  The First Circuit, though not addressing tranche-based standing directly, suggested that named plaintiffs did have standing to sue on behalf of all tranches within the two trusts in which they had purchased.  *See* Opening Br. 50 n.7.

*Federal Practice and Procedure* § 1785.1 (3d ed. 1998) ("whether [representatives] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends *not on standing*, but on an assessment of typicality and adequacy") (emphasis added). Appellees' assertion that *NECA* allowed "'Rule 23 to trump Article III'" merely repeats that mistaken premise. Defs.'-Br. 39.

Appellees also argue that a tranche-based standing rule "makes good sense" because each tranche "'is backed by [a] different loan pool[] … and the representations made in the prospectus supplements about each certificate are therefore unique." Defs.'-Br. 37, 41. But this only repeats the district court's flatly mistaken factual premises. The district court wholly ignored the offerings in which many tranches were supported by a *single* loan group. *See, e.g.*, Prospectus Supplement, CWALT 2005-72 (single loan group supports 11 classes of certificates).[6] The district court's dismissal of those tranches, at a minimum, was error. More fundamentally, as *NECA* explained, even if each tranche *were* backed by different loan pools (which is not the case here), they would create variations only with respect to *damages*—not injury, and certainly not Article III injury. And as for

---

[6] No. 10-302, D.E. 273-2, Ex. B ("Alternative Loan Trust 2005-72 will issue thirteen classes of certificates …. The assets of the trust fund that will support both the offered certificates and other classes of certificates as described in this prospectus supplement will consist, on the closing date, of *a pool of mortgage loans* with an aggregate principal balance of approximately $741,706,622 ….") (emphasis added).

appellees' similarly inaccurate premise of "unique" representations, the representations here were near-identical, if not identical, across every offering document.

Ultimately, appellees' defense of tranche-based standing distills down to a statement that two district court opinions, including *one that NECA vacated*, adopted a similar view. Defs.'-Br. 42-43. Far from giving credence to the district court's "consideration of the litigation risks flowing from its standing and tolling rulings," Defs.'-Br. 36, that dearth of support for those rulings only underscores that the court's assessment of litigation risks badly missed the mark.

Meanwhile, appellees' numerous references to the district court's *statutory* standing ruling are a red herring. The district court's approach to statutory standing shared the same basic defect as its Article III ruling; it assessed as a statutory "standing" question what should have properly been considered a Rule 23 question. Sections 11 and 12 of the Securities Act provide causes of action to individuals who purchase securities that are the direct subject of the prospectus and registration statements. *See* 15 U.S.C. § 77k ("any person acquiring such security … may … sue"); § 77l(a) (seller "shall be liable …. to the person purchasing such security from him"). Named plaintiffs plainly had statutory standing to bring their claims. Whether they could raise the Securities Act claims of other class members in a class action was a question that should have been analyzed under the Rule 23 adequacy

24

and typicality rubric, which would have avoided the no-standing-to-represent-but-adequate-representative whipsaw created by the district court. *See supra*.

### C. The Tolling Rulings Are Untenable.

Named plaintiffs and the district court also adopted an irrationally low assessment of the likelihood of success for an appeal of the tolling rulings. But those rulings, which rendered the vast majority of class members' claims time-barred, were even more flawed than the district court's standing rulings.

Appellees double down on the district court's novel treatment of *American Pipe* tolling as not only contingent on standing, but as destroyed by *later-discovered* standing defects. The district court insisted that its *May 2011* tranche-based standing ruling meant that the vast majority of putative members of the *2007 Luther* class had suffered, unbeknownst to them, a standing defect that wiped out their heretofore perfectly reasonable reliance on *American Pipe*. That rule has nothing to recommend it. Certainly nothing in the *American Pipe* rule—that "the commencement of a class action suspends the applicable statute of limitations as to *all asserted members of the class* who would have been parties had the suit been permitted to continue as a class action"—supports that approach. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (emphasis added). And the possibility that the rug will be pulled out from asserted members of the class years later based on highly disputable standing principles eliminates all of the benefits the *American*

25

*Pipe* rule attempts to achieve. *American Pipe* depends on a reasonably ascertainable and enduring assurance that asserted members of a class need not rush out and file individual actions to avoid a time bar. The district court's standing exception to *American Pipe* eviscerates the rule. That is not something a district court gets to do to a well-settled Supreme Court rule.

Appellees attempt to defend the district court's approach to tolling as making good policy sense.[7] They posit, for instance, that it prevents "'attempts to circumvent the statute of limitation by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule.'" Defs.'-Br. 49. Presumably such blatant circumvention efforts would not long survive and so any tolling period would not be long lived. But in all events, the uncertainty injected by the district court rule would eviscerate the driving policy behind *American Pipe* identified by the Supreme Court—efficiency of the litigation process—by requiring class members to file protective suits in any case where standing could even plausibly be contested.

---

[7] Appellees' contention that courts lack the "'constitutional power'" to toll a statute of limitations for a plaintiff without standing, Defs.'-Br. 49, only compounds the court's error in dressing up a Rule 23 issue as an Article III defect. In any event, a district court does not modify a statute of limitations simply by recognizing that the running of that statute has been tolled.

Appellees seek to soften those perverse consequences by noting that the district court "did acknowledge that '[i]n certain cases, where the standing of an original class action plaintiff is a matter of bona fide dispute, it may well be unfair to subsequently bar plaintiffs who reasonably-but-mistakenly relied on that plaintiff to represent their interests.'" Defs.'-Br. 50. But appellees inadvertently underscore the incoherence of the district court's own reasoning, for *in their very next* paragraph, they note the "split of authority" over the "tranche-based standing" ruling. Defs.'-Br. 51. By their own acknowledgement, then, the *Luther* standing defects *were* a matter of "bona fide dispute." *Compare FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *9 (C.D. Cal. Nov. 21, 2012) (district court below describing *Luther* as an "*abusive* … lawsuit" based on theory that *Luther* named plaintiffs lacked tranche-based standing) (emphasis added).

For similar reasons, appellees cannot distinguish the many cases where this Court has applied tolling despite jurisdictional defects with the original named plaintiffs. *See Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009); *Catholic Soc. Servs. v. INS*, 232 F.3d 1139 (9th Cir. 2000); *Valenzuela v. Kraft, Inc.*, 801 F.2d 1170 (9th Cir. 1986). In those cases, the Court emphasized that class members had a good-faith belief that the statute of limitations was tolled. Here too, class members could have reasonably relied on *Luther* to protect their interests. Appellees attempt to draw a distinction, arguing that the jurisdictional defects all arose "*after* the class was

certified," whereas here plaintiffs "'never had standing.'" Defs.'-Br. 51 n.28. In fact, however, the jurisdictional defects in *Hatfield* and *Valenzuela* existed from the start so the courts there likewise "never had" jurisdiction. Meanwhile, the *Luther* plaintiffs' supposed standing defects, far from being obvious from the case's inception, were not identified until the district court issued its tranche-based standing ruling years after the fact. There is ultimately no way to distinguish those analogous cases, confirming that *Luther* should have tolled the statute of limitations for all putative class members.

Finally, appellees' effort to defend the district court's sweeping dictum that *American Pipe* tolling does not apply to state-court actions involving purely federal claims falls flat. Appellees maintain that *American Pipe* was concerned with "avoid[ing] inefficiencies in the *federal* courts." Defs.'-Br. 45. Those are precisely the inefficiencies that the district court's rule would invite. If the statute of limitations is *not* tolled by the filing of a state-court class action involving purely federal claims, class members would be forced to saddle the *federal courts* with individual claims under the very same federal statutes. Moreover, although the facts of *American Pipe* involved sequential federal suits, it relied on *Burnett v. New York Central Railroad Co.*, 380 U.S. 424 (1965)—a case that tolled a statute of limitations based on, as here, a federal suit originally brought in a state court.

\* \* \*

At bottom, the district court's standing and tolling rulings were fundamentally flawed. Even appellees readily concede that these rulings were "uncertain[]" and subject to splits of authority. *E.g.*, Defs.'-Br. 23. But that only goes to show that the named plaintiffs and the district court dramatically overstated the risks to plaintiffs of further litigation at the point of settlement. The core premises enshrined in the distribution of recovery among the three categories of claims were deeply flawed and would almost certainly have been overturned on appeal. Correcting even just one of the district court's many mistaken premises would have had far-reaching consequences on both the overall amount and allocation of the settlement.

## CONCLUSION

For the reasons set forth above, this Court should reverse the judgment below.

Respectfully submitted,

DAVID J. GRAIS
MARK B. HOLTON
OWEN L. CYRULNIK
KATHRYN E. MATTHEWS
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, NY 10036

s/PAUL D. CLEMENT
PAUL D. CLEMENT
 *Counsel of Record*
JEFFREY M. HARRIS
CANDICE C. WONG
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Objectors-Appellants Broderick CDO 2 Ltd., Cimarron CDO, Ltd., Crystal Cove CDO, Ltd., Duke Funding IX, Ltd., G Square Finance 2006-1 Ltd., Hout Bay 2006-1 Ltd., Kleros Preferred Funding, Ltd., Millstone II CDO Ltd., Millstone III CDO, Ltd., and Millstone IV CDO, Ltd.*

October 8, 2014

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7).  The brief, excluding exempted portions, contains 6,966 words, as calculated by Microsoft Word 2013, and is printed in a proportional Times New Roman font at 14 point.

Dated: October 8, 2014

<u>s/Candice C. Wong</u>
Candice C. Wong

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October, I electronically filed the foregoing Appellants' Reply Brief with the Clerk of Court of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which provides electronic service of the filing to all counsel of record who have registered for ECF notification in this matter.

<u>s/Candice C. Wong</u>
Candice C. Wong